## IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT TENNESSEE

Mark Clayton,

*Plaintiff,*

v.

No.

Lauren Hogan, Glenn Funk, Amy Hunter, Tom Palko, John Honeysucker, Kimberly Hayes, Hall Balthrop, Cyrus Toosi, Scott Potter, Fox News Channel 5 Nashville, Bill Young, Tom Lawless, Paige Burcham Dennis, Metropolitan Nashville Government, Metro Nashville Water Services,

*Defendants.*

### Complaint – Jury Demand

### Parties

1. Plaintiff Mark Clayton is a citizen of the United States and is currently a resident of Davidson County Tennessee.

2. Tom Palko was at all times pertinent was a supervisor with the Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff.

3. John Honeysucker was at all times was a supervisor with Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff.

4. Kimberly Hayes was at all times relevant was an employee with Nashville Metro Water Services. She interfered with Plaintiff's attempts to get relief with regards

to his bridge being eroded and she was named in the bill of particulars in the malicious prosecution against Plaintiff.

5. Hal Balthrop was at all times relevant was a supervisor with Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff.

6. Cyrus Toosi was at all times relevant was an employee with Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff.

7. Scott Potter was at all times relevant was the director of Nashville Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded

8. Glenn Funk was at all times relevant the District Attorney for Davidson County. Based on a statement by Lauren Hogan, his office directed her to prosecute Plaintiff for harassment against employees of the Metro Water Services even though she felt the charge lacked merit because his office resented Plaintiff calling them as opposed to Plaintiff calling Metro Water Services.

9. Lauren Hogan at all times relevant worked as a prosecutor for the Davidson Count District Attorney's Office. She pursued a prosecution against Plaintiff that she knew lacked merit. She also acted as a complaining witness by falsely asserting in her Bill Of Particulars words that Plaintiff did not actually say.

10. Amy Hunter at all times relevant worked as the supervisor of Lauren Hogan and instructed her to prosecute Plaintiff without probable cause.

2

11. Fox News Channel 5 Nashville is a news organization in Nashville, Davidson County TN. The printed a libelous account of Plaintiff's attendance at a Tennessee Registry of Election Finance where they falsely asserted that Plaintiff was "rambling" and didn't make it clear whether he was there for or against Councilman Jonathan Hall. Plaintiff clearly stated his purpose was to support Mr. Hall. They also repeated the allegation made that Plaintiff had made "threatening accusations" prior to the meeting without printing Plaintiff's denial of that claim in the meeting or the fact that he called them before printing to explain his side of the story.

12. Bill Young is a member of the Tennessee Registry of Election Finance that stated that they had taken "the unusual step of requesting a trooper attend the meeting."

13. Tom Lawless is a member of the Tennessee Registry of Election Finance and the one said "That's it. You're dismissed." and dircted the state trooper to have Plaintiff removed from the meeting.

14. Paige Burcham Dennis is a member of the Tennessee Registry of Election Finance and falsely asserted that Plaintiff had called and made "threatening accustions" prior to the meeting.

15. Metro Nashville Government is the government for Davidson County Tennessee and all defendants are connected as agents in some capacity.

16. Metro Nashville Water Services is the water department for Davidson County Tennessee.

## Jurisdiction

### I  Federal Question Jurisdiction

17. This court has jurisdiction of this action pursuant to Article III, section I of the Constitution of the United States and 28 U.S.C. §§ 1331, 1332, 1343 et seq and 1367 (supplemental jurisdiction and 42 U.S.C. § 1988 et seq. This action is filed pursuant to 42 U.S.C. § 1983 to obtain redress for the deprivation of rights guaranteed to the Plaintiff by the due process clause and the equal protection clauses of the fourteenth amendment and the fourth amendment to the United States Constitution, as applied to the states via the selective incorporation doctrine, and the common law of Tennessee and the Tennessee Constitution.

### II  Supplemental Jurisdiction

18. Plaintiff also invokes the supplemental jurisdiction of the United States District Court for common law and statutory state tort claims.

19. According to *Monroe v Pape*, federal court action is appropriate "when the State governments criminally refuse or neglect those duties which are imposed." *Monroe v. Pape*, 365 US 167, 233 (1961). The third aim of 42 U.S.C. § 1983 is "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Id.* at 174.

20. The email record shows that employees of Metro Nashville Government conspired together at every turn to prevent Plaintiff from having due process in exercising his legal rights.

21. When Plaintiff persisted in asserting his rights, Defendants conspired with the Metro Nashville District Attorney's Office to pursue criminal prosecution against Plaintiff for harassment of employees of Metro Water Services when the District Attorney's Office knew there was no basis for a criminal prosecution but pursued

4

the claim anyway because Plaintiff called the DA's office complaining about civil rights violations against black politicians and other matters.

## Venue

22. Venue is proper under 28 U.S.C. § 1391(a) because, all of actions relevant to this matter took place in Davidson County Tennessee and all Defendants live and/or do business in Davidson County Tennessee.

23. On all counts, throughout the entire process, senior policy makers were deliberately indifferent and/or participated in not only tortious but also civil rights violations against Plaintiff.

## Background Facts

24. Plaintiff initially had a good working relationship with Metro government services.

25. An example of this is in February 2011, he was able work with Jada Rosenberry and Jennifer Hill to get a stump removed from the stream running through his property.

26. This process involved the Davidson County Sheriff's Department, Metro Water Services, Mayor's Office and the Metro Nashville Davidson County government as a whole.

27. This stump was in the same area as the 2016 erosion damage and stump Plaintiff later complained about but without the same satisfactory result.

28. In 2012 Plaintiff became the Tennessee Democratic party nominee for U.S. Senate, much to the displeasure to some of the the Tennessee Democratic Party Executive Committee. In 2014, Mark Clayton obtained an order from the United

States Sixth Circuit Court of Appeals outlining the "public function test" which mandated the standard of review for when the Tennessee Democratic Party Executive Committee is a public and not a private organization, which both the Tennessee Democratic Party Executive Committee state actors acting under color of law have contemptuously failed to comply. The Defendants in this case are also offended by Mark Clayton's political success and have organized these actions against Mark Clayton.

29. Kimberly Hayes sent email on 5/3/2016 about Mark Clayton calling again regarding "closed service requests" numbered 269615 and 434232, and she attached a voicemail where Plaintiff threatened to sue. Theresa Constonis, attorney for Metro Nashville, was copied on the email.

30. On 5/5/2016, Randal Moore sent pictures of Plaintiff's driveway for investigation requested by Brenda Haywood to Felicia Page.

31. On 5/5/2016, John Honeysucker sent an email to Rickey Smith and Tom Palko asking for someone to investigate Plaintiff's issue as then councilwoman Brenda Haywood had asked him to investigate it.

32. On 5/6/2016 Tom Palko sent an email to Ricky Smith and Felecia Page asking to set Plaintiff's matter for investigation as his home was "close to the creek in a valley section" and there was "not much room for the road, creek and home."

33. Brenda Haywood told Plaintiff he should talk to John Honeysucker because he (Mr. Honeysucker) could help resolve Plaintiff's issue.

34. On 6/29/2016, John Honeysucker sent Plaintiff his contact information.

35. On or about 6/29/2016, Plaintiff, Brenda Haywood and John Honeysucker had dinner together so that Plaintiff could have an opportunity to discuss with Mr. Honeysucker the issues he was having with flooding and erosion at his property.

6

36. On 7/11/2016, John Honeysucker sent Plaintiff a text message stating:

> This is written notice asking you not to continue harassing me by way of calling my phone.

37. Mr. Clayton then responded by stating:

> "I did not harass you. You will receive a cease and desist letter for multiple violations of Tennessee Code. I have your text from June 29 with your information and have patiently waited over a month for you to contact me. Today you refused to hand over engineering reports and if you do not cease and desist from slandering me I will then sue you. I will also seek an indictment against you for official oppression."

38. On 7/11/2016, Rachel Nolan of Metro Legal sent an email to Felecia Page, subject "4948 Laws Rd" asking her to sent "everything you have for this address."

39. On 7/19/2016, Felecia Page sent an email to Rachel Nolan confirming "It was delivered to the Legal Department at the Metro Courthouse."

40. On 1/9/2017, Kelly Biggs sent an email to "MWS Sw Rom Inquires" stating that a customer "is being sued by neighbor over culvert" and he (the customer) "has questions about why it is not in compliance and how to fix the issue." The customer was identified as Joey Dixon.

41. On 4/14/2017, Rachel Nolan (Metro Legal) sent an email to Felecia Page (MWS) asking about the status of the 2016 investigation of 4940 Laws Road.

42. On 4/17/2017, Felecia Page responded to Rachel Nolan saying "This service request has been closed" without giving any explanation for the closure.

7

43. On 4/17/2017, Tom Palko sent an email to Rachel Nolan (MWS), stating "We did not investigate again in 2016." If further clarified "The work we did upstream did not adversely affect his property. His driveway is his responsibility. We have closed out this request."

44. The email from Tom Palko on 4/17/2017 did not at all address the issue that Plaintiff raised in 2016 regarding the culvert Mr. Dixon put in downstream, despite the fact that Mr. Dixon inquired about that on 1/9/2017.

45. On 11/2/2017, Erin Williams (Mayor's Office), sent an email to Leoncio Dominguez (MWS) stating that Plaintiff had come by the office the previous day, posted a video. (That video was of the office visit). She stated that Plaintiff had alleged intimidation by the mayor's office regarding a drainage issue and she asked for an "update on his case."

46. In that video, Plaintiff pointed out that Sean Braisted was in the office but "stuck his head out" and then disappeared. Plaintiff asserted that what was happening to him was "official oppression" from Mr. Braisted, Detective Michael Dixon and Mayor Mega Barry were misusing their office to intentionally flood his property by allowing his neighbor to violate the law and dam a stream which resulted in the flooding of his property. Detective Michael Dixon had not disclosed his connection with the mayor's office and they were intimidating his councilwoman and neighbors and threatening them and defaming Plaintiff.

47. On 11/2/2017, Leoncio Dominguez forwarded Erin Williams' email to Tom Palko and Ricky Swift and them to "provide Erin with any updates we may have on Mr. Clayton's request."

48. On 11/3/2017, Tom Palko sent a email to Erin Williams regarding the investigation into Plaintiff's complaint about his property being flooded. Mr. Palko *only*

8

talked about the upstream issues from the culverts the MWS put in for Plaintiff's neighbor and he totally ignored issues brought before him regarding Plaintiff's neighbor downstream having put in an unpermitted culvert that was damming the creek and causing Plaintiff's property to flood. Further in this same email, Tom Palko referred to the waterway that flows through Plaintiff's property as a "creek" which should have prompted him to look into the local, state and federal regulations for changing the water flow of a creek as was done with Plaintiff's neighbor's construction. Lencio Dominguiez, Rickey Swift and Rymond Bogle were copied on this email.

49. On 11/7/2017, Tom Palko sent an email to Renee Jackson, subject "RE: 4956 Laws Rd" where he said "Are they going back with essentially the same size or is larger? The guy downstream (Mark Clayton) thinks we are sending him more water. Water flows downhill and I want the water under the road and not over it."

50. On 11/8/2017, Tom Palko sent an email to Sonia Allman (MWS), subject "FW: Mark Clayton" where he says "This guy is very aggressive. The video shows what I am referring to." Scott Potter was copied on that email.

51. On 11/8/2017, Tom Palko sent an email to Erin Williams, subject "Mark Clayton" where he stated "You may be hearing from him again. Some time ago we replaced 2 driveway pipes above him." And he added "This may be the project he is referring to in his video." In the video in question, the Plaintiff clearly talked about the neighbor downstream from him being allowed to dam up the water with an illegal culvert and *not* about the upstream issue.

52. On 11/9/2017, Tom Palko sent an email to Erin Williams and Billy Fields subject "Mark Clayton - Laws Road" where he stated that Plaintiff "has made contact with our contractor" and that "We will have a police officer on site throughout the

9

remainder of this project." He talked about "replacing a failed pipe" and "We are not adding any runoff to Mr. Clayton's property." Once again Mr. Palko redirected attention from Plaintiff's real concern, his neighbor downstream being allowed to have an illegal culvert installed that was flooding his property, and he was purposefully and dishonestly portraying Plaintiff as somehow being dangerous. Leoncio Dominguez, Sonia Allman, Scott Potter, Renee Jackson and Ricky Smith were copied on this email.

53. The truth is that Plaintiff only contacted said contractor by phone to inquire why Metro Water Services seemed willing to deal with other issues on his road, but seemed unwilling to deal with the flooding problem caused by his neighbor's illegal culvert. Plaintiff never threatened the contractor and nothing he did justified the expense of hiring a police officer to be onsite on the project.

54. On 11/9/2017, Tom Palko sent an email to Walker Bloodworth, subject "FW: Mark Clayton - Laws Road" were he stated they were "going to pay for the police officer for this project" and "We see it as a necessary part of this particular job."

55. On 11/9/2017, Christina Binkley sent an email to Tom Palko stating that "Amanda has been made aware of the situation" and she was going to "look up the SEU rates so that we can get an estimate." Amanda Deaton-Moyer was copied on that email.

56. On 11/9/2017, Tom Palko sent an email to Christina Brinkley (MWS) subject "Mark Clayton - Laws Road" that stated "Thank you for making this easy." Amanda Deaton-Moyer was copied on this email.

57. 11/9/2017, Christina Brinkley sent an email to Tom Palko, subject "RE: Mark Clayton - Laws Road" stating that the "hourly rate was $74.50 or approximately $3,000 weekly." Amanda Deaton-Moyer was copied on this email.

58. On 11/9/2017, Tom Palko sent an email to Christina Binkley subject "RE: Mark Clayton - Laws Road" stating he was "ok with increasing the existing PO" and "Hopefully we won't have this issue on future projects." Amanda Deaton-Moyer was copied on this email.

59. On 11/9/2017, Tom Palko sent an email to Renee Jackson, subject "RE: Mark Clayton" stating that "Walker said they would pay for the police officer, but I think it is necessary and have no problem with us covering the cost."

60. On 11/9/2017, Renee Jackson sent an email to Walker Bloodworth (Walker Building Group", subject "RE: Mark Clayton" asking him to "Please bill us for the uniformed police officer." Tom Palko was copied on that email.

61. On 11/19/2017, Roger Lindsey sent an email to Tom Palko, Kimberly Hayes, Rickey Swift, Renee Jackson and Matthew Tays subject "Video from Remnants of Harvey." The email identifies a video that Plaintiff took before the Davidson County grand jury on a direct presentment. Mr. Lindsey points out that Plaintiff's main issue is the "'illegal' culvert downstream." For the first time in any emails Plaintiff has received, someone from Metro Water Services actually does some kind of analysis regarding the Plaintiff's neighbors culvert, however that analysis did not satisfy Federal or Tennessee state law.

62. On 1/4/2018, Catina Jordan (MWS) sent an email to "MWS SW Rom Inquiries" subject "4956 Laws Rd" where she stated that a James Dotson had called to complain about a culvert that had eroded and collapsed.

63. On 1/23/2018, Rhonda Moore sent an email to Renee Jackson that James Dotson had called again because no one had contacted him about his request, that he was going to call his attorney if the request was not resolved, and that he had contacted their contractor, the Walker Group. This contact of a contractor by Mr.

Dotson does not appear to have resulted in the hiring of a police officer as was the case with the Plaintiff.

64. On 2/2/2018, John Honeysucker send an email to Steve Mishu (MWS), Charissa Mishu (MWS), Kimberly Hayes (MWS), Christian Thompson (MWS), and copied Hal Balthrop (MWS), Jim Snyder (MWS), Tom Palko (MWS), Ricky Smith (MWS), Peggy Deaner (MWS), Teresa Lyons-Oten (MWS), Leoncio Domingues (MWS) and Sonia Allman (MWS). In that email he stated "AFter consulting with Theresa Contonis (Legal), Please advise that any and all inquiries from Mark Clayton be directed to legal Department immediately."

65. On 2/2/2018, Ricky Swift (MWS) forwarded John Honeysucker's email about forwarding all inquires from Plaintiff to legal services to Felecia Page (MWS), Kendra Turner (MWS), Rhonda Moore (MWS), Chad Diehl (MWS), Jackson Renee (MWS), Mikey Jackson (MWS), Randal Moore (MWS), Matthew Pickett (MWS), Matthew Tays (MWS), Casey Cooper (MWS) and Kareem Bonugli (MWS).

66. On 3/12/2018, Catina Jordan sent an email to "MWS SW Rom Inquiries" subject "4956 Laws Rd" stating that James Dotson had called to inquire about repairs to be done to his yard after culverts were replaced. This shows that MWS were cooperating with Mr. Dotson even though he had contacted their contractor directly and had threatened legal action.

67. On 6/6/2018, Erin Williams (Mayor's Office) sent and email to Tom Palko, John Honeysucker and Leoncio Dominguez, subject "Mark Clayton", where she said that Plaintiff had come back to her office, said he had been aggressive previously, and was concerned, among other things, that that had "gotten in the way of him getting service that he believes that he is owed" and that he had been directed to only contact Metro Legal. He asked her to help him move forward to get answers

to his concerns. She asked in the email if there was "any particular person in legal" that she should contact.

68. On 6/6/2018, Tom Palko sent an email to Erin Williams, John Honeysucker and Leoncio Dominguez subject "Mark Clayton. He stated "We have investigated his property on more than one occasion and have closed out those requests. His issues are private property issues that we cannot address. He lives in a valley with a creek running through his property that floods during heavy rains. We can't fix that." Note that MWS had the authority to address Plaintiff's neighbor's illegal construction.

69. On 6/6/2018, Erin Williams sent an email to Tom Palko, John Honeysucker and Leoncio Dominguez subject "RE: Mark Clayton" that stated "Right. The conversation we had this week was focused primarily on the issue with his neighbor that you referenced in the email you attached. He believes that Mr. Dixon altered the culvert in a way that has substantially increased flooding on his property, causing damage to his driveway. Has that part of his complaint been addressed before? I haven't read through all of the old emails I have, but I don't see a response to that in the ones I've checked or in the one you attached. Thanks for dredging (see what I did there?) this up again, so I can respond." Erin pointed out that Tom didn't actually address the issue Plaintiff was raising.

70. On 6/6/2018, Tom Palko sent an email to Erin Williams stating "That was very clever." He went on to say that "If he is talking about his neighbor downstream we did look at that and determined there was nothing for us to do. It was not a new construction. The top of the pipe and driveway is at least 4 feet lower than his driveway. In the flood videos he showed there was not 4' of water flowing over that pipe which means it was not an impact for his property." First there is no indication that Tom Palko or anyone else at MWS addressed the issue until after

Plaintiff did a direct presentment to the Davidson County grand jury. Prior to that, every time Plaintiff brought up the issue of the neighbor downstream, Tom Palko would redirect the conversation to the *upstream* issues that were talked about back in 2011. Second, when the downstream neighbor's culvert was put in back in 2011, it was done in violation of Nashville Metro Codes and Federal and Tennessee state law. MWS had the authority to require the neighbor to remove the culvert and put it back in legally, but actively refused to exercise that authority. Lastly, the "analysis" that Tom Palko mentions was never turned over to Plaintiff and it is directly contradicted by un-rebutted expert testimony which was put in case against his downstream neighbor in Davidson County Chancery Court.

71. Further, in his lawsuit against his downstream neighbors, Plaintiff submitted a report from hydrological engineer John Dewall which asserted that the construction of the causeway would cause flooding.

72. Plaintiff was arrested on April 23, 2019 on a charge of harassment against certain employees of Metro Water Services.

73. When Plaintiff finally received the Bill Of Particulars from Lauren Hogan, all the evidence showed was a quote where Lauren Hogan false claimed Plaintiff said he was "coming after" Tom Palko, a record of several other calls and voicemails left with Metro Water Services, and an email meme of a picture of Hall Balthrop and another unknown individual.

74. Plaintiff's first two criminal defense attorneys tried to pressure him to take a deal that would include an admission of guilt but Plaintiff refused.

75. Plaintiff's third attorney filed a motion to dismiss based on Plaintiff's lawful purpose in contacting MWS.

76. Plaintiff also filed through his attorney a motion for the Davidson County District Attorney's Office to be disqualified from prosecuting him.

77. Plaintiff also filed through his attorney a motion to reveal all evidence in the indictment against Plaintiff.

78. The Davidson County District Attorney's Office did not respond to any of those motions and case against the Plaintiff was ultimately dismissed.

79. Councilman Jonathan Hall was on Plaintiff's witness list in his criminal case and also in the civil case against his downstream neighbors.

80. Mr. Hall was fined an exorbitant amount for campaign finance mistakes.

81. Plaintiff, on information and belief, asserts that this was retaliation against Mr. Hall for being a named witness for Plaintiff.

82. Plaintiff, on information and belief, is aware of other council persons who contacted Mr. Hall concerned that they would be hit with the fallout of the election commission going after Mr. Hall as they made similar mistakes but those concerns never materialized which is more evidence that Mr. Hall was singled out.

83. On or about May 17, 2022, Plaintiff attended a meeting with the Tennessee Registry of Election Finance in support of Mr. Hall.

84. Plaintiff called the office for the Tennessee Registry of Election Finance prior to the meeting to explain that he was coming in support of Mr. Hall.

85. At the meeting Plaintiff was interrupted by Paige Dennis by her making a false asserting, in the form of a question, that Plaintiff made "threatening accusations" in his call to the Tennessee Registry of Election Finance office.

86. Plaintiff made no threats against anyone in his call to the Tennessee Registry of Election Finance.

87. Bill told News Channel 5 that they had taken the "unusual step" of making sure a state trooper was present.

88. Tom Lawless ultimately directed the state trooper to have Plaintiff removed from the meeting.

## Causes Of Action

### I   Malicious Prosecution

89. The elements of malicious prosecution are "(1) a prior suit or judic a motion to dismiss based on the fact that Plaintiff had a lawful purposedial proceeding was instituted without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in plaintiff's favor." *Roberts v. Federal Exp. Corp.*, 842 SW 2d 246, 248 (Tenn 1992).

90. The Tennessee Supreme Court has held that "the existence of probable cause is a question (1) unrelated to a prosecutor's subjective belief, and (2) properly decided by a jury." *Id.*

91. Malice can be shown by "lack of probable cause" or "want of reasonable grounds for prosecution as the circumstances appeared to the prosecutor. . . or as they would have appeared to a person of ordinary circumspection and diligence." *Perry v. Sharber* , 803 S.W.2d 223, 225 (Tenn. Ct. App. 1990).

92. "Any improper motive is sufficient to constitute malice when malicious prosecution is charged." *Lawson v. Williamson*, 447 S.W.2d 369, 374 (Tenn. 1969).

93. Under Tennessee law "abandonment or withdrawal of an allegedly malicious prosecution is sufficient to establish a final and favorable termination so long

as such abandonment or withdrawal was not accompanied by a compromise or settlement, or accomplished in order to refile the action in another forum." *Christian v. Lapidus*, 833 S.W.2d 71, 74 (Tenn. 1992).

94. Plaintiff was arrested on April 23, 2019 on a charge of harassment against certain employees of Metro Water Services.

95. Plaintiff refused multiple settlement offers presented by attorneys Jordon Sluder and Byron Pugh.

96. Plaintiff, after having to put pressure on Byron Pugh to diligently represent him, received a bill of particulars signed by DA Lauren Hogan where she falsely claimed Plaintiff stated he was "coming after" Tom Palko, when those were not Plaintiff's actual words as recorded on the voicemail.

97. Plaintiff ultimately retained the services of attorney John Tennyson, after attorney Byron Pugh stated he was told to withdraw from the case by the Tennessee Board Of Professional Responsibility.

98. Attorney John Tennyson filed a motion to dismiss and a motion to have the Davidson County District Attorneys Office barred from prosecuting the case.

99. During one of the court hearing days, Lauren Hogan stated in front of John Tennyson that she did not want to even pursue the case against Plaintiff for so called harassment of Metro Water Services but did so because Plaintiff has called the DA's office on multiple occasions pressuring the DA's office take legal actions Plaintiff believed were in the public interest.

100. Ultimately John Tennyson had to step down from representing Plaintiff because the Tennessee Board Of Professional Responsibility suspended him over CLE and over a billing matter with another client in a different state.

101. Neither the Tennessee Board Of Professional Responsibility nor the criminal trial court gave Plaintiff any assistance in finding a new attorney despite the TBPR having told attorney Byron Pugh, himself a former Nashville/Davidson District Attorney, to withdraw from the case and then proceeded to expedite proceedings to suspend and then ultimately, in late December 2021, to disbar attorney John Tennyson, specifically with the motive to hinder Mark Clayton's cases as well as civil rights cases for black Tennesseans which John Tennyson was winning at the time – the same said civil rights cases which are known by all parties to be supported and managed by Mark Clayton.

102. Attorney Cesar Arbelaez, who was not even an attorney of record for Mark Clayton in State v. Clayton, and who like Byron Pugh was also a former Nashville/Davidson district attorney who had been fired for public racist comments when he had refused an offer by Glenn Funk to allow Cesar Arbelaez resign, filed what came to be a stricken motion to withdraw, which motion was filled with salacious and untrue lies about Mark Clayton. Attorney Cesar filed the document attacking his own firm's client, Plaintiff, right before the State v. Clayton the second and latter time which the State v. Clayton trial was scheduled to begin.

103. Honorable Monte Watkins allowed Mark Clayton's defense attorneys at Byron Pugh legal office and the law office of Dunham and Jones, both firms which were paid in full, to withdraw without cause (Byron Pugh withdrew by contested court order with no Rule 47 particularity and Dunham and Jones constructively withdrew by taking Mark Clayton's money and then firing John Tennyson for helping Mark Clayton) and forced Plaintiff to file pleadings without an attorney making Mark Clayton a victim of 5th and 6th Amendment violations of his civil rights.

104. The state failed to respond to motion to dismiss, motion to disqualify the district attorney office, and motion to unseal the indictment procedings for approximately three (3) months. Ultimately, Honorable Judge Monte Watkins dismissed State v. Clayton.

## II   Slander And Libel

105. The tort of defamation covers both libel and slander. *Brown v. Christian Brothers Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013).

106. "A libel action involves written defamation and a slander action involves spoken defamation." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 820 (Tenn. 1994).

107. "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Id.*

108. "To establish a prima facie case of defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Brown*, 428 S.W.3d at 50.

109. Publication means the communication of the defamatory matter to a third person. *Id.* To be actionable, the alleged defamatory statement must constitute a serious threat to the plaintiff's reputation.

110. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation. *Id.*

111. On May 18, 2022 Plaintiff attended a meeting with the Tennessee Election Registry Board over an exorbitant fine filed against Councilman Jonathan Hall.

19

112. Mr. Hall was on Plaintiff's witness list as a defense witness in his criminal prosecution case.

113. Plaintiff believed the high fine was retaliation and witness intimidation against Mr. Hall.

114. On May 17, 2022 Plaintiff made one phone call to the Tennessee Election Registry Board to find out particulars regarding the meeting. On that same day May 17, 2022 one day prior to the meeting for the Tennessee Election Registry Board attacking Jonathan Hall, while going for a leisurely walk and talking through his earpods, in one single phone call, Mark Clayton called the Tennessee Election Registry Board staff receptionist to inform that not only himself Mark Clayton wished to testify as an interested party and an Interpleader, but black supporters of Jonathan Hall from Memphis wished to drive in and testify as well, in part, that the policy of Paige Burcham Dennis (Mark Clayton stated that he did not recall her name), who is white, to inflict the "maximum" penalty of $10,000 against Jonathan Hall per alleged violation resulting in a $360,000 unfair fine was meant to arouse invidious racial discrimination and to create a chilling effect against black voters and black candidates.

115. A representative from the Tennessee Election Registry Board then immediately called Jonathan Hall to ask if he knew the Plaintiff and Jonathan Hall answered that he did know Plaintiff and that the Plaintiff would be a favorable witness on Jonathan Hall's behalf the next day at the May 18, 2022 hearing.

116. At the meeting itself, on May 18, 2022 Paige Burcham Dennis, accused Plaintiff of making threats, when nothing of the sort had ever happened, and when as a matter of law and fact, Mark Clayton informed the Tennessee Election Registry Board that he had not only defeated the State in State v. Clayton over similar false allegations, but that the entire Nashville/Davidson District

Attorney's office agreed in State v. Clayton to be disqualified as prosecutors against Mark Clayton over Mark Clayton's unrebutted and sworn allegations that the entire Nashville/Davidson County prosecutor had violated the Klu Klux Klan Act against minorities.

117. At the meeting itself, on May 18, 2022 Tom Lawless personally ordered the pre-meditated false arrest/imprisonment of Mark Clayton. Tom Lawless took this action as a state actor in his individual capacity under color of law in conspiracy with Tom Lawless, Paige Burcham Dennis, and Bill Young. This action deprived Mark Clayton of his civil rights.

118. On May 18, 2022 immediately following the Tom Lawless, Paige Burcham Dennis, and Bill Young slander and false arrest/imprisonment of Mark Clayton, during the continuation of the official proceeding celebrated and discussed their actions against Mark Clayton.

119. During the Tom Lawless, Paige Burcham Dennis, and Bill Young celebration which followed the slander and false arrest/imprisonment of Mark Clayton, Hank Fincher registry member stated of the false arrest of Clayton "Another satisfied customer" and then stated that the individual members of the Tennessee Election Registry Board had, in fact, 1) physically removed Mark Clayton from the meeting and that 2) Hank Fincher also said that he could not remember anyone else ever having been treated this way by the Election Registry.

120. Prior to the meeting itself, on May 18, 2022 Tom Lawless, Paige Burcham Dennis, David Golden, Tom Mortono, and Bill Young, conspired in their individual capacity to slander and use the slander as a false pretext to conspire with a state trooper to false arrest/imprisonment Mark Clayton.

121. At least two (2) Member's of the Nashville/Davidson District Attorney office were at the Tennessee Election Registry Board meeting on May 18, 2022. During his testimony, Mark Clayton stated while pointing back to these two unknown individuals and stated that Jonathan Hall was on Mark Clayton's witness list and was a key witness. Mark Clayton also stated that the Nashville/Davidson District Attorney office is already disqualified from bringing the trumped up election finance charges against Jonathan Hall as a means to intimidate a witness, which is a possible crime, to prejudice the case of State v. Clayton which the Nashville/Davidson District Attorney office lost anyway.

122. The two (2) Member's of the Nashville/Davidson District Attorney office, as officers of the court, failed and refused to comply with Rule 10 to report these possible violations to the appropriate authorities and instead participated in the false arrest/imprisonment of Mark Clayton, who reasonably apprehended force from the state trooper and involuntarily left the public meeting.

123. This meeting took place after Plaintiff had the previous harassment charges against him dismissed, and the Tennessee Election Registry Board knew this from Mark Clayton's formal testimony.

124. Plaintiff informed the meeting participants that the previous case of harassment was dismissed and that there was no merit to the failed, abandoned, and dismissed State v Clayton allegations of harassment.

125. Nashville Fox Channel 5 attended the May 18, 2022 Tennessee Election Registry Board meeting and videotaped the entire event.

126. A Tennessee state trooper forcibly ejected Mark Clayton from the meeting against Mark Clayton's will.

127. In addition to having stated the same during his testimony which News Channel 5 recorded, Plaintiff also contacted News Channel 5 immediately after the May 18, 2022 Tennessee Election Registry meeting and let them know that the allegations of having made any threats were false, but News Channel 5 that night both printed and televised repetition of the slander in multiple parts of the same story that Plaintiff was ejected from the meeting for harassment and made no qualifying statement.

128. Mr. Sam Stockard who was in attendance wrote on his blog that the meeting participants talked for (unspecified amount of time) longer than the actual interaction between Mark Clayton and the Tennessee Election Registry Board regarding Plaintiff being ejected.

**III   False Imprisonment**

129. The elements of false imprisonment are "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Id.* at 54 quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn.1990).

130. According to the Tennessee statute, removal[1] also constitutes false imprisonment. *Id.* § 39-13-302

131. "In order to constitute an unlawful imprisonment, where no force or violence is actually employed, the submission of the plaintiff must be to a reasonably apprehended force." *Newsom v. Thalhimer Bros., Inc* ., 901 S.W.2d 365, 367 (Tenn. 1994).

132. On May 18, 2022, Plaintiff attended a public election finance hearing where in support of Councilman Jonathan Hall who was also on Plaintiff's witness list in his criminal and civil case.

---

[1] "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a)

133. Prior to the meeting, Plaintiff made one phone call the Tennessee Election Registry Board and informed her that he was coming to the meeting and explained to her his position that Mr. Hall was being unfairly targeted due to being on Plaintiff's witness list and that the fine being levied against Mr. Hall was out of line with actions taken or not taken against other campaigns with similar infractions.

134. Plaintiff has been made aware of off the record communications among councilmen who were not punished to the same extent that they were concerned that the punishment against Mr. Hall would spill over to them as well. Plaintiff intends to subpoena them for deposition to put those conversations on the record.

135. As Plaintiff began to speak, members of the committee began shouting over him and Paige Burcham Dennis falsely accused Plaintiff of having made threats.

136. As a result of this false accusation, Plaintiff was forcibly ejected from the meeting by a Tennessee State Trooper.

137. The submission of the Plaintiff was to the reasonably apprehended force by the state trooper.

138. The removal of the Plaintiff was involuntary.

139. The Plaintiff had the right to be at the meeting within the sole discretion of his liberty

140. The Plaintiff chose to be at the meeting and not to leave.

### IV   Intentional Infliction Of Emotional Distress

141. Under Tennessee law "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized

society; and (3) the conduct complained of must result in serious mental injury."
*Bain v. Wells*, 936 SW 2d 618, 622 (Tenn. 1997).

142. The conduct Plaintiff is complaining about was intentional and it is not tolerated by civilized society as shown by the fact that Tennessee has laws that criminalizes such conduct.

## A. Outrageous Conduct Shown By Official Oppression Through Malicious Prosecution

143. Tennessee's "official oppression statute" puts criminal liability on "a public servant under color of law" who "Intentionally subjects another to mistreatment or to arrest, detention, stop, frisk, halt, search, seizure, dispossession, assessment or lien when the public servant knows the conduct is unlawful." T.C.A. § 39-16-403(a)

144. Based on Lauren Hogan's own statement, Glenn Funk and Amy Hunter initiated a prosecution against Plaintiff for supposedly harassing employees of Metro Water Services when they were in fact upset at Plaintiff for lawful communication with the District Attorney's Office.

145. The Bill Of Particulars filed by Lauren Hogan identifies Tom Palko, Kimberly Hayes, Hall Balthrop and Cyrus Toosi as being involved in the initiation of the prosecution of Plaintiff.

## B. Outrageous Conduct Shown By Official Oppression Through Denial Of Equal Protection And Due Process

146. Tennessee's "official oppression statute" puts criminal liability on "a public servant under color of law" who "Intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity, when the public servant knows the conduct is unlawful."

147. Tennessee's "Bill Of Rights For Permit Applicants" requires, among other things, that 1) "the permitting process under this chapter should be a predictable, ordinary process for the benefit of the commissioner and permit applicants alike", 2) " the permitting process under this chapter should be susceptible to easy public review and scrutiny", 3) "permitting process under this chapter should afford applicants basic due process, including notice of application defects, timely review of applications, and prompt and meaningful administrative and judicial review of permitting decisions." *Id.* 69-3-141

148. The Tennessee Constitution guarantees "equal privileges and immunities for all those similarly situated." *Tennessee Small School Sys. v. McWherter*, 851 SW 2d 139, 152 (Tenn: Supreme Court 1993)

149. Due process under the U.S. Constitution also requires equal protection for similarly situated individuals. *Teague v. Lane*, 489 US 288, 300 (1989).

150. Kimberly Hayes showed contempt for Plaintiff's rights as a permit applicant under Tennessee Law when Plaintiff described to her a hypothetical construction of a causeway with culvert across the stream and she told him that "of course" that would need a permit, but when she realized that Plaintiff was talking about his neighbor's downstream causeway that was built without permit she reversed her position, thus violating Plaintiff's equal protection rights under the Tennessee and U.S. constitutions by treating him different from a similarly situated person.

## C.  Outrageous Conduct Shown By Perjury

151. Tennessee's perjury statute includes "a false statement, not under oath, but on an official document required or authorized by law to be made under oath and stating on its face that a false statement is subject to the penalties of perjury." T.C.A. § 39-16-702.

26

152. Under the Tennessee Rules Of Criminal Procedure, "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." T.R.Cr.P. 7

153. Lauren Hogan in a Bill Of Particulars attributed to Plaintiff words he did not in fact say, the false statements were intentional and a Bill Of Particulars is an official statement signed by an attorney which is required to be true.

### V Violation Of 42 U.S.C. § 1983

154. Plaintiff incorporates by reference all paragraphs under the headings "Outrageous Conduct Shown By Official Oppression Through Malicious Prosecution", "Outrageous Conduct Shown By Official Oppression Through Denial Of Equal Protection" and "Outrageous Conduct Shown By Perjury."

155. The elements of 42 U.S.C. § 1983 are 1) a plaintiff has been denied a constitutional right and 2) that deprivation has happened under the color of law. *Adickes v. SH Kress &Co.*, 398 US 144, 188 (1970) By the statute, color of law means any "color of any statute, ordinance, regulation, custom, or usage." *Id.* at 213 The Supreme Court has held that custom only takes the force of law "by virtue of the persistent practices of state officials." *Id.* at 230.

156. the "custom" language was included in 42 U.S.C. § 1983 because "because of the persistent and widespread discriminatory practices of state officials" and

157. Under *Monell*, "a public official may be held liable in damages when his actions are found to violate a constitutional right and there is no qualified immunity". *Monell v. New York City Dept. of Social Servs.*, 436 US 658, 707 (1978).

158. Municipalities generally cannot be held liable for action of employees but "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official

policy, inflicts the injury that the government as an entity is responsible under § 1983."

159. That same principal "also applies to a local government when implementation of its official policies or established customs inflicts the constitutional injury." *Id.* at 708.

160. "The text of the statute purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997).

161. "The coverage of the statute is thus broader than the preexisting common law of torts. We have nevertheless recognized that Congress intended the statute to be construed in the light of common-law principles that were well settled at the time of its enactment." *Id.*

162. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law" counts as color of law. *United States v. Classic*, 313 US 299, 326 (1941).

163. On of the aims of 42 U.S.C. § 1983 "was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice" so that plaintiffs would have a remedy "against those who representing a State in some capacity were unable or unwilling to enforce a state law." *Monroe*, 365 US at 172, 174.

164. Malicious prosecution is an actionable claim under 42 U.S.C. § 1983. *Esmail v. Macrane*, 53 F. 3d 176 - Court of Appeals, 180 (7th Cir. 1995).

165. When using malicious prosecution for a 42 U.S.C. § 1983 claim, it's not enough to show lack of probable cause as for the malicious prosecution claim itself, but

also to show there was a "spiteful effort" to "get" the plaintiff "for reasons wholly unrelated to any legitimate state action." *Id.*

166. For the purposes of 42 U.S.C. § 1983, there can be a "class of one" because "classifications should be scrutinized more carefully the smaller and more vulnerable the class is." *Id.*

167. Prosecutors have absolute immunity from suit under 42 U.S.C. § 1983 "when performing the traditional functions of an advocate." *Kalina*, 522 U.S. at 118.

168. However, prosecutors do not have absolute immunity when "acting as a complaining witness rather than a lawyer." *Id.* at 119.

169. The malicious prosecution of Plaintiff goes above and beyond mere absence of probable cause to "spiteful effort" to "get" Plaintiff "for reasons wholly unrelated to any legitimate state action" as shown by Lauren Hogan stating she didn't want to pursue the harassment case regarding Metro Water Services but did so from pressure by her superiors who didn't like him calling the DA's office.

170. Lauren Hogan does not have absolute immunity because she acted as a complaining witness when she put words in the mouth of Plaintiff saying he said he was "coming after" Tom Palko when those are not the words on the recording.

171. Actions taken by Kimberly Hayes, Tom Palko and others to thwart Plaintiff's ability to exercise his rights on the the Permit Applicant's Bill Of Rights constitutes a violation of his due process rights under 42 U.S.C. § 1983.

172. Prosecuting Plaintiff for protected political speech from the email "meme" that he sent to voicemails and calls that he made for the purpose of pressuring the Metro Water Services to actually do their job is a violation of Plaintiff's First Amendment rights of free speech and right to petition the government for redress and is therefore actionable under 42 U.S.C. § 1983.

173. Multiple city officials have shown a custom of abuse of the constitutional rights of Plaintiff shown through emails directing others not to talk to Plaintiff, through a prosecutor being directed to prosecute Plaintiff against her better judgment and through Kimberly Hayes reversing court on the requirement of a permit once she realized to whow she was talking.

WHEREFORE Plaintiff prays for the following relief:

1. declaratory and injunctive relief

2. Service of process be executed upon all named defendants.

3. A trial by jury to determine liability and the extend of damages.

4. Return of Plaintiff's property and monetary damages.

5. Economic and non-economic damages for intentional infliction of emotional distress, reckless infliction of emotional distress, humiliation, depression, anxiety, low quality of life, mental suffering, anguish of the mind, emotional anguish, trauma and apprehension, property and income loss, expenses for medical and psychological rehabilitation, suffering and physical pain and sickness, damage to property, loss of earning capacity and violations of civil rights which either may or may not be torts and actual damages related thereto.

6. Punitive damages.

7. Pre and post judgment interest.

8. Any further such relief this Court may find appropriate.

Respectfully Submitted,

 s/ John Drake

John Drake (BPR No. 03502)
(615) 810-6645
jmdrakelaw@gmail.com

**Verification**

I, Mark Clayton, after having been duly sworn according to law, hereby depose and state that the facts and statements in the foregoing Complaint are true and correct to the best of my information, knowledge and belief.

_____
Mark Clayton

Sworn and subscribed before me this the 17 day of November 2022.

_____
Notary Public

My Commission Expires: 11/6/2024