# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

MARK CLAYTON,                                )
                                             )
    Plaintiff,                      )
                                             )
v.                                           )    **Case No. 3:22-cv-00936**
                                             )    **Judge Aleta A. Trauger**
LAUREN HOGAN *et al.*,                       )
                                             )
    Defendants.                     )

## MEMORANDUM

Plaintiff Mark Clayton, through an attorney, filed an initial Complaint (Doc. No. 1) that

has now been superseded by a First Amended Complaint ("FAC") (Doc. No. 5), in which he asserts

various state and federal claims against three distinct sets of defendants, each of which has now

filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b). (Doc. Nos. 31, 35, 37.)[1]

The plaintiff has responded in opposition to each of these motions, and he has also filed a Motion

to Strike (Doc. No. 58) a reply brief filed by one set of the defendants, as well as a Motion for

Leave to File Second Amended Complaint (Doc. No. 48). The court addresses each of these

motions herein.

## I.    THE METRO DEFENDANTS' MOTION TO DISMISS AND THE PLAINTIFF'S MOTION TO STRIKE

### A.    Factual Allegations

This case arises out of the plaintiff's interactions with employees of several different state

---

[1] Two defendants named in the original Complaint (Metro Water Services and Fox News Channel 5 Nashville) were terminated with the filing of the FAC, which did not name them. The claims against a third defendant, Stephanie Durman, were nonsuited in May 2023. (*See* Doc. No. 47.)

and municipal agencies. The first distinct set of defendants identified in the FAC is comprised of the Metropolitan Government of Nashville and Davidson County ("Metro") (identified in the FAC as "Metropolitan Nashville Government") and six employees of Metro Water Services ("MWS"), a department of Metro: Tom Palko, Kimberly Hayes, Hal Balthrop, Cyrus Toosi, John Honeysucker, and Scott Potter (collectively with Metro, the "Metro Defendants"). The individuals are all sued in both their individual capacity and official capacity. (FAC ¶¶ 2–7.) The factual allegations in the FAC concerning these defendants and the claims asserted in the FAC are as follows.[2]

Generally, the plaintiff alleges that, sometime in 2016, after experiencing flooding and erosion issues on his property following the installation of an allegedly illegal culvert by his downstream neighbors, the Dixons, he turned to MWS to help mitigate the problem. (FAC ¶¶ 25, 27.) MWS, however, failed to adequately address his problem. (*Id.* ¶¶ 27, 30.) Because of MWS's failure to address his situation, the plaintiff "threatened to sue," apparently in a voicemail message left with MWS (*Id.* ¶ 30.)

On May 3, 2016, defendant Hayes sent an email identifying the plaintiff's two service requests as "closed," to which she attached the plaintiff's voicemail in which he threatened to sue. (*Id.* ¶ 31.) The plaintiff does not identify to whom Hayes sent the email, but he states that Councilwoman Brenda Haywood reached out to MWS on May 5, 2016 in an attempt to help the plaintiff resolve his issues. The next day, due to Haywood's request, defendant Honeysucker, in his capacity as an MWS supervisor, sent an email to Palko, also a supervisor, asking someone to

---

[2] As the defendants point out, the FAC is not a model of clarity, and it is not always apparent which claims the plaintiff intended to assert against which defendants. The court, like the defendants, has endeavored to understand the pleading but declines both the defendants' invitation to dismiss the FAC for "obfuscation" and the plaintiff's suggestion that the defendants' motions be construed as motions for a more definite statement.

investigate the plaintiff's issue. (*Id.* ¶¶ 39–40.) Palko emailed two other MWS employees, asking them to investigate. (*Id.* ¶ 41.)

Several weeks later, upon Haywood's suggestion that Honeysucker might be able to help him, the plaintiff had dinner with Haywood and Honeysucker so that plaintiff could discuss his issue with Honeysucker. Honeysucker gave the plaintiff his contact information around that time. (*Id.* ¶¶ 42–44.) However, on July 11, 2016, less than two weeks later, Honeysucker sent the plaintiff a text message asking him "not to continue harassing me by way of calling my phone." (*Id.* ¶ 45.) The plaintiff responded that he had not harassed Honeysucker, accused Honeysucker of violating the law and slandering the plaintiff, and threatened to sue him for slander and to seek a criminal indictment for "official oppression." (*Id.* ¶ 46.) Shortly thereafter, acting upon a request from "Metro Legal," MWS sent "everything [it] ha[d]" related to the plaintiff's address to the "Legal Department at the Metro Courthouse." (*Id.* ¶¶ 47–48.)

Beginning in early 2017, apparently as a result of the plaintiff's lawsuit against his downstream neighbors, the Dixons, Metro Legal made inquiries with MWS about its investigation of the plaintiff's complaint about the Dixons' allegedly illegal culvert. In April 2017, Tom Palko responded for MWS that its investigation was closed and that the work *MWS* had done *upstream* of the plaintiff's property had not adversely affected the plaintiff's property. The plaintiff points out that this email did not address the plaintiff's complaint about the problem caused by the Dixons *downstream* from his property. (*Id.* ¶¶ 49–53.)

In November 2017, an individual from the Mayor's Office contacted MWS to report that the plaintiff had visited the Mayor's Office the previous day claiming "intimidation by the mayor's office regarding a draining issue" and requesting an update on the status of his case with MWS. (*Id.* ¶ 54.) The plaintiff apparently videotaped the visit and then posted the video online. (*See id.*)

Palko responded to the inquiry but again incorrectly described the plaintiff's complaint as involving an issue with work MWS had performed upstream of his house, ignoring the issue with the Dixons and their "unpermitted culvert." (*Id.* ¶ 56.)

Later the same month, MWS was doing some work on a property upstream from the plaintiff's property but on the same road. The plaintiff references numerous emails from Tom Palko describing the plaintiff as "aggressive" or "very aggressive," based on the video the plaintiff had posted, and continuing to incorrectly state that the plaintiff had a problem with an upstream installation, even though the video to which Palko referred clearly depicts the plaintiff talking about his issue with his downstream neighbors' culvert. (*Id.* ¶¶ 57–59.) Palko also noted that the plaintiff had contacted MWS's "contractor." (*Id.* ¶ 60.) The plaintiff states that he "only contacted the said contractor . . . to inquire why Metro Nashville seemed willing to deal with other issues on his road, but seemed unwilling to deal with the flooding problem caused by his neighbor's illegal culvert." (*Id.* ¶ 61.) Rather than ever dealing with the plaintiff's actual problem, MWS employed a police officer to be onsite while MWS was performing work upstream of the plaintiff's property, allegedly because MWS feared interference by the plaintiff. The plaintiff references numerous communications between various MWS employees about this decision. (*Id.* ¶¶ 62–68.) One individual, Roger Lindsey, sent an email to various other MWS employees, referencing the plaintiff's video and correctly recognizing, for the first time, that the plaintiff's "main issue" was the illegal culvert downstream from his property. (*Id.* ¶ 69.)

The plaintiff references an issue that one of his neighbors had with a collapsed culvert in January 2018, about which the neighbor complained and threatened a lawsuit. These threats, however, did not result in the hiring of a police officer. (*Id.* ¶¶ 70–71.)

In February 2018, John Honeysucker notified other MWS employees that any and all future inquiries from the plaintiff should be directed to Metro Legal. (*Id.* ¶ 72.)

In June 2018, Palko sent an email to Erin Williams in the Mayor's Office, copied to several others, stating that MWS had "investigated [the plaintiff's] property" but that his "issues are private property issues that we cannot address." (*Id.* ¶ 74.) Palko again failed to recognize the plaintiff's actual issue that, according to the plaintiff, MWS did have the authority to address. (*Id.*) Williams responded, asking whether MWS had ever addressed the plaintiff's issue with his downstream neighbor, which was the main issue the plaintiff had discussed with her in a conversation that week. (*Id.* ¶ 75.) Palko responded, incorrectly, according to the plaintiff, that MWS had looked at that issue but that "there was nothing for us to do. It was not a new construction." (*Id.* ¶ 76.) According to the plaintiff, MWS "simply didn't want to address" his concerns. (*Id.* ¶ 77.)

The plaintiff does not discuss additional communications between him and MWS that took place after June 2018. Nor, in fact, does it appear that any of his claims against the MWS employees are related to the above-referenced interactions between the plaintiff and MWS. He alleges, however, that the "DA's office sent 5 (five) police cars to arrest Plaintiff on April 23, 2019, on a charge of harassment against employees of [MWS]." (*Id.* ¶ 79.) These charges were eventually dismissed (as discussed below in connection with the claims against employees of the District Attorney's Office), but MWS "never addressed [the plaintiff's] issues at the property, and the problem remains to date." (*Id.* ¶ 82.)

The court construes the FAC as articulating "Causes of Action" under state law for (1) malicious prosecution; (2) defamation in the form of libel, slander, and false light invasion of privacy ("false light"); (3) false imprisonment; and (4) intentional infliction of emotional distress

("IIED"). (FAC ¶¶ 131–85.) In addition, it sets forth claims under 42 U.S.C. § 1983 for malicious prosecution in violation of the plaintiff's Fourth Amendment rights, denial of his Fourteenth Amendment rights to equal protection and due process; and denial of his rights to free speech and to petition the government for redress guaranteed by the First Amendment. (FAC ¶¶ 186–206.) The FAC also states claims under 42 U.S.C. § 1985(2), for conspiracy to interfere with civil rights, and § 1986, for "neglect to prevent." (*Id.* ¶¶ 207–13.) The FAC does not always specify which defendants are targeted by which claims.

The Metro Defendants responded to the FAC by filing their Motion to Dismiss under Rule 12(b)(6) and supporting Memorandum of Law (Doc. Nos. 31, 32.) They construe the FAC as asserting state-law and § 1983 claims for malicious prosecution against Palko, Hayes, Balthrop, and Toosi; libel and false light claims against Palko; IIED claims against Palko, Hayes, Balthrop, and Toosi; due process claims under § 1983 against Palko and Hayes and an equal protection claim against Hayes; and a municipal liability claim under § 1983 against Metro. They seek dismissal of all claims against each of them. The plaintiff filed a Response, opposing dismissal of any of the claims (Doc. No. 44), and the Metro Defendants filed a Reply (Doc. No. 51) responding to the plaintiff's arguments or, alternatively, his failure to address certain of their arguments.

The plaintiff responded to the Metro Defendants' Reply by filing his Motion to Strike that Reply and a supporting Memorandum (Doc. Nos. 58, 59), to which the Metro Defendants filed a Response (Doc. No. 62), and in further support of which the plaintiff filed a Reply (Doc. No. 63).

### B. Rule 12(b)(6) Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal

Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider, not only the complaint and exhibits attached to it, but also exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted).

A court may also consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

### C. Discussion

#### 1. Official-Capacity Claims

The Metro Defendants argue, as an initial matter, that the official capacity claims against them should be dismissed as unnecessary and redundant of the claim against Metro, which is also named as a defendant. (Doc. No. 32, at 8–9.) The plaintiff does not contest dismissal of the official-capacity claims and states that he will "make relevant statement changes to the styling of the Second Amended complaint"—which he has not yet been granted permission to file—"to . . . remove that they are being sued in their official capacity." (Doc. No. 44, at 2.)

The court will grant the Metro Defendants' motion, insofar as it seeks dismissal of the official-capacity claims against the individual defendants.

#### 2. Malicious Prosecution

The Metro Defendants note that it is entirely unclear from the face of the pleading whether the plaintiff intends to state malicious prosecution claims against any of them. In an abundance of caution, they argue that—insofar as the FAC may be construed as attempting to assert malicious prosecution claims under both state and federal law against Palko, Hayes, Balthrop, and Toosi, on the basis of their being identified in the Bill of Particulars filed by the District Attorney's office in the criminal case against the plaintiff as "being involved in the initiation of the prosecution of the plaintiff" (*see* FAC ¶ 177; *see also* FAC Ex. 2, Doc. No. 5, at 44–46)—the claims should be dismissed for failure to state a claim for which relief may be granted.[3]

---

[3] The Metro Defendants also note that, to the extent the plaintiff intends to bring a state-law malicious prosecution claim against Metro, Metro is absolutely immune from liability for claims based on intentional torts by Metro employees, under the Tennessee Governmental Tort Liability Act ("TGTLA"). (Doc. No. 32, at 9 n.5.) The plaintiff does not respond to this argument.

### a) *Elements of Malicious Prosecution Claims*

The elements of a Tennessee malicious prosecution claim are that "(1) a prior suit or judicial proceeding was instituted without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in plaintiff's favor." *Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020) (quoting *Roberts v. Fed. Express Corp.*, 842 S.W.2d 246, 247–48 (Tenn. 1992)). "Probable cause is established where facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Roberts*, 842 S.W.2d at 248 (internal quotation marks and citation omitted). "Probable cause is to be determined solely from an objective examination of the surrounding facts and circumstances." *Id.* Its existence "does not depend on the subjective mental state of the prosecutor." *Id.*

A malicious prosecution claim under § 1983 does not actually require malice, at least in the Sixth Circuit. *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017). The elements of such a claim are that: (1) a criminal prosecution was initiated against the plaintiff, and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Id.* (citing *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010)).

---

The court agrees that, insofar as he might have intended to state a malicious prosecution claim or other state law tort claims against Metro under *respondeat superior*, based on the intentional acts of its employees, the TGTLA expressly maintains immunity for government entities for suits arising out of "malicious prosecution" and "[t]he institution or prosecution of any judicial or administrative proceeding, even if malicious or without probable cause," among other intentional torts. Tenn. Code Ann. § 29-20-205(2) & (5). In any event, the plaintiff has not evinced any intent to pursue the state law tort claims against Metro under *respondeat superior*, and the court does not construe the FAC as asserting any such claims.

b)      *The Metro Defendants' Arguments*

The Metro Defendants argue that the plaintiff's state-law malicious prosecution claim fails, because: (1) the grand jury indictment establishes probable cause and negates malice; (2) the plaintiff does not allege that any individual Metro Defendant "made, influenced, or participated" in the District Attorney's Office's decision to prosecute the plaintiff.

An indictment does not conclusively establish the existence of probable cause. Rather, it gives rise to a rebuttable presumption of probable cause, a presumption that can be rebutted by proof that:

> (1) [the defendant] knowingly or recklessly made false statements, falsified evidence, or fabricated evidence to set a prosecution in motion; (2) the statements and evidence, along with concealments and misleading omissions, were material to the prosecution; and (3) the statements and evidence were not merely grand jury testimony or, in the broad sense, part of the preparation for such testimony.

*Price v. Montgomery Cty.*, 72 F.4th 711, 725 (6th Cir. 2023) (citing *King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017). Similarly, under state law, while "parties are not liable for malicious prosecution simply because they give information to the police," they may be liable if they "knowingly tell the police false information." *Gordon v. Tractor Supply Co.*, No. M2015-01049-COA-R3-CV, 2016 WL 3349024, at *5 (Tenn. Ct. App. June 8, 2016) (citing *Wykle v. Valley Fidelity Bank & Trust Co.*, 658 S.W.2d 96, 99 (Tenn. Ct. App. 1983), and *Cohen v. Ferguson*, 336 S.W.2d 949, 954 (Tenn. Ct. App. 1959)).

The Metro Defendants argue that the allegations in the FAC fail to overcome the presumption of probable cause established by the indictment, because it contains no facts suggesting that the Metro Defendants provided false information to any individuals in the District Attorney's Office or that they otherwise influenced or participated in the decision to prosecute.

The plaintiff argues in response that the "Metro Defendants listed under malicious prosecution"—presumably referring to Palko, Hayes, Balthrop, and Toosi (*see* FAC ¶ 177)—are

"admitted by all sides to be complaining witnesses in this matter." (Doc. No. 44, at 3.) He insists that the emails quoted in the FAC show "a propensity by these defendants to defame Plaintiff in such a way as to lead to his criminal prosecution" and that "to the extent that information given to the DA during the investigatory phase was false or showed a reckless disregard for the truth, defendants are liable for malicious prosecution." (*Id.*) He also takes issue with the defendants' assertion that he does not allege fraud or any facts that would suggest that the District Attorney's Office did not believe the plaintiff to be guilty of the harassment charges, pointing to his allegation that Assistant District Attorney Lauren Hogan stated (in front of the plaintiff's attorney) that "she had to continue to prosecute the case, on instruction from the District Attorney's office in Nashville, because Mark Clayton continued to make calls to the District Attorney's office about other issues" and his allegation that the Bill of Particulars filed by Hogan "falsely claimed Plaintiff stated he was 'coming after' Tom Palko, when Plaintiff said no such words, and such words are not recorded on the voicemail referenced by Hogan." (FAC ¶¶ 33, 139, 138; Doc. No. 44, at 4.)[4] He also contends that the Metro Defendants "acknowledge," in response to the libel and false light claims, that the plaintiff alleges that the defendants "sent false and/or misleading emails that alleged or implied criminal acts by the Plaintiff" and that, "[t]o the extent that such claims became part of the pre-grand jury investigation of Plaintiff, the Defendants are liable for malicious prosecution." (Doc. No. 44, at 4–5.)

The court has combed the FAC and finds no plausible allegations that Palko, Hayes, Balthrop, or Toosi made false allegations of fact regarding the plaintiff to any members of the District Attorney's Office or that such false allegations were material to or influenced the decision

---

[4] The plaintiff states in his Response that Hogan "misquoted a voicemail Plaintiff left Defendant Palko where Plaintiff said 'I'm after you' which was changed in [the] transcript to 'I'm coming after you.'" (Doc. No. 44, at 6.)

to prosecute. The FAC, notably, is devoid of any allegations regarding the number, type, or content of the communications that took place between the plaintiff and the MWS employees after June 2018 through the date of the plaintiff's indictment in April 2019. However, it appears from the FAC and the State's Response to the Defendant's Motion for Bill of Particulars (to which the plaintiff refers as the "Bill of Particulars"), attached as Exhibit 2 to the FAC, that the charges in the indictment were premised upon (1) a voicemail that the plaintiff left for Tom Palko on September 6, 2018, a copy of which was provided to the DA's Office and to Clayton's defense counsel (and allegedly misquoted by Lauren Hogan in the Bill of Particulars); (2) an email from Clayton to Hal Balthrop on September 9, 2018, which contained a "photograph of Hal Balthrop and his wife," purportedly accompanied by offensive language, also provided to the DA's Office and to defense counsel in discovery; and (3) Mark Clayton's calling MWS at least five times on September 8, 2018 and seven times on September 4, 2018 and leaving "annoying, offensive, alarming and frightening voicemails to various individuals at [MWS] on multiple dates" from July 31, 2018 through September 5, 2018, recordings of all of which (six in total) had been labeled by number and had been produced to defense counsel in discovery. (Doc. No. 36-1.)

Regarding the plaintiff's contention that the defendants "admit" to making false statements in their arguments for dismissal of the libel and false light claims, as discussed below, that is not correct, nor are the statements alleged in support of those claims relevant to the harassment charges against the plaintiff.

The only actual fact alleged in the FAC regarding the Metro Defendants' role in the prosecution is that the Bill of Particulars identifies Palko, Hayes, Balthrop, and Toosi as "being involved in the initiation of the prosecution of Plaintiff." (FAC ¶ 177.) At most, this allegation supports a reasonable inference that the Metro Defendants provided information to the District

Attorney's office. Likewise, based on the Bill of Particulars itself, it may reasonably be presumed that such information was in the form of a report of the number of times the plaintiff had called and the fact that he had left voicemails, but it is clear that the content of those voicemails was revealed by the actual messages themselves and reviewed by the prosecutors, since the messages were produced to Clayton's attorney in discovery. The District Attorney's Office employees, that is, evaluated the evidence themselves. There is no suggestion in the record that the decision to prosecute was based on the MWS employees' representations as to what the voicemails and emails said, as opposed to the prosecutors' own assessment of that evidence.

Because the FAC does not plausibly allege or give rise to a reasonable inference that the Metro Defendants knowingly provided false information to the District Attorney's Office or that the District Attorney's Office relied on such misrepresentations in bringing the harassment charges, as would be required to support the malicious prosecution claims against them under both federal and state law, the Metro Defendants' motion to dismiss the malicious prosecution claims will be granted.

### 3. *Libel and False Light Invasion of Privacy*

Only Palko, among the Metro Defendants, is expressly targeted by the plaintiff's libel and false light claims. The entirety of the factual allegations supporting these two claims is that Palko "libeled Plaintiff by sending internal emails to third parties claiming Plaintiff was 'very aggressive' and insinuating that a police officer needed to be on hand to protect a contractor from Plaintiff" and "put Plaintiff in a false light by sending emails saying he was 'very aggressive' and by pushing to have a police officer present when a contractor was on Plaintiff's street making repairs." (FAC ¶¶ 152, 158; *see also id.* ¶¶ 58 (referencing the November 2017 email from Palko to another MWS employee describing the plaintiff as "very aggressive"), 60 (referencing November 2017 email from Palko to Erin Williams at the Mayor's Office stating that the plaintiff had "made contact with

our contractor" and MWS's intention to have a police officer present for the project it was working on up the street from the plaintiff's property), 63 (notifying the contractor that a police officer would be on site "for this project" and that MWS saw this "as a necessary part of this particular job").) The plaintiff admits he had contacted the contractor. (*Id.* ¶ 61.)

The Metro Defendants do not address the elements of the claims, such as whether the statements were actually both false and defaming. *See Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). Instead, they argue only that the claims are subject to dismissal as untimely. (Doc. No. 32, at 12.) In his Response, the plaintiff states:

> As already explained, the false and misleading statements made by Defendants that the Defendants address in this section go to their liability under malicious prosecution with the same resulting damages. As such Plaintiff is willing in his amended complaint to put those paragraphs under malicious prosecution.

(Doc. No. 44, at 7.) The court understands from this language that the plaintiff has affirmatively abandoned his libel and false light claim against Balko and intends the referenced allegations to bolster his malicious prosecution claims, as discussed above. Accordingly, the motion to dismiss the libel and false light claims against Palko will be granted.

### 4. *Intentional Infliction of Emotional Distress*

The IIED claim appears to be asserted against Palko, Hayes, Balthrop, and Toosi. Part IV of the FAC is devoted to the IIED claim. In this section, the plaintiff summarizes the legal elements of such a claim under Tennessee law, states that the conduct he is complaining about satisfies those elements, and asserts that he "has a report from a forensic psychiatrist detailing the emotional trauma he suffered as a result of the alleged conduct." (FAC ¶ 173.)

Under subsection A of Part IV, entitled "Outrageous Conduct Shown By Official Oppression Through Malicious Prosecution," the plaintiff asserts that Tennessee's "official oppression statute" gives rise to criminal liability on the part of any public servant who

"[i]ntentionally subjects another to mistreatment or to arrest, detention, stop, frisk, halt, search, seizure, dispossession, assessment or lien when the public servant knows the conduct is unlawful." (FAC ¶ 175 (quoting Tenn. Code Ann. § 39-16-403(a)).) The FAC then asserts that Palko, Hayes, Balthrop, and Toosi are identified in the Bill of Particulars filed by Lauren Hogan in his criminal case as "being involved in the initiation of the prosecution of Plaintiff." (FAC ¶ 177.) The court understands the plaintiff to be asserting that these defendants' "initiation of the prosecution" against him constitutes outrageous conduct for purposes of his IIED claim.

Subsection B of Part IV, entitled "Outrageous Conduct Shown By Official Oppression Through Denial Of Equal Protection And Due Process," quotes Tennessee's "official oppression statute" as criminalizing a public servant's act of intentionally denying or impeding "another in the exercise or enjoyment of any right, privilege, power or immunity, when the public servant knows the conduct is unlawful." (FAC ¶ 178.) It also quotes Tennessee's "Bill Of Rights For Permit Applicants" as ensuring a predictable permitting process that "afford[s] applicants basic due process," and it references the Tennessee and United States Constitutions as guaranteeing equal protection for similarly situated individuals. (*Id.* ¶¶ 179–80 (quoting Tenn. Code Ann. § 69-3-141).) The FAC then alleges that defendant Hayes

> showed contempt for Plaintiff's rights as a permit applicant under Tennessee Law when Plaintiff described to her a hypothetical construction of a causeway with culvert across the stream and she told him that "of course" that would need a permit, but when she realized that Plaintiff was talking about his neighbor's downstream causeway that was built without a permit she reversed her position, thus violating Plaintiff's equal protection rights under the Tennessee and U.S. constitutions by treating him differently from a similarly situated person.

(FAC ¶ 182.) The court understands the plaintiff to be asserting here that Hayes's alleged reversal of her position constituted outrageous conduct for purposes of his IIED claim.

To make out a *prima facie* case of IIED under Tennessee law, a plaintiff must show that "the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated

by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012). Tennessee courts have emphasized that the conduct at issue must be truly

> extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Bain v. Wells*, 936 S.W.2d 618, 623 (Tenn. 1997) (citations omitted). "[T]his is not an easy burden to meet." *Oates v. Chattanooga Pub. Co.*, 205 S.W.3d 418, 428 (Tenn. Ct. App. 2006).

The Metro Defendants generally argue that the IIED claims against them are subject to dismissal, first, because the FAC is "devoid of allegations that any of [the] alleged conduct [by these defendants] was extreme or outrageous." (Doc. No. 32, at 14.) They argue that this is particularly true where the plaintiff was indicted, which, they claim, conclusively establishes the existence of probable cause. They contend that the plaintiff fails to adequately allege serious mental injury. They also point out, in a lengthy footnote, that the statute of limitations for an IIED claim is one year and argue that, insofar as the claim is based on the Metro Defendants' involvement in the prosecution of the plaintiff, which was revealed to the plaintiff in the Bill of Particulars filed on May 15, 2020, the claim should be dismissed as time-barred.[5] And finally, they argue that they are entitled to qualified immunity on this claim.

---

[5] They acknowledge that the FAC does not reveal when the plaintiff's conversation with Hayes took place (Doc. No. 32, at 20 n.13), and they do not seek dismissal of that part of the IIED claim as time-barred.

In response, the plaintiff asserts that "[k]nowingly and falsely accusing someone of a crime to the point that that person is arrested and prosecuted" and "refusing services to a party without rational basis" are both "outrageous," that any inference of probable cause to support the criminal charges against him was dispelled by the dismissal of the charges, and that he both adequately alleges serious mental trauma in the FAC and will attach to his Second Amended Complaint the Affidavit of William Kenner, M.D., attesting that the plaintiff suffered "significant mental distress" related to the arrest and prosecution. (Doc. No. 44, at 8–9.)

In their Reply, the Metro Defendants contend, among other things, that the plaintiff's failure to respond to their argument that the statute of limitations argument bars the claim against them premised upon their alleged involvement in his prosecution requires dismissal of that claim.

In response to that portion of the Metro Defendants' Reply, the plaintiff filed his Motion to Strike Reply of Metro Defendants, arguing that the defendants "falsely claim Plaintiff 'waived' the issue of timeliness" and that their timeliness argument only appears in an "unrelated footnote" and therefore was never properly raised. (Doc. No. 58, at 1.) He also contends that the IIED claim is "tied to the Malicious Prosecution claim which all parties agree was timely filed." (*id.*; *see also* Doc. No. 59.) The Metro Defendants oppose the Motion to Strike as improper under Rule 12(f), because it is not a "pleading." (Doc. No. 62.) They also argue that the Motion to Strike is, in actuality, an "unauthorized 'sur-reply,'" filed without leave of court, and that, even if the court considers the new arguments raised therein, the IIED claim is still subject to dismissal. (*Id.* at 4.) The plaintiff filed a Reply, in which he continues to assert that the defendants' arguments are "false" and that they are now "asking the Court to give them a free pass on what is essentially fraud on the court." (Doc. No. 63, at 1; *see id.* at 3 ("Defendants' attorney is attempting fraud upon the court by trying to tie Plaintiff's Intentional Infliction Of Emotional Distress claim to

Defendants' emails.").) He insists that the court may strike part of the defendants' Reply or construe his Motion to Strike as a sur-reply. (*Id.* at 2.)

The court generally frowns upon such histrionic and hyperbolic language as that employed by the plaintiff in support of his Motion to Strike. Regardless, the court reaches the following conclusions with respect to the briefing related to the IIED claim and the merits thereof:

(1) A motion to strike under Rule 12 is not an appropriate vehicle for attacking a reply brief. A reply brief is not a pleading, nor does this particular Reply contain any material that remotely qualifies as "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). That said, the court will broadly construe the Motion to Strike as a sur-reply. Although filed without the court's permission, the court will consider the arguments raised in this document.

(2) While "an argument raised in a footnote without further development is [generally] deemed waived," *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 n.2 (6th Cir. 2013) (citing *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006)), the defendants' footnoted argument raising the statute of limitations is not perfunctory. It is ten lines long, cites the Tennessee statute establishing the applicable limitations period, a case from the Tennessee Supreme Court construing it, and the facts in the FAC supporting the defendants' untimeliness argument. Because the issue was adequately briefed, the court will exercise its discretion to consider it. *Accord Moat v. Metro. Gov't of Nashville*, No. 3:21-CV-00807, 2023 WL 4035909, at *11 (M.D. Tenn. June 15, 2023) (Trauger, J.).

(3) Any IIED claim premised upon the Metro Defendants' actions that purportedly support the plaintiff's malicious prosecution claims is clearly time-barred. The fact that the malicious prosecution claims are not time-barred is immaterial. A malicious prosecution claim does not accrue until the underlying criminal proceedings against the plaintiff are terminated in his favor,

*McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019). The criminal case was dismissed less than one year before the plaintiff filed this lawsuit, so the malicious prosecution claims are not time-barred. The plaintiff was aware, however, that the Metro Defendants were "involved in the initiation of the prosecution" against him no later than the date on which the Bill of Particulars was filed in the underlying criminal case, which put the plaintiff on notice of the Metro Defendants' alleged role in his prosecution. The Bill of Particulars was filed more than a year before the plaintiff filed this lawsuit. The IIED claim premised upon the Metro Defendants' "involvement" in the initiation of the prosecution is time-barred.

(4) Even if that claim were not time-barred, the plaintiff has not alleged facts that, if true, would support an IIED claim. As set forth above, the FAC contains no affirmative allegations that Palko, Hayes, Balthrop, or Toosi knowingly made false allegations of fact regarding the plaintiff to any members of the District Attorney's Office.[6]

(5) Contrary to the plaintiff's assertions in his Reply in support of the Motion to Strike, the Metro Defendants have not engaged in any type of fraud upon the court, nor is their motion to dismiss the IIED claim tied to the emails the plaintiff references in support of his libel and false light claims. On its face, their motion is clearly tied to (a) the plaintiff's statement that the Metro Defendants were "involved in the initiation of the prosecution of Plaintiff" (FAC ¶ 177) and (b) his allegations about his conversation with Kimberly Hayes (FAC ¶ 182). The defendants do not contend that that conversation took place by email. Rather, they state only that the plaintiff does

---

[6] To be clear, although the plaintiff argues that "refusing services to a party without a rational basis is also outrageous" (Doc. No. 44, at 8), the FAC does not premise the IIED claim on the MWS employees' failure to take seriously or act upon the plaintiff's complaints about the problems caused by his neighbors' allegedly illegal culvert. And, if he had done so, it appears that any such claim accrued well over a year before the plaintiff filed this lawsuit and, thus, would be time-barred anyway.

not identify whether it took place in person or by telephone. (*See* Doc. No. 32, at 20 n.13.)

(6) The IIED claim against Hayes based on the plaintiff's conversations with her is subject to dismissal for failure to state a claim for which relief may be granted, because Hayes' conduct—allegedly "revers[ing] her position" when she realized that the plaintiff was talking about his neighbor's downstream culvert and not a truly hypothetical situation—does not by any stretch of the imagination qualify as conduct "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Bain*, 936 S.W.2d at 623.

In sum, the IIED claim will be dismissed in its entirety as to the Metro Defendants. The court does not reach the parties' other arguments regarding this claim.

### 5. *Deprivation of Due Process*

Although the FAC is not clear on this point, the plaintiff appears to be attempting to assert claims against defendants Palko and Hayes for violating his Fourteenth Amendment right to due process, when they somehow "thwart[ed] [his] ability to exercise his rights on the Permit Applicant's Bill of Rights." (FAC ¶ 203.) He characterizes himself as a "permit applicant" in the context of his conversations with Hayes, when he asked "hypothetically" whether he would need a permit if he were constructing a causeway with a culvert across a stream. (FAC ¶ 182.)

The Due Process Clause of the Fourteenth Amendment provides, succinctly, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Due process is recognized as having both substantive and procedural components. *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). The substantive provision of the Due Process Clause "'specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Guertin*

*v. Michigan*, 912 F.3d 907, 918 (6th Cir. 2019) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)); *see also Range*, 763 F.3d at 588 ("Substantive due process . . . protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that shock the conscience." (internal quotation marks and citations omitted)). Relatedly, a procedural due process claim arises when the plaintiff alleges (1) a constitutionally protected life, liberty, or property interest, and (2) deprivation of that interest by state action without appropriate process. *Reed v. Goertz*, 598 U.S. 230, 236 (2023).

In this case, the plaintiff refers to himself as a "permit applicant," but he does not actually allege that he applied for any type of permit or that either Palko or Hayes deprived him of any permit. Even assuming that he had a constitutional right to adequate consideration of a permit application (for example, an application to install a culvert), he does not allege that Palko or Hayes violated any such right, for purposes of a substantive due process claim. Moreover, even if Hayes' allegedly reversing course in response to a hypothetical question posed to her by the plaintiff could be deemed conscience-shocking, for purposes of a substantive due process claim, her answer to a hypothetical question was simply not an "action," nor did it have any effect on the plaintiff or his rights. At worst, Hayes was predicting how the MWS would respond to a certain situation and then changed her mind as to how MWS would respond when the plaintiff made it clear that he was not talking about himself in the hypothetical situation but about an action his neighbor had already taken. Predicted action of this type is not a state action that could violate the plaintiff's fundamental life, liberty, or property interest. This claim is subject to dismissal.

### 6. Violation of Equal Protection Clause

The plaintiff alleges that Hayes, through this same conversation, violated his equal protection rights under both the Tennessee and U.S. Constitutions "by treating him differently

from a similarly situation person." (FAC ¶ 182.) In his Response to the Metro Defendants' Motion to Dismiss, he indicates that he intends the FAC to state an equal protection claim against Palko as well, based on "[e]mails already referenced in Plaintiff's Second Amended Complaint show[ing] that Tom Palko enforced a policy against treating Mr. Dixon the way Defendant Hayes told Plaintiff he would be treated, namely fining anyone who put in a culvert in that section of stream without doing a stream determination and applying for a permit." (Doc. No. 44, at 13.)[7]

"The Fourteenth Amendment's guarantee of the 'equal protection of the laws' bars governmental discrimination that either (1) burdens a fundamental right, (2) targets a suspect class, or (3) intentionally treats one differently from others similarly situated without any rational basis for the difference." *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023) (citing *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005)). The plaintiff here does not allege that he is a member of a suspect class, nor does he appear to allege a state action that burdened his fundamental rights. The court, like the defendants, construes his equal protection claim as a "class of one" claim.

To prevail on an equal protection claim under this theory, the plaintiff must show that (1) the defendants intentionally treated him "differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Id.* (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).

---

[7] With his Motion to Amend, the plaintiff filed what he purports to be a transcript of two different telephone conversations with Kimberly Hayes. (Doc. No. 55-8.) Because the plaintiff references this conversation in the FAC, the court finds that it can consider the purported transcripts without converting the motion to dismiss into a motion for summary judgment, but they do not actually substantiate the plaintiff's contention that Hayes "reversed her position" once she realized he was talking about his neighbor rather than himself (FAC ¶ 182), nor do they show outrageous conduct.

The plaintiff's problem, again, is that the state action about which he complains is purely hypothetical: he is claiming that the MWS employees *would have* treated him differently if he had sought to put in a culvert on his property than it actually treated his downstream neighbors. He cannot show that he is "similarly situated" to his neighbors, because he does not allege that he actually put in such a culvert or applied for a permit to install one.

This claim, too, will be dismissed under Rule 12(b)(6), for failure to state a claim for which relief may be granted.

### 7. Defendants Honeysucker and Potter

Although they are named in the FAC in both their individual and official capacities, the FAC contains no substantive allegations implicating Honeysucker or Potter in any of the enumerated causes of action. Regarding Honeysucker, the plaintiff alleges only that he (1) sent the plaintiff a text message in July 2016 requesting that he cease harassing him by calling his phone (FAC ¶ 45), (2) refused to turn over engineering reports apparently requested by the plaintiff sometime prior to that communication (FAC ¶ 46), and (3) advised other MWS employees in February 2018 to direct any inquiries from the plaintiff to the Metro Legal Department (FAC ¶ 72). The plaintiff does not attempt to link any of these actions to a claim for relief.

Potter's name is listed in the case caption on the first page of the FAC and in the enumeration of parties (FAC at 1 & ¶ 7), but he is not alleged to have had any personal involvement in any of the other events the plaintiff complains about.

In response to the Metro Defendants' Motion to Dismiss, the plaintiff states that Honeysucker "ratified and/or ignored a history of abuse of Plaintiff's constitutional rights to due process and equal protection" and that Potter, as director of MWS, was "responsible to make sure everyone in his department was properly trained." (Doc. No. 44, at 16, 17.)

Even if the FAC adequately stated claims for constitutional violations, it does not state a claim against Honeysucker based on ratification, and it does not allege any facts related to training. The claims against these defendants in their individual capacity will be dismissed for failure to state a claim for which relief may be granted.

### 8. *Municipal Liability*

The plaintiff names Metro as a defendant and makes it clear in the FAC that he intends to state municipal liability claims against Metro under § 1983, based on *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (*See* FAC ¶¶ 189–91, 205.) Under *Monell*, a municipality may be held liable "only for the adoption of a 'policy or custom' that violates federally protected rights." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 727 (6th Cir. 2005). To bring a municipal liability claim alleging unconstitutional policies, practices, or customs, the plaintiff must show "that [an] unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [a] constitutional violation.'" *Spainhoward v. White Cty.*, 421 F. Supp. 3d 524, 542 (M.D. Tenn. 2019) (Crenshaw, J.) (quoting *Napier v. Madison Cty.*, 238 F.3d 739, 743 (6th Cir. 2001)).

The municipal liability claim in this case fails simply because the plaintiff has not adequately alleged a violation of his constitutional rights. *See Napier*, 238 F.3d at 743 ("Because the analysis concludes that Napier cannot show that he suffered an underlying constitutional violation, his claims against Madison County must also fail."); *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").

The *Monell* claims against Metro are subject to dismissal.

### D.    Conclusion: Metro Defendants' Motion to Dismiss

The Metro Defendants have shown that the FAC fails to state a colorable claim against any of them. Their Motion to Dismiss will be granted in its entirety. The plaintiff's Motion to Strike will be denied, but the court has construed the document as a sur-reply and has considered the arguments set forth therein.

## II.    THE DISTRICT ATTORNEY DEFENDANTS' MOTION TO DISMISS

### A.    Facts and Procedural History

The FAC asserts claims against Davidson County District Attorney ("DA") Glenn Funk, Assistant DA Lauren Hogan, and Deputy DA Amy Hunter in both their individual capacity and official capacity. (FAC ¶¶ 8–10.)

Regarding these defendants (collectively, the "DA Defendants"), the FAC contains few factual allegations, as distinct from assertions of law. It alleges that Hogan was a prosecutor in the DA's Office, that she was supervised by Hunter, and that Hunter instructed her to "prosecute Plaintiff without probable cause." (FAC ¶¶ 9–10.) The plaintiff was charged with harassing MWS employees and was arrested on April 23, 2019. (FAC ¶ 32.) According to the plaintiff, Hogan stated in front of the plaintiff's attorney that she "did not even want to pursue the case" against the plaintiff (FAC ¶ 139) but "had to" "on instruction from the District Attorney's office in Nashville" (FAC ¶ 33), because the plaintiff had "called the DA's office on multiple occasions pressuring the DA's office to take legal actions Plaintiff believed were in the public interest" (FAC ¶ 139). The plaintiff believes that the prosecution against him was "because of the District Attorney's disagreements with [the plaintiff] politically or otherwise." (FAC ¶ 35.) In addition, the "DA's

office also caused the [TBI] to put Plaintiff on the list not to be able to buy a gun." (FAC ¶ 80.)[8]

The plaintiff alleges that Hogan filed a Bill of Particulars in the plaintiff's criminal case in which she "falsely claimed Plaintiff stated he was 'coming after' Tom Palko, when Plaintiff said no such words, and such words are not recorded on the voicemail referenced by Hogan." (FAC ¶ 138.) The plaintiff also asserts that Lauren Hogan "pursued a prosecution against Plaintiff that she knew lacked merit" and "acted as a complaining witness by falsely asserting in her Bill of Particulars words that Plaintiff did not say." (FAC ¶ 9.)

The charges were dismissed on December 3, 2021, "after Plaintiff filed a Motion to Dismiss, Motion to Disqualify the DA's office . . . and a Motion to Unseal the Indictment and the DA's office failed to respond to said motions." (FAC ¶ 36.) Even before the charges were dismissed, the plaintiff had successfully appealed his placement on the TBI's list. (FAC ¶ 81.)

Based on these allegations, the plaintiff states federal and state malicious prosecution claims against the DA Defendants, as well as, perhaps, claims for false arrest and IIED against all three DA Defendants based on the malicious prosecution. (FAC ¶ 176.) He states an IIED claim specifically against Hogan based on "outrageous conduct shown by perjury," which is premised on her filing the Bill of Particulars. (FAC ¶ 185.) He generally alleges a conspiracy between the DA Defendants and the Metro Defendants to prosecute him without probable cause, in retaliation for his making complaints about "civil rights violations against black politicians and other matters." (FAC ¶ 20.) In addition to seeking compensatory and punitive damages, the plaintiff also demands that "permanent injunctive and declaratory relief issue, including but not limited to a declaration that Plaintiff has never harassed or threatened anyone related to this matter" and that

---

[8] The FAC contains no factual allegations as to how the DA Defendants caused this result or, indeed, showing that they had anything to do with the TBI's decision in that regard.

"all parties" be enjoined from "further violations of Plaintiff's 2nd amendment rights." (FAC at 36.)

The DA Defendants seek dismissal of the official capacity claims against them on the grounds of sovereign immunity and for failure to state a claim for which relief may be granted, under Rule 12(b)(6). They seek dismissal of the individual capacity claims under Rule 12(b)(6) and under Rule 12(b)(1), on the grounds that they are entitled to absolute prosecutorial immunity.

In response, the plaintiff confirms that he intended to state claims against the DA Defendants for malicious prosecution, false arrest, and IIED. (Doc. No. 46, at 3–4, 7.) He argues that: (1) sovereign immunity does not apply, because he does not seek monetary damages from the DA Defendants in their official capacity; (2) Hogan is not entitled to absolute immunity, because she functioned as a "complaining witness" when the Bill of Particulars she drafted falsely attributed to the plaintiff words he did not actually say; (3) Hunter and Funk are not entitled to absolute immunity either, because they supervised Hogan and either "directly told her to falsify evidence" or "pressure[ed] her to pursue a prosecution she didn't believe in" (Doc. No. 46, at 7); (4) Hogan knowingly or recklessly made false statements in the Bill of Particulars, which rebuts probable cause and "obviate[es]" defendants' arguments for dismissal of the false arrest claim (*id.*); (5) the DA Defendants knowingly pursued an indictment that lacked probable cause; and (6) the FAC alleges continuing harm as required to warrant prospective injunctive relief, in the form of the DA Defendants' allegedly ongoing "efforts to chill" the plaintiff's protected speech (*id.* at 10).

### B. Official Capacity Claims

The plaintiff concedes that he does not seek monetary damages from the DA Defendants, in their official capacity, so the court has no need to address the defendants' argument for dismissal of such a claim on the grounds of sovereign immunity.

With respect to the plaintiff's official-capacity claims against the state officials for injunctive and declaratory relief, it is well established that a "suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," that is, against the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). States—and state officials sued in their official capacity—are generally absolutely immune from suit in federal court, based on principles of sovereign immunity. *Morgan v. Bd. of Pro. Resp.*, 63 F.4th 510, 515 (6th Cir. 2023). Such sovereign immunity is subject to several exceptions, including "(a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young*, 209 U.S. 123 (1908), applies; and (c) when Congress has properly abrogated a State's immunity." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). The state has not consented to this suit, and "there is no question that Congress has not abrogated Tennessee's immunity here," *id.*, which leaves only the *Ex parte Young* exception. Under that exception, "a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law," but the exception "does not . . . extend to any retroactive relief." *Id.* at 507–08.

The *Ex parte Young* doctrine applies "only when the plaintiff sues for 'prospective [injunctive] relief to end a continuing violation of federal law.'" *Morgan*, 63 F.4th at 515 (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)). "If the complaint fails to 'make clear what those ongoing violations are,' the exception does not apply." *Id.* (quoting *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("[A]llegations of future injury [must] be particular and concrete."). Thus, "[t]o determine if *Ex parte Young* applies, we 'need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Boler*, 865 F.3d at 412 (quoting *Dubuc v. Mich. Bd. of Law*

*Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003) (some internal quotation marks omitted)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Steele Co.*, 523 U.S. at 109 (citations omitted).

The FAC complains about the plaintiff's prosecution by the DA Defendants from 2019 until the dismissal of the charges on December 3, 2021. He requests monetary damages as well as "permanent injunctive and declaratory relief . . . , including but not limited to a declaration that Plaintiff has never harassed or threatened anyone related to this matter" and an injunction prohibiting "all parties from further violations of Plaintiff's 2nd amendment rights." (FAC at 36.) However, because the FAC contains no particular, concrete allegations of ongoing constitutional violations or future injury, it does not state a colorable claim for prospective injunctive or declaratory relief that would fall within the *Ex parte Young* exception. As a result, the plaintiff's claims against the DA Defendants in their official capacity for prospective injunctive and declaratory relief will be dismissed on the grounds of sovereign immunity and for failure to state a claim for which relief may be granted.

## C.    Individual Capacity Claims

The primary basis for the DA Defendants' motion for dismissal of the claims against them in their individual capacity is that they are entitled to absolute prosecutorial immunity, because all claims against them are premised upon actions taken in their role as advocates for the state.

"American law has long recognized 'absolute immunity' for those 'whose special functions or constitutional status requires complete protection from suit.'" *Price v. Montgomery Cty.*, 72 F.4th 711, 719 (6th Cir. 2023) (quoting *Barnett v. Smithwick*, 835 F. App'x 31, 35–36 (6th Cir. 2020); *see also Shell v. State*, 893 S.W.2d 416, 421 (Tenn. 1995) ("[I]t is settled that prosecutors are immune from actions for malicious prosecution under both § 1983 and state common law[.]"

(internal citations omitted)). Such immunity extends to state prosecutors "whose activities are 'intimately associated' with the judicial process." *Price*, 72 F.4th at 719. Prosecutorial immunity, in fact, "has a long reach—it extends even to 'unquestionably illegal or improper conduct,' including instances where a defendant is genuinely wronged." *Id.* (quoting *Cady v. Arenac Cty.*, 574 F.3d 334, 340 (6th Cir. 2009)). Generally, if the "conduct at issue was in furtherance of genuine prosecutorial interests, [the prosecutor] has absolute immunity for his actions." *Id.* at 720. Courts have held, therefore, that absolute immunity extends to, among other things, "maliciously institut[ing] a false prosecution with no probable cause," *Howell v. Sanders*, 668 F.3d 344, 350 (6th Cir. 2012) (citation omitted); preparing witnesses for trial, including by directing them to falsify testimony, *Spurlock v. Thompson*, 330 F.3d 791, 798 (6th Cir. 2003); and intentionally failing to disclose exculpatory evidence, *Price*, 72 F.4th at 720. Immunity does not depend on whether the prosecutor actually tries the case. *Howell*, 668 F.3d at 353.

Conversely, absolute immunity does not extend to "'investigative' or 'administrative' acts." *Spurlock*, 330 F.3d at 798 (quoting *Burns v. Reed*, 500 U.S. 478, 483 n.2 (1991)). Thus, for instance, prosecutors are not entitled to absolute immunity for giving legal advice to police, authorizing warrantless wiretaps, making sworn statements in an affidavit supporting an application for an arrest warrant, or making out-of-court statements at a press conference. *Id.* (citations omitted); *see also Price*, 72 F.4th at 719–20. This type of conduct is subject to qualified immunity instead. *Price*, 72 F.4th at 720. As the Sixth Circuit has explained, "[t]he analytical key to prosecutorial immunity . . . is advocacy—whether the actions in question are those of an advocate," and the "critical inquiry is how closely related is the prosecutor's challenged activity to his *role as an advocate* intimately associated with the judicial phase of the criminal process." *Spurlock*, 330 F.3d at 798 (quoting *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en

banc)) (emphasis in original).

In the present case, the claims against the DA Defendants are premised entirely upon their decision to prosecute the plaintiff, allegedly despite knowing that they lacked probable cause and that the indictment itself was "on its face insufficient" (Doc. No. 46, at 10), which decision also led to the plaintiff's arrest and allegedly gave rise to emotional damages sufficient to support his IIED claim. As set forth above, however, the decision to prosecute, irrespective of the presence or absence of probable cause, is precisely the type of decision a prosecutor makes in his or her "*role as an advocate* intimately associated with the judicial phase of the criminal process." *Spurlock*, 330 F.3d at 798. The plaintiff's allegations that this decision was made maliciously and with knowledge of the absence of probable cause are simply immaterial. They do not permit him to avoid the application of absolute immunity.

Likewise, it is clear as a matter of law that Hogan's drafting and filing the "State's Response to Defendant's Motion for Bill of Particulars" (*see* Doc. No. 55-3, at 2) are tasks she undertook in her role as an advocate. It is difficult to envision any actions more intimately associated with the judicial phase of proceedings than preparing and filing a court document in support of an indictment and in response to a motion filed by the defendant. Such acts fall squarely within "the scope of [Hogan's] duties as an advocate for the state." *Adams v. Hanson*, 656 F.3d 397, 405 (6th Cir. 2011). That Hogan "falsified evidence" by misquoting the plaintiff's voice message in the Response to Defendant's Motion for Bill of Particulars does not make it less a prosecutorial act intimately associated with the judicial phase of the criminal process. As the Sixth Circuit has repeatedly emphasized, "prosecutors do not forfeit their absolute immunity when they knowingly make false statements while advocating before the court." *Id.* (quoting *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 725 (6th Cir. 2011)).

While the plaintiff is correct that a "complaining witness" is generally entitled only to qualified rather than absolute immunity, *see id.* at 408, he is incorrect that Hogan's act of purportedly "falsely asserting in her Bill of Particulars words that Plaintiff did not actually say" (Doc. No. 46, at 3) meant that she somehow became a complaining witness. The plaintiff appears to be attempting to equate the State's Response to Defendant's Motion for Bill of Particulars to the affidavit submitted by the prosecuting attorney in *Kalina v. Fletcher*, 522 U.S. 118 (1997). In *Kalina*, the Supreme Court held that the preparation of a sworn affidavit in support of an arrest warrant was *not* a prosecutorial act, insofar as the prosecutor "personally vouched for the truth of the facts set forth in the certification under penalty of perjury." *Id.* at 121. The Court found that, by offering sworn testimony, the prosecutor "performed an act that any competent witness might have performed" and that "[t]estifying about facts is the function of the witness, not of the lawyer." *Id.* at 129–30. Drafting and filing the State's Response to Defendant's Motion for Bill of Particulars, however, unlike preparing and signing an affidavit under penalty of perjury, are acts that only a prosecuting attorney, not a witness, could perform. Hogan did not sign the Bill of Particulars under penalty of perjury,[9] and, in drafting it, she did not function as a witness. She functioned as a prosecutor advocating before the court.

The FAC does not allege facts suggesting that the DA Defendants took any action outside the scope of their prosecutorial role. The plaintiff's allegations of actual malice, falsification of evidence, and the pursuit of charges despite knowledge of the absence of probable cause, even if accepted as true, are not sufficient to strip the DA Defendants of absolute prosecutorial immunity for actions taken in their role as prosecutors. Thus, regardless of what claims the FAC may

---

[9] The document, as required of all court filings, contains a Certificate of Service signed by Hogan attesting only that she had served a true and correct copy of the document on opposing counsel. (Doc. No. 55-3, at 4.)

reasonably be construed as asserting—whether for malicious prosecution, false arrest, IIED, perjury, "official oppression," criminal harassment, First Amendment retaliation, or anything else the plaintiff might conjure—not one survives. The DA Defendants' Motion to Dismiss the individual capacity claims against them will be granted on the grounds that they are absolutely immune from suit on claims against them for actions taken in their role as advocates for the state.

### D. Conclusion: DA Defendants Motion to Dismiss

The DA Defendants' Motion to Dismiss will be granted in its entirety.

## III. THE REGISTRY DEFENDANTS' MOTION TO DISMISS

### A. Facts and Procedural History

The FAC also identifies as defendants Bill Young, Tom Lawless, and Paige Dennis, all "members of the Tennessee Registry of Election Finance" and sued in both their official and individual capacity. (FAC ¶¶ 11–13.) The allegations and claims against these defendants (collectively the "Registry Defendants") are as follows.

The plaintiff alleges that Metro Councilman Jonathan Hall was "fined an exorbitant amount for campaign finance mistakes" in retaliation for agreeing to be a witness for the plaintiff in both his criminal trial and his civil suit against his neighbors. (FAC ¶¶ 108–10.) On May 18, 2022, the plaintiff attended a Tennessee Registry of Election Finance meeting to address the fine imposed against Councilman Hall. The day before the meeting, the plaintiff called the Registry to provide notice that he intended to appear as a witness on behalf of Hall and that he believed Hall was being "unfairly targeted because he was on Plaintiff's witness list." (FAC ¶¶ 112–14.) The plaintiff did not make threats during this call. (FAC ¶ 123.)

While the plaintiff was testifying at the Registry meeting to his belief that Hall was being retaliated against, "members of the committee began shouting over" him, and Paige Dennis interrupted him by "making a false assertion, in the form of a question, that [he] had made threats"

during his call to the Registry the previous day. (FAC ¶¶ 165, 210, 122.) Defendant Bill Young told News Channel 5 that the Registry had "taken the 'unusual step' of making sure a state trooper was present" at the meeting on May 18, 2022. (FAC ¶ 124.) Tom Lawless directed the state trooper to remove the plaintiff from the Registry meeting. (FAC ¶ 125.) Various media outlets thereafter slanderously reported that the plaintiff had been ejected from the Registry meeting for making threatening statements. (FAC ¶¶ 128–30.)[10]

Based on the actions taken at the Registry meeting, the plaintiff asserts a claim against Dennis in her individual capacity for slander and false light invasion of privacy, based on her "falsely insinuating that [the plaintiff] had called making 'threats'" and, alternatively, "publicly accus[ing] him of 'making threats'" at a meeting at which News Channel 5 was present. (FAC ¶¶ 148, 155.) He asserts a "conspiracy" claim against Dennis, Young, and Lawless (and "possibly others"), apparently for conspiring to defame him, based on Young's statement that the Registry had a state trooper at the meeting. (FAC ¶¶ 151, 155.) He asserts a state law "false imprisonment" claim, presumably against Tom Lawless, for directing the state trooper to eject the plaintiff from the Registry meeting, as well as an IIED claim in association with that action. (FAC ¶¶ 159–74.) The plaintiff also purports to state federal claims under 42 U.S.C. §§ 1983 and 1985(2), based on the Registry Defendants' allegedly conspiring to have him ejected from a public meeting, in violation of his First Amendment rights to "petition the government for grievances, speech and the

---

[10] In support of their Motion to Dismiss, the Registry Defendants quote at length and rely on the truth of statements that appear in a News Channel 5 report referenced in the FAC. They assert that, because the FAC refers to the article, the court may consider the news article—and the events reported therein—without converting their Motion to Dismiss into a motion for summary judgment. The defendants are incorrect, as the plaintiff does not contend that the facts in the news report are accurate. In fact, he expressly alleges to the contrary. (*See* FAC 130.) While the court may accept as true the plaintiff's allegations that reporters were at the meeting and that publicity ensued regarding his ouster from the meeting, the court will not consider the contents of the article quoted by the defendants.

right to attend meetings open to the public." (FAC ¶ 206.)

The plaintiff seeks monetary damages as well as "permanent injunctive and declaratory relief . . . , including but not limited to a declaration that Plaintiff has never harassed or threatened anyone related to this matter." (FAC at 36.) The FAC specifically states that the Registry Defendants are sued in their individual capacity as well as their "official capacity regarding [his] claim for injunctive relief." (FAC ¶¶ 11, 12, 13.)

The Registry Defendants move for dismissal of the claims against them only in their individual capacity. (Doc. No. 37 ("Individual-Capacity Registry Defendants' Motion to Dismiss").) In support of their motion, they rely on Federal Rules of Civil Procedure 8, 12(b)(1), and 12(b)(6). (Doc. No. 38.) The plaintiff, in response, contends that his claims against the Registry Defendants are unambiguously pleaded and supported by sufficient facts and that the defendants are not entitled to any form of immunity.

### B. Discussion

#### 1. *Defamation (Slander) and Conspiracy to Commit Same*

The plaintiff's slander claim against Dennis is premised entirely on her "falsely insinuating" that the plaintiff had made "threats" (by asking whether he had made threats) when he called the Registry the day before the May 22, 2022 meeting. (FAC ¶¶ 148, 122, 154–55.) He asserts that the existence of a conspiracy is proved by Bill Young's (true) statement that, prior to the meeting, the Registry had "taken the 'unusual step' of making sure a state trooper was present" and Tom Lawless's act of directing the state trooper to remove the plaintiff from the meeting. (FAC ¶¶ 124–25, 155.) The plaintiff apparently surmises from Young's statement that the members of the Registry must have discussed the plaintiff's telephone call to the Registry the day before and decided among themselves to falsely accuse him of making threats. (*See* FAC ¶ 155 ("Paige Dennis, Tom Lawless and Bill Young put Plaintiff in a false light by conspiring to publicly

accuse him of 'making threats' on a call the day before the meeting and making the accusation in a meeting where News Channel 5 was present and conspiring to have a state trooper present to have Plaintiff forcibly removed without just cause.").)

In Tennessee, the tort of defamation encompasses both libel and slander. *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013). Here, the plaintiff's claim against the Registry Defendants is for slander only, which is defined as "the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood." *Id.* (quoting *Little Stores v. Isenberg*, 172 S.W.2d 13, 16 (Tenn. 1943)). To establish a *prima facie* case of defamation, a plaintiff must prove that: "(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Id.* (citations omitted).

The Registry Defendants argue that, insofar as the plaintiff is attempting to state a claim against Lawless and Young for slander, the claim should be dismissed under Rule 12(b)(6), because the plaintiff does not allege that they uttered any statements about him, much less untrue statements, at the Registry Meeting. They further argue that the claim should be dismissed as to all three of them for lack of jurisdiction, because, under state law, state employees are "absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment." (Doc. No. 38, at 5–6 (quoting Tenn. Code Ann. § 9-8-307(h)).) They also assert that, under state law, the Claims Commission has "exclusive jurisdiction" over "claims for libel and/or slander where a state employee is determined to be acting within the scope of employment." (*Id.* at 6.) They assert that there is "no doubt" that the alleged slander occurred at a "scheduled Registry meeting." (*Id.*) Reading between the lines, the court understands the Registry Defendants

to be suggesting that the facts as alleged in the FAC show that Dennis was acting within the scope of her employment when she made the statement and that, because the Claims Commission has "exclusive jurisdiction" over such claims, the slander claim in this court must be dismissed. The plaintiff responds that the defendants ignore his allegations of conspiracy and that, under the same state law they cite, they are not immune from liability for willful and malicious acts. (Doc. No. 45, at 8.)

The court finds that the defendants are not, at this juncture, entitled to dismissal of the claim on the grounds of immunity. Under state law, "[s]tate officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain." Tenn. Code Ann. § 9-8-307(h). In exchange for such immunity, the state itself has waived its absolute immunity to claims for monetary damages against the state based on the acts of state employees enumerated in the Claims Commission Act, including "[c]laims for libel and/or slander where a state employee is determined to be acting within the scope of employment." *Id.* § 9-8-307(a)(1)(R). Although the statute provides that the filing of claims against the state with the Tennessee Claims Commission "shall operate as a waiver of any cause of action, based on the same act or omission, which the claimant has against any state officer or employee," such waiver is "void if the commission determines that the act or omission was not within the scope of the officer's or employee's office or employment." *Id.* § 9-8-307(b).

To the court's knowledge, only one Tennessee decision addresses the question of whether the court may continue to exercise jurisdiction if a plaintiff has not already brought a parallel claim before the Claims Commission. In *Wright v. Seay*, No. 02A01-9702-CH-00046, 1997 WL 576538 (Tenn. Ct. App. Sept. 18, 1997), a state prisoner brought suit against prison officials for slander

and violation of § 1983. The trial court dismissed both claims, agreeing with the state defendants, with respect to the slander claim, that it was "obvious from the face of the complaint" that the claim was based on statements allegedly made "within the course and scope of their employment" and that the Claims Commission had exclusive "jurisdiction to make the initial finding as to whether the defendants acted maliciously or outside the scope of their employment." *Id.* at *1. The Tennessee Court of Appeals disagreed and held instead that, at least when suit was "instituted against a state employee in the trial court, the defenses of scope of employment and lack of willful or malicious conduct are defenses which may be raised by the defendant and resolved by the trier of facts." *Id.* at *2.

Applying that holding here, it would appear that the defendant has the burden of proving absolute immunity, and the plaintiff was not required to plead facts to avoid dismissal based on the Claims Commission Act. While the Registry Defendants may ultimately be able to establish that they are entitled to summary judgment on the basis of immunity, they are not entitled to dismissal on this basis. This conclusion, at a minimum, preserves the slander claim against Dennis.

Regarding the other two Registry Defendants, however, the FAC does not allege that they uttered any slanderous words. Insofar as the plaintiff intended to state a claim against them for slander, the claim is subject to dismissal for failure to state a claim for which relief may be granted. However, the FAC also articulates a claim against these defendants for conspiring with Dennis in connection with the allegedly slanderous statement. (FAC ¶ 151.) The plaintiff alleges that the existence of such a conspiracy between Dennis, Lawless, Young, and possibly others is established by the fact, as Young stated to News Channel 5, they had ensured ahead of time that a state trooper would be at the meeting. (*Id.*)

The elements of a cause of action for civil conspiracy are: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006). Conspiracy claims in Tennessee must be pleaded with some degree of specificity. *Id.* Conclusory allegations unsupported by material facts will not be sufficient to state such a claim. *Id.*

In this instance, while it seems doubtful that the plaintiff has actually pleaded the elements of a conspiracy to commit slander with the requisite particularity, the defendants have not moved for dismissal of this claim, and the court finds no basis for addressing it *sua sponte*.

The Registry Defendants' motion to dismiss the slander claim against Dennis and conspiracy to commit slander claims against Dennis, Young, and Lawless will be denied.

### 2. False Light and Conspiracy to Commit Same

The Tennessee Supreme Court recognizes the tort of false light invasion of privacy as a "distinct, actionable tort," albeit one that "overlap[s] in some ways" with defamation, such that, when "a plaintiff also asserts an alternative theory of recovery under [defamation], [he] can proceed upon either theory, or both, *although he can have but one recovery for a single instance of publicity*." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001) (citation and internal quotation marks omitted; emphasis in original). Tennessee generally defines the claim as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id.* at 643–44 (quoting Restatement (Second) of Torts § 652E (1977)). In *West*, the court—breaking from the Restatement—held that for false light claims involving private individuals about matters of private concern, negligence, rather than actual malice, is the appropriate standard. *Id.* at 648.

> Unlike in defamation claims,
>
> [t]he facts may be true in a false light claim. However, the angle from which the facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light. Literal accuracy of separate statements will not render a communication true where the implication of the communication as a whole was false.

*Id.* at 645 n.5 (internal quotations and citations omitted). Finally, the Tennessee Supreme Court has emphasized that, "[c]onsistent with defamation, . . . plaintiffs seeking to recover on false light claims must specifically plead and prove damages allegedly suffered from the invasion of their privacy." *Id.* at 648 (quoted in *Jones by & Through Sons v. Life Care Centers of Am.*, No. M2022-00471-COA-R3-CV, 2023 WL 3476523, at *7 (Tenn. Ct. App. May 16, 2023)).

The allegations supporting the plaintiff's false light claim are basically encapsulated in one paragraph:

> Paige Dennis, Tom Lawless and Bill Young put Plaintiff in a false light by conspiring to publicly accuse him of 'making threats' on a call the day before the meeting and making the accusation in the meeting where News Channel 5 was present and conspiring to have a state trooper present to have Plaintiff forcibly removed without just cause.

(FAC ¶ 155.) The FAC also asserts, based on a conversation between Jonathan Hall and the Registry's general counsel, that the Registry Defendants knew that the allegation that the plaintiff had made "threats" was false. (FAC ¶ 157.) In other words, the false light claim (and the related conspiracy claim) appears to be slightly broader than the slander claim, insofar as it incorporates the defendants' knowledge that the media and a state trooper would be at the meeting in response to the plaintiff's presence when Dennis made the allegedly false allegation that he had made threats.

Regarding damages, the plaintiff states that a blogger in attendance wrote a blog post about the plaintiff's ejection and that News Channel 5 videotaped the entire event and later "printed and televised repetition of the slander . . . that Plaintiff was ejected from the meeting for making threats and made no qualifying statement" even though he told them the threat allegations were false. (FAC ¶ 130.) He claims that a "Google search" for his name still turns up reports of the meeting from which he was wrongfully ejected. (FAC ¶ 150.) He asserts that "[a]n accusation that someone was removed from a meeting for making threats is highly offensive to a reasonable person." (FAC ¶ 156.) He alleges generally that he "has a report from a forensic psychiatrist detailing the emotional trauma he has suffered as a result of the" "conduct [he] is complaining about" (FAC ¶¶ 173, 172), and he seeks damages for the intentional and reckless infliction of emotional distress, humiliation, depression, anxiety, low quality of life, mental suffering, anguish of the mind, emotional anguish, trauma and apprehension, . . . [and] expenses for medical and psychological rehabilitation, suffering and physical pain and sickness" (FAC at 35–36), without attempting to parse which wrongful acts caused what degree of his emotional suffering.

The defendants again argue that, even assuming that Dennis's statement could be construed as painting the plaintiff in a false light, the plaintiff does not allege that Lawless and Young made any such statements and, therefore, that the false light claim against them must be dismissed for failure to state a claim. They also assert that the claim is inadequately pleaded, insofar it contains no specific allegations of damages arising from the particular statement giving rise to the false light claim.

The plaintiff responds to the motion for dismissal of his slander and false light claims in the same combined section, without really differentiating between them, and he contends, again, that, the statement placing him in false light initially was Dennis's false accusation that he had

made threats in the telephone call the previous day. He further asserts that it is obvious from the fact that the Registry Defendants admittedly took the "unusual step" of having a state trooper present that Young and Dennis coordinated in advance of the meeting, foreseeing the possibility that they would have the plaintiff ejected, which Lawless actually effected. The Registry Defendants do not address this conspiracy theory either, which seems to encompass, not only Dennis's statement, but an alleged concerted effort to paint the plaintiff as a dangerous person whose expected presence at the meeting required having a state trooper on duty and giving rise to the possibility of trumping up an excuse to have the plaintiff removed from the meeting.

The court finds that the Registry Defendants' failure to address the conspiracy arguments requires a rejection of their argument that the claims against Lawless and Young should be dismissed. Regarding damages, the court finds that the plaintiff's assertion of mental and emotional injury from the defendants' conduct is sufficient at this juncture, particularly given allegations of ongoing damages to his reputation by the availability of articles portraying him as having been removed from a meeting for making threats.

The FAC is not a model of clarity, and interpreting the plaintiff's claims requires some inferential leaps. The arguments the defendants raise though—that the allegations supporting the false light claim do not implicate Lawless and Young and that the plaintiff has not adequately alleged damages arising from the invasion of his privacy—are not well taken and do not warrant dismissal under Rule 12(b)(6).[11]

---

[11] The Registry Defendants do not argue, and the court has no need to consider, whether they would be immune from a false light claim as closely related to a libel claim for purposes of the Claims Commission Act. *See, e.g.*, *Miller v. Tennessee*, No. M2008-01241-COA-R3-CV, 2008 WL 11010708, at n.3 [no pagination] (Tenn. Ct. App. Dec. 10, 2008) (noting, but not addressing, "an issue whether the false light tort is encompassed within the immunity waived for libel and slander in subsection (R)" of Tenn. Code Ann. § 9-8-307(a)(1)).

### 3. False Imprisonment

The only fact actually supporting the plaintiff's false imprisonment claim is that "Tom Lawless ultimately directed the state trooper to have Plaintiff removed from the meeting." (FAC ¶ 125.) Regarding the same event, however, under his "Cause of Action" for "False Imprisonment," the plaintiff further states that, as a result of the "false accusation" that he made threats, he was "forcibly ejected from the meeting by a Tennessee State Trooper" and that he "submi[tted]" to "the reasonably apprehended force by the state trooper." (FAC ¶¶ 166, 167.) He also avers that he chose to be at the Registry Meeting and did not leave voluntarily. The FAC recites the legal elements of a civil false imprisonment claim, as defined by the Tennessee courts, and also references Tenn. Code Ann. § 39-13-302(a), which sets forth the elements of the criminal charge of false imprisonment and, as the plaintiff states, provides that "removal" can "also constitute false imprisonment." (FAC ¶¶ 159, 160.)

The court finds the statute defining the criminal offense of false imprisonment to be irrelevant to the plaintiff's claim. Under Tennessee law, the *tort* of false imprisonment is defined as the "intentional restraint or detention of another without just cause." *Newsom v. Thalhimer Bros.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1994) (citing *Brown v. SCOA Indus., Inc.*, 741 S.W.2d 916, 919 (Tenn. Ct. App. 1987)). The elements of the tort are: "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Id.* (citing *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)).

The Registry Defendants argue that: (1) the plaintiff fails to allege any facts implicating Dennis or Young for false imprisonment, since he alleges only that Lawless directed the state trooper to remove the plaintiff; (2) the FAC does not contain sufficient facts to show that physical force was used to remove him from the meeting; (3) on the face of the FAC, the removal appears to have been "ephemeral and peaceful" and did not constitute a "substantial" interference with his

liberty (Doc. No. 38, at 9); and (4) even if the FAC may be construed as stating a viable claim for false imprisonment, defendant Lawless is entitled to qualified immunity, since "Tennessee does not appear to have addressed false imprisonment pursuant to Tenn. Code Ann. § 39-13-302(a) in the context of public meetings or as Plaintiff describes." (Doc. No. 38, at 9.)

The plaintiff's protestations of conspiracy in his Response memorandum notwithstanding, the court finds that the FAC itself does reference conspiracy under the "False Imprisonment" heading (unlike under the "Slander" and "False Light Invasion of Privacy" headings) and does not allege facts to support either a direct false imprisonment claim or a false imprisonment conspiracy claim against either Dennis or Young. His assertion that he was "forcibly ejected" from the meeting "[a]s a result of" Dennis's false accusation" is not sufficient to attribute to *Dennis* Lawless's decision to direct the state trooper to eject him. Moreover, the fact that Dennis and Young may have discussed the plaintiff's telephone call and agreed ahead of time, as the plaintiff argues, to have a state trooper present does not establish, without more, that they agreed with Lawless in advance of the meeting to use the trooper to eject the plaintiff from the meeting, irrespective of what actually happened at the meeting.

As for Lawless, however, the Registry Defendants' assertion as to the "peaceable" quality of the plaintiff's removal alleges facts outside the scope of the FAC. The plaintiff himself alleges both that he was "forcibly ejected" from the meeting and that he submitted to a reasonable apprehension of force by the state trooper. These statements give rise to a reasonable inference both that force was employed and that the plaintiff reasonably apprehended additional force. The Tennessee Supreme Court, in any event, does not appear to require violence in the use of force— physical contact sufficient to restrain someone against his will satisfies the first element of the offense. Thus, hypothetically, an armed state trooper's taking hold of the plaintiff's arm to walk

him from the building would likely be sufficient to restrain him, for purposes of a false imprisonment claim. Moreover, "where no force or violence is actually employed," submission in the face of a reasonable apprehension of force will also suffice. *Newsom*, 901 S.W.2d at 367. The presence of a state trooper appears to substantiate the plaintiff's reasonable apprehension of force. The court finds, in short, that the plaintiff has adequately alleged the use of force to detain or restrain him.

As for the Registry Defendants' qualified immunity argument, they argue only that the Tennessee courts have not applied Tenn. Code Ann. § 39-13-302(a)—the statute defining the criminal offense of false imprisonment—in the context of an allegedly unlawful ejection of a citizen from a public meeting. The court, as noted above, finds the criminal statute to be irrelevant in the context of a civil false imprisonment claim, the elements of which are well established. The defendants, therefore, have not established that dismissal on this ground is warranted.

The court will grant the motion to dismiss the false imprisonment claim against Dennis and Young but deny it as to Lawless.

### 4. *42 U.S.C. § 1983*

Section 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws." To state a claim under § 1983, a plaintiff must allege and show: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003); 42 U.S.C. § 1983.

The plaintiff's § 1983 claim against the Registry Defendants is premised upon his allegation that they conspired to "have Plaintiff ejected from a public meeting based on a false accusation that Plaintiff made 'threats' on a phone call the previous day." (FAC ¶ 206.) He asserts

that this conspiracy "is a violation of [his] First Amendment Right . . . to petition the government for grievances, speech and the right to attend meetings open to the public." (*Id.*)

In arguing for dismissal of this claim, the Registry Defendants assert that the allegations in the FAC are contradicted by "the News Channel 5 article that plaintiff relies upon in his Complaint." (Doc. No. 38, at 11–12.) The Registry Defendants quote the article at great length, while also stating, in a footnote, that they "do not intend to convert this motion into a motion for summary judgment" but that, "because Plaintiff repeatedly references the article throughout the Complaint and attaches a screenshot of the article in Exhibit 3 to the complaint," they "believe that the Court may rely upon the article without conversion." (Doc. No. 38, at 12 n.2.) They argue, based upon the version of events set forth in that article, that the removal of the plaintiff from the Registry meeting was "clearly based on conduct and not his viewpoint." (*Id.* at 14.)

The Registry Defendants are simply wrong in asserting that the court may consider the facts set forth in the article they cite to be true without converting their motion into one for summary judgment. Under Rule 12(d), if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Further, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* The Sixth Circuit has emphasized that, in considering a motion to dismiss, the court may (and should), without converting the motion, consider "exhibits attached to the complaint." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001). In addition, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.* (citation omitted). However, the mere fact that the plaintiff references the existence of a news article in his pleading does not, without more, mean that the article is "central" to his claims in the sense that he adopted the truth

of any of the matters asserted in that article. To the contrary, he clearly disavows the truth of the article, describing it as having "printed and televised repetition of the slander" that he had been ejected from the meeting for making threats. (FAC ¶ 130.) The court, in short, declines the invitation to accept as true the matters asserted in that article and will not consider the contents of the article at all for purposes of ruling on the Registry Defendants' Motion to Dismiss.

Because their motion to dismiss the § 1983 First Amendment claims relies solely on the truth of the facts set forth in that article, which is not an appropriate basis for a Rule 12(b)(6) motion, the Registry Defendants' motion to dismiss this claim will be denied.

  *5.*  *42 U.S.C. §§ 1985 and 1986*

The plaintiff invokes 42 U.S.C. § 1985(2) and alleges that his rights under this provision were violated when he was intimidated and prevented from testifying as "an official witness at a judicial proceeding before the Tennessee Election Registry Of Election Finance." (FAC ¶ 208.) He also invokes 42 U.S.C. § 1986 and asserts that two unnamed and unknown "members of the DA's office" are "liable under 42 U.S.C. § 1986," insofar as they "witnessed" the conspiratorial actions of the Registry Defendants, including their "forcibly ejecting him from the May 18, 2022 meeting in order to keep [him] from testifying" (FAC ¶ 213), but did not come to his aid. No other defendants are expressly identified in the FAC as having violated § 1986.

Section 1985 creates a cause of action for conspiracy to interfere with civil rights. Subpart (2) of § 1985, which the FAC invokes, pertains to "[o]bstructing justice; intimidating party, witness, or juror." The first clause of § 1985(2) specifies that, to be actionable under this clause, an alleged obstruction of justice must occur with respect to proceedings "in any court of the United States." *Id.* The Supreme Court has construed the clause to refer narrowly to "federal judicial proceedings." *Kush v. Rutledge*, 460 U.S. 719, 724 (1983). The second clause of § 1985(2) "applies to conspiracies to obstruct the course of justice *in state courts*" and "contains language requiring

that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws." *Id.* at 725. This provision also requires allegations of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 726; *Taylor v. Streicher*, 465 F. App'x 414, 419 (6th Cir. 2012). Section 1986 provides a cause of action against anyone who has knowledge of an imminent violation of § 1985 and, "having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do."

The Registry Defendants move for dismissal of the § 1985(2) claim on the grounds that a hearing before the Registry does not qualify as a judicial proceeding within the ambit of either part of § 1985(2) and, further, that the plaintiff does not allege racial or other class-based animus. Even though § 1986 as set forth in the FAC is clearly not directed to them, they move for its dismissal as to them for failure to allege facts showing that any of them violated this provision. The plaintiff objects that whether the Registry meeting qualifies as a court proceeding is a disputed question of fact, but he does not address his failure to allege race-based animus. And he claims to have clearly stated a claim against the Registry Defendants under § 1986.

The plaintiff here does not allege obstruction of any federal court proceeding, and, even if a Registry meeting qualified as a state judicial proceeding for purpose of the second part of § 1985(2), the plaintiff does not allege any race-based or other invidious discriminatory motive. His claim under § 1985(2) against the Registry Defendants, therefore, will be dismissed. The § 1986 claim, aside from not being asserted against the Registry Defendants, is subject to dismissal

simply because it requires, as a threshold matter, a violation of § 1985, which the plaintiff has not shown.[12]

### 6. Official Capacity Claim

Finally, although the FAC clearly and unambiguously states that the Registry Defendants are sued in both their official and individual capacity and further specifies that the plaintiff seeks injunctive relief against them, the Registry Defendants' motion does not address the official capacity claim against them. However, suit against the Registry Defendants in their official capacity is the same as suit against the Tennessee Registry of Election Finance itself, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), and the Registry was created by the General Assembly in 1989 as an independent entity of state government, *see* Tenn. Code Ann. § 2-10-201 *et seq.* As discussed above, States and state agencies—and state officials sued in their official capacity—are generally absolutely immune from suit in federal court, based on the Eleventh Amendment and principles of sovereign immunity. *Morgan v. Bd. of Pro. Resp.*, 63 F.4th 510, 515 (6th Cir. 2023).

The Eleventh Amendment is a jurisdictional bar that federal courts "may (and should)" raise *sua sponte*. *Nair v. Oakland Cty. Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006); *see also Cady v. Arenac Cty.*, 574 F.3d 334 (6th Cir. 2009). In this instance, although the Registry Defendants have failed to raise the argument, the court finds that the official capacity

---

[12] The FAC indicates the plaintiff's intention to "add[] to the complaint" the two unidentified employees of the DA's Office who allegedly attended the Registry meeting, witnessed the violations of the plaintiff's constitutional rights, and failed to come to the plaintiff's aid. (FAC ¶ 213.) The plaintiff has never sought to amend his pleading to add new defendants, and any attempt to do so now would clearly be futile, as such claims would be time-barred. *See, e.g.*, *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) ("Sixth Circuit precedent clearly holds that new parties may not be added after the statute of limitations has run, and that such amendments do not satisfy the 'mistaken identity' requirement of Rule 15(c)(3)(B)." (citations omitted)).

claim against them for prospective injunctive and/or declaratory relief fails for the same reason that the official capacity claim against the DA Defendants fails. As with that claim, the only possible exception to sovereign immunity under which the plaintiff's official-capacity claim could proceed is the *Ex parte Young* exception, which permits federal courts to "issue prospective injunctive and declaratory relief compelling a state official to comply with federal law" but "does not . . . extend to any retroactive relief." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008).

As explained above, unless the complaint clearly alleges ongoing violations of federal law, the exception does not apply. *Morgan*, 63 F.4th at 515. And "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (citations omitted).

The FAC complains about the Registry Defendants' actions during and just before a meeting that took place on May 18, 2022. The plaintiff does not allege any ongoing violations or threats of violations of his federal rights by these defendants. His request for a declaration that he "never harassed or threatened anyone related to this matter" (FAC at 36) addresses past conduct— the *plaintiff's* conduct, not the defendants'. Because the FAC contains no particularized, concrete allegations of ongoing constitutional violations or future injury, it does not state a colorable claim for prospective injunctive or declaratory relief that would fall within the *Ex parte Young* exception. As a result, the court will dismiss *sua sponte* the plaintiff's claim against the Registry Defendants in their official capacity for prospective injunctive and declaratory relief on the grounds of sovereign immunity.

### C.       Conclusion: Registry Defendants' Motion to Dismiss

As set forth herein, the Registry Defendants' motion for dismissal of the individual capacity claims against them will be granted in part and denied in part. It will be granted with respect to the (1) false imprisonment claims against Dennis and Young and any potential claim for false imprisonment conspiracy against all three defendants; and (2) all claims under 42 U.S.C. §§ 1985(2) and 1986. It will otherwise be denied.

In addition, the court will dismiss *sua sponte* the claim against the Registry Defendants in their official capacity, on the basis of sovereign immunity and a failure to allege facts that would permit the application of the *Ex parte Young* exception to such sovereign immunity.

## IV.     PLAINTIFF'S MOTION TO AMEND

### A.       Procedural History

The plaintiff initiated this action by filing the original Complaint on November 17, 2022. Before any defendants answered, he filed the FAC on January 11, 2023, pursuant to Rule 15(1), specifically noting that "News Channel 5 is removed as a defendant to allow for sending of a cease and desist letter as required by statute." (FAC at 1.)[13] All three sets of defendants named in the FAC filed their Motions to Dismiss on March 27, 2023. The plaintiff filed his Response in opposition to all three motions on May 15, 2023 and then, on May 17 and 18, 2023, filed his Motion For Leave To File A Second Amended Complaint, supporting Memorandum, and the proposed Second Amended Complaint ("SAC"). (Doc. Nos. 48, 49, 49-1.)[14]

---

[13] The FAC also removed MWS and added defendant Stephanie Durman, but the plaintiff later nonsuited the claims against Durman. (Doc. No. 47.)

[14] The plaintiff filed numerous proposed exhibits to the SAC two weeks later, on May 31, 2023. (Doc. No. 55.)

In support of his motion, the plaintiff states that he filed the FAC "mainly . . . to deal with the issue of temporarily removing News Channel 5 as a defendant" and that he now simply seeks to add it back, after having given it the "chance . . . to respond to his cease and desist communication." (Doc. No. 49, at 2.) He states that he also proposes to amend his pleading to clarify "which claims went to which parties" and to provide all of "the facts that support those claims." (*Id.*) He asserts that his motion should be granted under Rule 15, because there has been no undue delay, bad faith, or a repeated failure to cure deficiencies, nor could any defendant establish prejudice. (*Id.* at 1.)

Immediately on the heals of the plaintiff's motion, the court entered an order holding the Motion for Leave to Amend in abeyance "until the plaintiff complies with Local Rule 7.01(a)(1)." (Doc. No. 50.)[15] To date, the plaintiff has not complied with Local Rule 7.01, but the Metro Defendants and the Registry Defendants filed Responses in opposition to the Motion for Leave to Amend (Doc. Nos. 54, 56), in which they both argue that the proposed amendment would be futile as to them. In addition, the Metro Defendants also point out that the plaintiff never complied with the Local Rule. They further argue that it is appropriate to deny a motion to amend brought after a motion to dismiss has been fully briefed and they would be prejudiced by having to respond to "yet another amended complaint simply because of" the plaintiff's undue delay in seeking to amend. (Doc. No. 54, at 3.) The plaintiff filed Replies to both Responses, attempting to defend his request to amend but without actually addressing the defendants' arguments.

The court finds it appropriate at this time to lift the stay, despite the plaintiff's apparent failure to comply with Local Rule 7, and will rule on the motion as follows.

---

[15] Rule 7.01(a)(1) provides that all motions except those under Rules 12, 56, 59, and 60 "must state that counsel for the moving party has conferred with all other counsel, and whether or not the relief requested in the motion is opposed."

**B.     Legal Standards**

Rule 15 provides that "[t]he court should freely give leave [to amend pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). Nevertheless, denying leave is appropriate in instances of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018).

Whether to grant or deny a motion to amend lies within a district court's discretion, but the court must explain the reason for denying such a motion. *Parchman*, 896 F.3d at 736.

**C.     Discussion**

*1.     Undue Delay*

Regarding undue delay, the court notes that the primary cause of delay in this case is not the plaintiff's filing his Motion for Leave to Amend, but the court's caseload that prevented it from resolving the pending motions more expeditiously. That said, the court finds that the Motion for Leave to Amend, filed basically in conjunction with the plaintiff's Responses to the various Motions to Dismiss, was not unduly delayed. Moreover, granting the plaintiff leave to amend, at least for purposes of adding News Channel 5 as a defendant and clarifying certain of his claims, would not prejudice the named or responding defendants.

*2.     Futility*

*a)     The Metro Defendants*

The proposed SAC contains new allegations and exhibits concerning the Metro Defendants in their individual capacity, including, with regard to the plaintiff's telephone conversations with Hayes, transcripts of two telephone calls. In the first one, the plaintiff mentions that he talked to Hayes "a few weeks ago about a wet weather conveyance in Davidson County," and Hayes

confirms that to build any kind of crossing over a waterway, the plaintiff would first need a "stream determination" to confirm whether the waterway was a stream or a wet weather conveyance and that he would need a permit to put a culvert in a wet weather conveyance. (Doc. No. 55-8, at 2.) She also confirmed that, if the plaintiff did not get a permit, he could be fined and "they'll probably make you take it out." (*Id.* at 3.) The second transcript is clearly dated March 22, 2019 and appears to be of a telephone call taking place after the conversation referenced above, since the context establishes that it is not the plaintiff's first conversation with Hayes. (*Id.* at 4.) This conversation on March 22, 2019 is the one in which Hayes allegedly changed course when she understood that the plaintiff was trying to find out if the same policies would apply to his neighbor. The plaintiff now states that, when the plaintiff asked her if the same policies would apply to a "similarly situated downstream property owner, her stated policy changed," insofar as she "refused to say if Mr. Dixon would be fined or have to remove the culvert and tried to change the subject to whether Plaintiff's property had ever actually flooded." (SAC ¶¶ 87–88; *see* Doc. No. 55-8, at 7–11).)

The plaintiff further alleges that Palko "enforced a policy against treating Mr. Dixon the way Defendant Hayes told Plaintiff he would be treated, namely not fining anyone who put in a culvert in that section of stream without doing a stream determination and applying for a permit" and falsely telling the plaintiff there was "'nothing they could do' because the Dixon's culvert was 'not a new construction.'" (SAC ¶¶ 90–92.)

The plaintiff also alleges with somewhat greater specificity in the SAC that the Metro Defendants appeared as "complaining witnesses" against him in the Bill of Particulars; that Palko "libeled" the plaintiff by sending emails to third parties claiming he was "very aggressive" and "insinuating that a police officer needed to be on hand to protect a contractor from Plaintiff"; that Palko's "false and misleading statements" about the plaintiff were "brought into the DA's office's

bogus pre-grand jury investigation of Plaintiff"; and that the Metro Defendants cannot claim qualified immunity for "pushing for" the plaintiff's prosecution, since the facts show an absence of probable cause. (SAC ¶¶ 153–55.) He affirmatively claims that "[a]ll Defendants knew or had reason to know that there was no probable cause" for the charges against him, as a result of the police report declaring that the plaintiff had not threatened anyone and that the police saw no reason to arrest him. (SAC ¶ 179.) Finally, he asserts that he "won his criminal case against the State on the merits." (SAC ¶ 184.)

The plaintiff, of course, did not have a criminal case against the state. The court presumes that he intends to say that he prevailed in the criminal case against him when, as he states, the DA Defendants failed to respond to his various pretrial motions in the criminal case, and Judge Monte Watkins dismissed the case. (SAC ¶¶ 183, 175.) The defendants, in response, filed as an exhibit the actual Order signed by Judge Watkins, which states: "This cause came to be heard on December 03, 2021. After due consideration, and on its own motion, the Court DISMISSES the above case without prejudice." (Doc. No. 54-1.)

In any event, as set forth above, the court has found that the state and federal malicious prosecution claims against the plaintiff set forth in the FAC are subject to dismissal on the grounds that the plaintiff did not allege facts affirmatively showing, or even giving rise to a reasonable inference, that the Metro Defendants made false allegations of fact regarding the plaintiff to any members of the DA's Office or that such false allegations were material to or influenced the charges against the plaintiff. Instead, as the Bill of Particulars makes clear, the charges were based on the actual text of voicemails and emails and on call records showing the number of times the plaintiff called MWS on given days. The plaintiff's new factual allegations do not require reconsideration of that determination. The plaintiff refers to allegedly libelous statements made by

Palko about the plaintiff that took place in 2017 (*see* SAC ¶¶ 57–62) and speculates, without any supporting facts, that those libelous statements were brought to the DA's attention and influenced the decision to prosecute.[16] Even if the statements were brought to the DA's attention, the facts as alleged by the plaintiff do not suggest that any of the charges brought against him were based on such statements. The plaintiff's attempt to amend his pleading to bolster his malicious prosecution claims against the Metro Defendants is futile. The newly alleged facts do not change the analysis.

In addition, regarding the state law malicious prosecution claim, the Tennessee Supreme Court has recently held—conversely to the United States Supreme Court—that, to pursue a common law malicious prosecution claim, the plaintiff must establish that the final disposition of the criminal proceedings against him indicated a finding of actual innocence. *Mynatt v. Nat'l Treas. Employees Union*, 669 S.W.3d 741, 751 (Tenn. 2023). The plaintiff in this case refers to the dismissal of his case by Judge Monte Watkins as a favorable disposition, but he does not affirmatively allege that the dismissal indicated actual innocence. In addition, Judge Watkins' Order dismissing the case "without prejudice" on its face does not affirmatively indicate a finding of actual innocence and, for purposes of the state law claim, does not establish a favorable termination of the criminal proceedings. *See Mynatt*, 669 S.W.3d at 753 ("Because Plaintiff's complaint did not allege facts sufficient to show that the dismissal of his criminal charges constituted a favorable termination reflecting on the merits and indicating innocence, Plaintiff cannot prove an essential element of his malicious prosecution claim."). For this reason, too, the

---

[16] Although the plaintiff also now states that Palko "libeled" him by sending emails in November 2017 to third parties claiming he was "very aggressive" and "insinuating that a police officer" was required to protect a contractor from the plaintiff, the SAC very clearly does not bring defamation or false light claims against the Metro Defendants, instead identifying by name the Registry Defendants against whom those claims are brought.

motion to amend is futile with respect to the state law malicious prosecution claim.[17]

In additional support for his IIED claims, the plaintiff includes new allegations specifically linking his emotional distress to his arrest and prosecution, which, in turn, resulted from "actions [he] took to resolve his water issues." (SAC ¶ 234.) These new allegations are not sufficient to save his IIED claims against the Metro Defendants. The claims, as set forth above, are subject to dismissal, first, because the IIED claim is time-barred, because as it is premised upon information the plaintiff learned no later than the filing of the Bill of Particulars. In addition, the plaintiff's new exhibit—the transcript of his telephone calls with Hayes in March 2019—establish that his IIED claim against her, which is premised upon those calls, is time-barred as well. And finally, in any event, the plaintiff does not allege sufficiently outrageous conduct on the part of any individual defendant.

Likewise, with respect to the plaintiff's due process and equal protection claims, which are both premised upon Palko's and Hayes' actions in allegedly "treating [the plaintiff] differently from a similarly situated person" and "thwart[ing his] ability to exercise his rights on the Permit Applicant's Bill of Rights (SAC ¶¶ 242, 264), the court has found that the alleged actions were premised upon a hypothetical situation, such that the plaintiff could not show he was actually similarly situated to his purported comparator. The SAC's new allegations further establish that the plaintiff knew about the alleged different treatment and thwarting of his rights no later than March 22, 2019, when he had his second or third telephone call with Hayes. These claims, too,

---

[17] The same is not true of the federal malicious prosecution claim under § 1983. With regard to the "favorable termination" element of a federal claim, the United States Supreme Court recently held that "a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022).

accrued more than a year before the plaintiff filed suit, and § 1983 claims in Tennessee are subject to a one-year statute of limitations. Tenn. Code Ann. § 28-3-104(a)(3); *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). These claims are time-barred and, for this reason as well, the amendment would be futile as to these claims.

Finally, the plaintiff has attempted in the SAC to bolster his *Monell* claims against Metro by including an entirely new section entitled "Facts Showing Senior Policy Makers For Purposes of Metro Nashville 42 U.S.C. § 1983 Liability Under *Monell*." (SAC at 19.) In this section, he asserts that "four mayoral administrations . . . enforced policies" against him and his property; that "Vice Mayor Brenda Haywood" demonstrated official policy by "sending prayer, heart, and thumbs up emojis" instead of actually taking any action to help him; that various "employees of Metro Nashville with final decision making authority ratified the constitutional violations against [him] or failed to train and supervisor [sic] to prevent them," including Mayors Karl Dean, Megan Barry, David Briley, and John Cooper; that Scott Potter was "copied on at least one email from the employees at MWS who had adopted an internal policy of not helping Plaintiff with his legitimate complaints"; that John Honeysucker was an MWS supervisor who "made a false allegation" that the plaintiff had threatened him and also told multiple people at MWS to refer all inquiries from the plaintiff to Metro Legal; and that Kimberly Hayes was "over the single family dwelling section of permitting" and had the "power to levy fines and demand construction be removed, and made it clear that there was a different policy for Plaintiff than there was for the similarly situated downstream property owner." (SAC ¶¶ 126, 129, 252.) These allegations, however, are still not sufficient to state a *Monell* claim against Metro, because the plaintiff has

failed to establish any underlying violation of his constitutional rights by any Metro employee.[18]

The new allegations in the SAC, in sum, would not be sufficient to save any of the plaintiff's claims against the Metro Defendants in their individual capacity or the *Monell* claims against Metro.

b) *The DA Defendants*

The DA Defendants have not responded to the Motion for Leave to Amend—nor were they required to do so, in light of the court's having held the motion in abeyance pending the plaintiff's compliance with the Local Rules. The court nonetheless finds that, with respect to the DA Defendants, the proposed SAC would be futile. The court has examined the proposed SAC in detail. It contains additional allegations intended to shore up the plaintiff's contention that he was charged and indicted without probable cause and that the DA Defendants knew that they lacked probable cause. As set forth above, however, the absence or presence of probable cause is irrelevant, and the proposed SAC does not contain any facts that, if true, would show that the DA Defendants' actions that are the subject of the plaintiff's claims fell outside the scope of their prosecutorial activities or their role as advocates for the state.

More specifically, the plaintiff proposes to add new allegations that, prior to the indictment, "Metro Nashville Police Department investigated" and "didn't find probable cause" to arrest him for harassment or making threats but that the DA Defendants nonetheless took the matter to the grand jury to obtain an indictment. (SAC ¶¶ 139–41.) He adds that the indictment itself failed to list facts supporting the charges and instead merely contained a "conclusory recitation of the

---

[18] Again, even if the plaintiff stated a claim against Metro based on municipal policies or practices that led to the alleged deprivations of equal protection and due process, the claim would be time-barred, as the plaintiff alleges that he became aware of those alleged deprivations no later than his March 22, 2019 telephone call with Kimberly Hayes.

statute" under each count of the indictment. (SAC ¶¶ 144.) The SAC also details plaintiff's criminal defense attorney's efforts to obtain additional details about the facts supporting the charges, his ultimately filing a Motion for Bill of Particulars, the first defense counsel's withdrawal from representing the plaintiff because he refused to comply with the plaintiff's demand that he file a pretrial motion to dismiss the charges, and the plaintiff's hiring new counsel who did file various pretrial motions in which he argued, among other things, that the DA's Office was "pursuing the indictment and prosecution of Plaintiff with malice, knowing the Plaintiff was not guilty . . . with the improper purpose of chilling Plaintiff's First Amendment rights of free speech and to petition the government for redress of grievances" and that the charges were "based on fraud." (SAC ¶¶ 164–65; *see also id.* ¶¶ 166–75.) Finally, according to the plaintiff, Hogan's statement that she did not want to prosecute but was being pressured to do so showed that her supervisors, Funk and Hunter, did not "truly believe Plaintiff was guilty of the crime" for which he was indicted. (SAC ¶¶ 177, 78.)

None of these additional facts makes any difference to the claims against the DA Defendants, because, as discussed above, absolute immunity extends to maliciously instituting prosecution with no probable cause, preparing witnesses for trial and even directing them to falsify testimony, and intentionally failing to disclose exculpatory evidence. *Price v. Montgomery Cty.*, 72 F.4th 711, 720 (6th Cir. 2023) ; *Howell v. Sanders*, 668 F.3d 344, 350 (6th Cir. 2012); *Spurlock v. Thompson*, 330 F.3d 791, 798 (6th Cir. 2003).

The plaintiff also includes a cursory and conclusory assertion that the DA's Office, "knowing it had not probable cause against Plaintiff, *investigated the matter itself*." (SAC ¶ 141 (emphasis added); *see also id.* ¶ 145 (asserting that the fact that defendants Palko and Balthrop were subpoenaed as grand jury witnesses "show[ed] the DA's office had been in communication

with these parties during the investigatory phase.").) While it is true that state prosecutors are only entitled to qualified, rather than absolute, immunity for acts deemed "investigatory," *see Spurlock*, 330 F.3d at 798, the plaintiff does not identify the investigatory acts in which the DA Defendants supposedly engaged that would subject them to liability. Merely "investigating," *per se*, is not enough. Moreover, the allegations that the DA Defendants communicated with witnesses prior to the indictment, standing alone, suggests only that they did so in their role as prosecutors by questioning witnesses and preparing them to testify—again, actions with respect to which the DA Defendants are immune from liability.

Because the new allegations concerning the DA Defendants change nothing, the proposed SAC is futile as to the DA Defendants.

c)      *The Registry Defendants*

The SAC does not contain substantial new factual allegations directed at the Registry Defendants. It does, however, clarify the plaintiff's intention to state a slander claim against Paige Dennis; a conspiracy to commit slander claim against Dennis, Young, and Lawless; a false light claim against Young; a "conspiracy for false-light invasion of privacy" claim against Dennis, Young, and Lawless. Because the court has already found that the motion to dismiss those claims as set forth in the FAC should be denied, the plaintiff's request to amend and clarify these claims is not futile.

The plaintiff also clarifies that he intended to bring a false imprisonment claim against all three Metro Defendants. The SAC still does not allege facts suggesting that the plaintiff intended to state a claim for *conspiracy* to commit false imprisonment, and it does not allege facts implicating Dennis or Young. The SAC, therefore, is futile insofar as it still fails to state a false imprisonment claim against these two defendants.

Likewise, the court has found that the Registry Defendants have failed to establish that they are entitled to dismissal of the claim against them under 42 U.S.C. § 1983 for alleged violation of the plaintiff's First Amendment rights. The SAC continues to assert the same claim.

The SAC does not modify the claims under 42 U.S.C. §§ 1985 and 1986, which are still subject to dismissal for failure to state a claim for which relief may be granted.

The SAC still does not bring colorable claims against the Registry Defendants in their official capacity that fall within the scope of the *Ex parte Young* exception and would not serve to salvage those claims.

### D.      Conclusion: The Plaintiffs' Motion for Leave to Amend

The court finds that the plaintiff did not unduly delay in seeking to amend his pleading. However, the proposed amendment is futile, insofar as it seeks to reinforce or substantiate the claims against the Metro Defendants and the DA Defendants. The proposed amendment is *not* futile with respect to the Registry Defendants, except insofar as it still attempts to state a common law false imprisonment claim against defendants Dennis and Lawless and claims against all three Registry Defendants under 42 U.S.C. §§ 1985 and 1986.

In sum, the plaintiff's Motion to Amend will be granted in part and denied in part. It will be denied as futile, insofar as it (a) seeks to allege new facts to support the claims against the Metro Defendants or the DA Defendants or to otherwise salvage the claims against those defendants; (b) seeks to state a claim for false imprisonment against defendants Dennis and Young or a claim for conspiracy to commit false imprisonment against any defendant; (c) continues to assert claims under 42 U.S.C. §§ 1985(2) and 1986; and (d) may be construed as asserting an official-capacity claim against the Registry Defendants. Otherwise, the motion to amend will be granted, and the plaintiff may file a *revised* SAC that omits the dismissed claims that are being dismissed for failure to state a claim for which relief may be granted. The revised SAC will not be construed as asserting

or reinstating claims against the Metro Defendants or the DA Defendants, and those defendants will have no obligation to answer the SAC or participate further in this litigation. Moreover, the SAC will not be deemed to reinstate any of the claims stated against the Registry Defendants (in their individual or official capacity) that the court has found should be dismissed from the FAC for failure to state a claim for which relief may be granted.

## V. CONCLUSION

For the reasons set forth herein:

(1) the Metro Defendants' Motion to Dismiss (Doc. No. 31) and the DA Defendants' Motion to Dismiss (Doc. No. 35) will both be granted in their entirety.

(2) The plaintiff's Motion to Strike (Doc. No. 58) will be denied, but the court has construed the filing as a sur-reply and considered the arguments set forth therein.

(3) The Registry Defendants' Motion to Dismiss (Doc. No. 37) will be granted in part and denied in part. The motion will be granted, insofar as it seeks dismissal of the false imprisonment claim against defendants Dennis and Lawless and the 42 U.S.C. §§ 1985 and 1986 claims against all three defendants. The motion will otherwise be denied.

(4) The court will dismiss *sua sponte* the official capacity claim against the Registry Defendants, on the grounds of sovereign immunity.

(5) The plaintiff's Motion for Leave to Amend (Doc. No. 48) will be granted in part and denied in part, and the plaintiff will be directed to file a revised SAC that complies with the court's ruling.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge