## In The United States District Court Middle District Tennessee

| | |
|---|---|
| Mark Clayton,<br><br>*Plaintiff,*<br>v.<br><br>Lauren Hogan, Glenn Funk, Amy Hunter, Tom Palko, John Honeysucker, Kimberly Hayes, Hall Balthrop, Cyrus Toosi, Scott Potter, William Young, Tom Lawless, Paige Dennis, Metropolitan Nashville Government, Scripps Howard Publishing Company DBA News Channel 5,<br><br>*Defendants.* | No. 3:22-cv-00936 |

**Second Amended Complaint – Jury Demand**

Pursuant to Rule 15(1) of the Federal Rules Of Civil Procedure, Plaintiff files this Second Amended Complaint along with his Motion To Amend.

**Parties**

1. Plaintiff Mark Clayton is a citizen of the United States and is currently a resident of Davidson County Tennessee.

2. Tom Palko was at all times pertinent a supervisor with the Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff. He is sued in his individual capacity regarding specified tort claims.

3. John Honeysucker was at all times a supervisor with Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his

bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff. He is sued in his individual capacity regarding specified tort claims.

4. Kimberly Hayes was at all times relevant was an employee with Nashville Metro Water Services. She interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and she was named in the bill of particulars in the malicious prosecution against Plaintiff. She is sued in her individual capacity regarding specified tort claims.

5. Hal Balthrop was at all times relevant a supervisor with Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff. He is sued in his individual capacity regarding specified tort claims.

6. Cyrus Toosi was at all times relevant an employee with Nashville Metro Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded and he was named in the bill of particulars in the malicious prosecution against Plaintiff. He is sued in his individual capacity regarding specified tort claims.

7. Scott Potter was at all times relevant the director of Nashville Water Services. He interfered with Plaintiff's attempts to get relief with regards to his bridge being eroded. He is sued in his individual capacity regarding specified tort claims.

8. Glenn Funk was at all times relevant the District Attorney for Davidson County. Based on a statement by Lauren Hogan, his office directed her to prosecute Plaintiff for harassment against employees of the Metro Water Services even though she felt the charge lacked merit because his office resented Plaintiff

calling them as opposed to Plaintiff calling Metro Water Services. He is sued in his individual capacity regarding specified tort claims and in his official capacity regarding the Plaintiff's claim for injunctive relief.

9. Lauren Hogan at all times relevant worked as a prosecutor for the Davidson Count District Attorney's Office. She pursued a prosecution against Plaintiff that she knew lacked merit. She also acted as a complaining witness by falsely asserting in her Bill Of Particulars words that Plaintiff did not actually say. She is sued in her individual capacity regarding specified tort claims and in her official capacity regarding the Plaintiff's claim for injunctive relief.

10. Amy Hunter at all times relevant worked as the supervisor of Lauren Hogan and instructed her to prosecute Plaintiff without probable cause. She is sued in her individual capacity regarding specified tort claims and in her official capacity regarding the Plaintiff's claim for injunctive relief.

11. William Young is a member of the Tennessee Registry of Election Finance that stated that they had taken "the unusual step of requesting a trooper attend the meeting." He is sued in his individual capacity regarding specified tort claims and in his official capacity regarding the Plaintiff's claim for injunctive relief.

12. Tom Lawless is a member of the Tennessee Registry of Election Finance and the one said "That's it. You're dismissed." and directed the state trooper to have Plaintiff removed from the meeting. He is sued in his individual capacity regarding specified tort claims and in his official capacity regarding the Plaintiff's claim for injunctive relief.

13. Paige Dennis is a member of the Tennessee Registry of Election Finance and falsely asserted that Plaintiff had called and made "threats" prior to the meeting.


Case 3:22-cv-00936 Document 90 Filed 03/15/24 Page 3 of 49 PageID #: 881

She is sued in her individual capacity regarding specified tort claims and in her official capacity regarding the Plaintiff's claim for injunctive relief.

14. Metro Nashville Government is the government for Davidson County Tennessee and all defendants are connected as agents in some capacity.

## Jurisdiction

### I Federal Question Jurisdiction

15. This court has jurisdiction of this action pursuant to Article III, section I of the Constitution of the United States and 28 U.S.C. §§ 1331, 1332, 1343 et seq and 1367 (supplemental jurisdiction and 42 U.S.C. § 1988 et seq. This action is filed pursuant to 42 U.S.C. § 1983 to obtain redress for the deprivation of rights guaranteed to the Plaintiff by the due process clause and the equal protection clauses of the fourteenth amendment and the fourth amendment to the United States Constitution, as applied to the states via the selective incorporation doctrine, and the common law of Tennessee and the Tennessee Constitution.

### II Supplemental Jurisdiction

16. Plaintiff also invokes the supplemental jurisdiction of the United States District Court for common law and statutory state tort claims.

17. According to *Monroe v Pape*, federal court action is appropriate "when the State governments criminally refuse or neglect those duties which are imposed." *Monroe v. Pape*, 365 US 167, 233 (1961). The third aim of 42 U.S.C. § 1983 is "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Id.* at 174.

18. The email record shows that employees of Metro Nashville Government conspired together at every turn to prevent Plaintiff from having due process in exercising his legal rights.

19. When Plaintiff persisted in asserting his rights, Defendants conspired with the Metro Nashville District Attorney's Office to pursue criminal prosecution against Plaintiff for harassment of employees of Metro Water Services when the District Attorney's Office knew there was no basis for a criminal prosecution but pursued the claim anyway because Plaintiff called the DA's office complaining about civil rights violations against black politicians and other matters.

**Venue**

20. Venue is proper under 28 U.S.C. § 1391(a) because, all of actions relevant to this matter took place in Davidson County Tennessee and all Defendants live and/or do business in Davidson County Tennessee.

21. On all counts, throughout the entire process, senior policy makers were deliberately indifferent and/or participated in not only tortious but also civil rights violations against Plaintiff.

**Background Facts**

22. From prior to his false arrest and imprisonment through the dismissal of the charges, Plaintiff owned property known by address as 4948 Laws Rd (herein "Clayton Property"), and a stream runs through the Clayton Property.

23. Said stream runs into another property downstream from the Clayton Property.

24. Neighbors Joseph and Faye Dixon had work done at his property, which involved Metro Nashville. This work involved the installation of an illegal culvert downstream from the Clayton Property. Subsequent to this work being done

downstream at the neighbor's property (herein "Dixon Property") Plaintiff had issues at the Clayton property. These issues were, the following:

(a) Flooding

(b) Bridge covered in water, blocking any thoroughfare which is the rightful right-of-way of Plaintiff

(c) Erosion and damage to the Clayton Property (add more detail to these if necessary)

25. The damages are the subject of a lawsuit known as Clayton v. Dixon, (currently on appeal, Tennessee Case No. M2021-00521-COA-R3-CV), and such damages from the flooding are not the subject of this action.

26. Plaintiff attempted to mitigate damages described above, and had Metro Nashville out to address the problem. However, the problem remained unaddressed by Metro Nashville.

27. Plaintiff called Metro Nashville regarding his service requests, #269615 and #434232 respectively.

28. Plaintiff had a responsibility to call Metro Nashville, because he could not fix the issue himself without Metro Nashville input, because he did not want to be guilty of violations of the Tennessee Waterways Act.

29. However, Metro Nashville wholly failed to address his concerns regarding the illegal culvert installed by Dixon. For their failure to address his situation, he threatened to sue.

30. In response, on 5/3/2016, Kimberly Hayes sent an email regarding such service requests as "closed". She attached the voicemail where Plaintiff threatened to sue.

31. Subsequent communications between Plaintiff and Metro Nashville, which shall be detailed herein below, did not resolve Plaintiff's issue either. In fact, rather than address his concerns, Metro Nashville had him arrested on or about April 23, 2019.

32. The charge allegedly was harassment, but in reality, Prosecutor Lauren Hogan stated that she had to continue to prosecute the case, on instruction from the District Attorney's office in Nashville, because Mark Clayton continued to make calls to the District Attorney's office about other issues.

33. Mark Clayton is a politically active resident of the State of Tennessee, and such political activity has included runs for political office, as well as involvement in civil rights issues, both related to voting and otherwise, in different areas of the State of Tennessee.

34. As a result, on information and belief, the prosecution continued against Mark Clayton because of the District Attorney's disagreements with Mark Clayton politically or otherwise, regarding those issues in which he was involved as a civil rights activist, and were not in any way related to the alleged charges for which he was arrested on April 23, 2019.

35. The charges from April 23, 2019, were in fact finally dismissed on December 3, 2021 after Plaintiff filed a Motion To Dismiss, Motion To Disqualify the DA's office from prosecuting him and a Motion To Unseal The Indictment and the DA's office failed to respond to said motions.

36. During that period of his prosecution, Plaintiff had suffered damages to his reputation, to his insurance business, and to his standing in the Tennessee community. Such damages have continued to date.

## I CORRESPONDENCE BETWEEN PLAINTIFF AND METRO NASHVILLE

37. Most of the correspondence occurred between Plaintiff and members of Metro Nashville Water Services, herein MWS.

38. Councilwoman Brenda Haywood reached out to Metro Nashville to attempt to resolve Plaintiff's situation. On 5/5/2016, Randal Moore (MWS) sent the pictures of Plaintiff's driveway for investigation which were requested by Councilwoman Brenda Haywood to Felicia Page (MWS).

39. On 5/6/2016, John Honeysucker, supervisor for MWS, sent an email to Tom Palko, another supervisor for Metro Nashville, asking for someone to investigate Plaintiff's issue, due to Councilwoman Brenda Haywood's request.

40. On 5/6/2016, Tom Palko (MWS) sent an email to Ricky Smith (MWS) and Felicia Page asking to set Plaintiff's matter for investigation, as his home was "close to the creek in a valley section" and there was "not much room for the road, creek and home."

41. Councilwoman Brenda Haywood told Plaintiff he should talk to John Honeysucker, because Mr. Honeysucker could help resolve Plaintiff's issue.

42. On or about 6/29/2016, Plaintiff, Councilwoman Brenda Haywood, and John Honeysucker of Metro Nashville had dinner together so that Plaintiff could have an opportunity to discuss with Mr. Honeysucker the issues he was having with flooding and erosion at the Clayton Property.

43. On or about 6/29/2016, John Honeysucker sent Plaintiff his contact information.

44. On 7/11/2016 John Honeysucker sent Plaintiff a text message stating: "This is written notice asking you not to continue harassing me by way of calling my phone."

45. Plaintiff responded, stating: "I did not harass you. You will receive a cease and desist letter for multiple violations of the Tennessee Code. I have your text from June 29 with your information and have patiently waited over a month for you to contact me. Today you refused to hand over engineering reports and if you do not cease and desist from slandering me I will then sue you. I will also seek an indictment against you for official oppression."

46. On 7/11/2016, Rachel Nolan of Metro Legal sent an email to Felicia Page, subject "4948 Laws Rd." asking her to send "everything you have for this address."

47. On 7/19/2016, Felicia Page sent an email to Rachel Nolan confirming "It was delivered to the Legal Department at the Metro Courthouse".

48. On 1/9/2017, Kelly Biggs sent an email to "MWS Sw Rom Inquiries" stating that a customer "is being sued by neighbor over culvert" and he (the customer) "has questions about why it is not in compliance and how to fix the issue." The customer was identified as Mr. Dixon (neighbor of Plaintiff, whose property upstream from the Clayton Property and work performed on it by Metro Nashville led to the downstream damages at the Clayton Property as detailed herein above.)

49. On 4/14/2017, Rachel Nolan (Metro Legal) sent an email to Felicia Page asking about the status of the 2016 investigation of Laws Road

50. On 4/17/2017, Felicia Page responded to Rachel Nolan saying "This service request has been closed" without giving any explanation for the closure.

51. On 4/17/2017, Tom Palko sent an email to Rachel Nolan (Metro Legal) stating: "We did not investigate again in 2016," and further clarified, "The work we did upstream did not adversely affect his property. His driveway is his responsibility. We have closed out this request."

52. The email from Tom Palko on 4/17/2017 did not at all address the issue that Plaintiff raised in 2016 regarding the culvert Mr. Dixon put in downstream, despite the fact that Mr. Dixon inquired about that on 1/9/2017. (See earlier paragraph)

53. On 11/2/2017, Erin Williams (Mayor's Office), sent an email to Leoncio Dominguez (MWS) stating that Plaintiff had come by the office the previous day, posted a video. (That video was of the office visit, described more herein below) She stated that Plaintiff had alleged intimidation by the mayor's office regarding a drainage issue and she asked for an "update on his case."

54. On 11/2/2017, Leoncio Dominguez forwarded Erin Williams' email to Tom Palko and Ricky Swift and them to "provide Erin with any updates we may have on Mr. Clayton's request."

55. On 11/3/2017, Tom Palko sent an email to Erin Williams regarding the investigation into Plaintiff's complaint about his property being flooded. Mr. Palko only talked about the upstream issues from the culverts Metro Nashville put in for Plaintiff's neighbor and he totally ignored the issues brought before him regarding Plaintiff's neighbor downstream (the Dixons) having put in an unpermitted culvert that was damming the creek and causing the Clayton Property to flood.

56. On 11/7/2017, Tom Palko sent an email to Renee Jackson (MWS) subject "RE: 4956 Laws Rd." where he asked "Are they going back with essentially the same size or is larger? The guy downstream (Mark Clayton) thinks we are sending him more water. Water flows downhill and I want the water under the road and not over it."

57. On 11/8/2017, Tom Palko sent an email to Sonia Allman (MWS) subject "FW: Mark Clayton," stating: "This guy is very aggressive. The video shows what I am

referring to."

58. On 11/8/2017 Tom Palko sent an email to Erin Williams, subject "Mark Clayton", stating: "You may be hearing from him again. Sometime ago we replaced 2 driveway pipes above him." He added, "This may be the project he is referring to in his video." In the video, Plaintiff clearly talked about the neighbor downstream from him being allowed to dam up the water with an illegal culvert and not about the upstream issue.

59. On 11/9/2017, Tom Palko sent an email to Erin Williams and Billy Fields (MWS) subject "Mark Clayton - Laws Road" where he stated that Plaintiff "has made contact with our contractor" and that "We will have a police officer on site throughout the remainder of this project." He talked about "replacing a failed pipe" and "we are not adding any runoff to Mr. Clayton's property." Once again, Mr. Palko redirected attention from Plaintiff's real concern, his neighbor downstream being allowed to have an illegal culvert installed that was flooding the Clayton Property.

60. Plaintiff had only contacted the said contractor by phone to inquire why Metro Nashville seemed willing to deal with other issues on his road, but seemed unwilling to deal with the flooding problem caused by his neighbor's illegal culvert.

61. Metro Nashville did not respond to his concerns regarding the flooding problem caused by his neighbor's illegal culvert.

62. Instead, on 11/9/2017, Tom Palko sent an email to Walker Bloodworth (contractor) subject "FW: Mark Clayton - Laws Road" where he stated that they were "going to pay for the police officer for this project," and "we see it as a necessary part of this particular job."

63. On 11/9/2017, Christina Binkley (MWS) sent an email to Tom Palko stating that "Amanda [Deaton-Moyer] has been made aware of the situation" and she was going to "look up the SEU rates so that we can get an estimate." Amanda Deaton-Moyer was copied on that email.

64. On 11/9/2017, Tom Palko sent an email to Christina Binkley (Metro Nashville) subject "Mark Clayton - Laws Road" that stated "Thank you for making this easy. Amanda Deaton-Moyer was copied on this email.

65. On 11/9/2017, Christina Brinkley sent an email to Tom Palko, subject, "RE: Mark Clayton - Laws Road" stating that the "hourly rate was $74.50 or approximately $3,000 weekly." Amanda Deaton-Moyer was copied on this email.

66. On 11/9/2017, Tom Palko sent an email to Christina Binkley (MWS) subject "RE: Mark Clayton - Laws Road" stating he was "ok with increasing the existing PO" and "Hopefully we won't have this issue on future projects." Amanda Deaton-Moyer was copied on this email.

67. On 11/9/2017, Tom Palko sent an email to Renee Jackson, subject, "RE: Mark Clayton" stating that "Walker said they would pay for the police officer, but I think it is necessary and have no problem with us covering the cost."

68. On 11/9/2017, Roger Lindsey sent an email to Tom Palko, Kimberly Hayes, Rickey Swift, Renee Jackson, and Matthew Tays subject: "Video from Remnants of Harvey." the email identifies a video that Plaintiff took before the Davidson County Grand Jury on a direct presentment. Mr. Lindsey points out that Plaintiff's main issue is the "illegal' culvert downstream". This is the first time that Metro Nashville acknowledges Plaintiff's issue.

69. On 1/4/2018, Catina Jordan (MWS) sent an email to "MWS SW Rom Inquiries" subject "4956 Laws Rd." where she stated that a James Dotson had called to complain about a culvert that had eroded and collapsed.

70. On 1/23/2018, Rhonda Moore (MWS) sent an email to Renee Jackson that James Dotson had called again because no one had contacted him regarding his request, that he would call his attorney if the request was not resolved, and that he had contacted the Walker Group, a contractor for MWS. However, the similar threats of legal action did not appear to have resulted in the hiring of a police officer to deal with Mr. Dotson, as was done with Plaintiff.

71. On 02/02/2018, John Honeysucker sent an email to Steve Mishu (MWS), Charissa Mishu (MWS), Kimberly Hayes (MWS), Christian Thompson (MWS). In that email, he stated, "After consulting with Therea Contonis (Legal), Please advise that any and all inquiries from Mark Clayton be directed to legal Department immediately."

72. On 6/6/2018, Tom Palko sent an email to Erin Williams of the Mayor's office, John Honeysucker and Leoncio Domniguez subject "Mark Clayton." He stated, "We have investigated his property on more than one occasion and have closed out those requests. His issues are private property issues that we cannot address. He lives in a valley with a creek running through his property that floods during heavy rains. We can't fix that." This email, again, did not address the illegal construction at the Dixon property which Metro Nashville did have authority to address.

73. On 6/6/2018, Erin Williams sent an email to Tom Palko, John Honeysucker, and Leoncio Dominguez subject "RE: Mark Clayton" that stated: "Right. The conversation we had this week was focused primarily on the issue with his neighbor that you referenced in the email you attached. He believes that Mr.

Dixon altered the culvert in a way that has substantially increased flooding on his property, causing damaging to his driveway. Has that part of his complaint been addressed before? I haven't read through all of the old emails I have, but I don't see a response to that in the ones I've checked or in the one you attached."

74. In the above communication from the Mayor's office, Metro Nashville is reminded once again of the actual issue Plaintiff is raising which they refuse to address.

75. On 6/6/2018, Tom Palko sent an email to Erin Williams stating, "If he is talking about his neighbor downstream we did look at that and determined there was nothing for us to do. It was not a new construction."

76. However, Plaintiff, having at this point filed a lawsuit against the Dixons for this construction, submitted in that lawsuit a report from hydrological engineer John Dewall which asserted that the construction of the causeway would have caused the flooding. This is important to the present matter because it demonstrates, on information and belief, that Metro Nashville simply didn't want to address the concerns of Plaintiff.

77. Plaintiff had initiated communication with Metro Nashville in the hopes of resolving a flooding issue at his property that was not his cause, but which he could also not address without Metro Nashville's input because he did not want to violate the Tennessee Waterways Act. However, at no point did Metro Nashville, after almost two years of communication, ever address his concerns.

78. Instead, the DA's office sent 5 (five) police cars to arrest Plaintiff on April 23, 2019, on a charge of harassment against employees of Metro Nashville Water Services.

79. The DA's office also caused the Tennessee Bureau of Investigation (TBI) to put Plaintiff on the list to not be able to buy a gun.

80. Even before his dismissal, Plaintiff appealed the action by the TBI and had his constitutional 2nd amendment rights restored.

81. As described herein above, charges against Plaintiff were dismissed, only after much damage to Plaintiff's business, reputation and standing in his community. Metro Nashville never addressed his issues at the property, and the problem remains to date.

82. Plaintiff had multiple phone conversations with Defendant Kimberly Hayes, at least two which he recorded. (Exhibit [8] : Kimberly Hayes recording transcripts. ).

83. Prior to these conversations, Plaintiff had talked to Defendant Hayes regarding a construction done by the downstream property owner, Mr. Joseph Dixon, who did not follow any process before putting in a culvert on the same stream.

84. In two of the conversations Defendant Hayes made it clear that before a permit could even be applied for to do a crossing over a wet weather conveyance, a stream determination had to be done to make sure it was not, in fact a stream.

85. Defendant Hayes also made it clear that if Plaintiff put a culvert in without first getting a permit, he would be fined and forced to take the culvert out.

86. Defendant Hayes stated that if the wet weather conveyance was determined to be a stream, the construction would have to be a bridge.

87. However when Defendant Hayes realized she was talking to Plaintiff, and when Plaintiff asked if similarly situated downstream property owner, her stated policy changed.

88. Defendant Hayes refused to say if Mr. Dixon would be fined or have to remove his culvert and tried to change the subject to whether Plaintiff's property had ever actually flooded.

89. Worse, Defendant Hayes indicated that Plaintiff wouldn't even be able to tear down and rebuild his bridge in the same place.

90. Emails already referenced in Plaintiff's Second Amended Complaint shows that Tom Palko enforced a policy against treating Mr. Dixon the way Defendant Hayes told Plaintiff he would be treated, namely fining anyone who put in a culvert in that section of stream without doing a stream determination and applying for a permit.

91. Especially telling is when Defendant Palko claimed with regards to Mr. Dixon's culvert that there was "nothing they could do" because the Dixon's culvert was "not a new construction."

92. However, when the Dixon put their culvert in, it fell under the purview of the Metro Water Services permitting system, and Plaintiff contacted Metro Water Services about the Mr. Dixon's culvert the same year it was initially constructed.

93. Further, Defendant Kimberly Hayes made it clear in the recorded conversations that she is a "process owner" over "single family residential."

## II FACTS INVOLVING THE TENNESSEE REGISTRY OF ELECTION FINANCE MEETING

94. Councilman Jonathan Hall was Plaintiff's witness list in Plaintiff's criminal case and also in the civil case against his downstream neighbors.

95. Mr. Hall was fined an exorbitant amount for campaign finance mistakes.

96. Plaintiff, on information and belief, asserts that this was retaliation against Mr. Hall for being a named witness for Plaintiff as the fine was initially levied against Mr. Hall roughly two (2) weeks before Plaintiff's criminal case was scheduled to go to trial.

97. Plaintiff, on information and belief, is aware of other council persons who contacted Mr. Hall concerned that they would be hit with the fallout of the election commission going after Mr. Hall as they made similar mistakes but those concerns never materialized which is more evidence that Mr. Hall was singled out.

98. On May 18, 2022 Plaintiff attended a meeting with the Tennessee Election Registry Of Election Finance over an exorbitant fine filed against Councilman Jonathan Hall.

99. On May 17, 2022, the day before the meeting, Plaintiff made one phone call to the Tennessee Election Registry Of Election Finance to put them on notice that he would appear as a witness, adverse to the State, and also as an interested party.

100. Plaintiff informed the Registry that he believed Jonathan Hall was being unfairly targeted because he was on Plaintiff's witness list.

101. On May 17, 2022, Jonathan Hall had a missed call from Lauren Topping, general counsel counsel for the Tennessee Registry Of Election Finance, which he returned the same day. (Exhibit [1] : Affidavit of Jonathan Hall and phone screenshot )

102. During that phone call, Mr. Hall asked Ms. Topping if the meeting could be postponed due to a medical emergency with his son. (*id*)

103. Ms. Topping advised him that she could not make a determination herself about a continuance and advised him to send an email detailing the situation. (*id*)

104. Ms. Topping then asked Mr. Hall if he knew Plaintiff. (*id*)

105. Mr. Hall responded that he knew Plaintiff and that Plaintiff planned to come as a witness on Mr. Hall's behalf. (*id*)

106. Ms. Topping then stated that Plaintiff had called the office and stated his intent to appear as a witness. (*id*)

107. At no time in the conversation did Ms. Topping say anything about Plaintiff making any threats or saying anything else inappropriate. (*id*)

108. At the meeting Plaintiff was interrupted by Paige Dennis by her making a false assertion, in the form of a question, that Plaintiff made threats his call to the Tennessee Registry of Election Finance office.

109. Plaintiff made no threats against anyone in his call to the Tennessee Registry of Election Finance.

110. William Young told News Channel 5 that they had taken the "unusual step" of making sure a state trooper was present.

111. Tom Lawless ultimately directed the state trooper to have Plaintiff removed from the meeting.

112. At least two (2) Member's of the Nashville/Davidson District Attorney office were at the Tennessee Election Registry Of Election Finance meeting on May 18, 2022. During his testimony, Mark Clayton stated while pointing back to these two unknown individuals and stated that Jonathan Hall was on Mark Clayton's witness list and was a key witness. Mark Clayton also stated that the Nashville/Davidson District Attorney office is already disqualified from bringing

the trumped up election finance charges against Jonathan Hall as a means to intimidate a witness, which is a possible crime, to prejudice the case of State v. Clayton which the Nashville/Davidson District Attorney office lost anyway.

113. The two (2) Member's of the Nashville/Davidson District Attorney office, as officers of the court, knew or should have known that the acts of slander and false imprisonment taken against Plaintiff in the meeting were illegal and neglected to prevent the actions from being taken.

114. Nashville Fox Channel 5 attended the May 18, 2022 Tennessee Election Registry Of Election Finance meeting and videotaped the entire event.

115. Mr. Erick Schelzig who was in attendance wrote on his blog that the meeting participants discussed the ejection of Plaintiff for a significant period of time afterwards.

116. In addition to having stated the same during his testimony which News Channel 5 recorded, Plaintiff also contacted News Channel 5 immediately after the May 18, 2022 Tennessee Election Registry meeting and let them know that the allegations of having made any threats were false, but News Channel 5 that night both printed and televised repetition of the slander in multiple parts of the same story that Plaintiff was ejected from the meeting for making threats and made no qualifying statement.

## III FACTS SHOWING SENIOR POLICY MAKERS FOR PURPOSES OF METRO NASHVILLE 42 U.S.C. § 1983 LIABILITY UNDER MONELL

117. In 2012, Mark Clayton was a candidate for public office.

118. During 2012, Detective Michael Dixon visited Mark Clayton's home and falsely portrayed himself as part of a security detail for public figures like Clayton.

119. Detective Dixon claimed to be investigating an extortion attempt against another politician.

120. Despite his claims, Detective Dixon did not take any meaningful action to further his supposed investigation into the extortion ring.

121. During 2012, Mark Clayton reported to Detective Dixon about numerous crimes against him, including activities of an interstate fraud ring.

122. Mark Clayton claimed to be a victim of an oppressive metro government policy, designed to cause property damage by flooding, in an attempt to coerce him into repairing his bridge without a permit—a felony under TCA § 69-3-115.

123. Detective Dixon did not inform Mark Clayton about the identities of those who falsely accused him of making threats.

124. Detective Dixon's role, under the color of law, was allegedly to unlawfully spy on Mark Clayton without probable cause, to encourage criminal activity against him, and to complicate the permitting process of Title 69-3 under the orders of respective mayors.

125. In 2018, Detective Dixon's cover was blown.

126. Over four mayoral administrations, the mayors directly enforced policies against Mark Clayton and his property.

127. The mayors involved were Karl Dean, Megan Barry, David Briley, and John Cooper.

128. Vice Mayor Brenda Haywood had contact with Mark Clayton throughout the process, including arranging a formal lunch with Clayton and John Honeysucker to discuss the water issue.

129. The official policy from the mayor's office and metro legal included sending prayer, heart, and thumbs up emojis. (Exhibit [13] : Texts to and from Brenda Haywood )

130. A prayer emoji text dated December 14, 2021, represents this policy.

131. Additional texts from December 31, 2021, explicitly referenced a request for a permit.

## Causes Of Action

### I Malicious Prosecution - Lauren Hogan, Glenn Funk, Amy Hunter, Tom Palko, Kimberly Hayes, Hall Balthrop and Cyrus Toosi

132. The elements of malicious prosecution are "(1) a prior suit or judicial proceeding was instituted without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in plaintiff's favor." *Roberts v. Federal Exp. Corp.*, 842 SW 2d 246, 248 (Tenn 1992).

133. The Tennessee Supreme Court has held that "the existence of probable cause is a question (1) unrelated to a prosecutor's subjective belief, and (2) properly decided by a jury." *Id.*

134. Malice can be shown by "lack of probable cause" or "want of reasonable grounds for prosecution as the circumstances appeared to the prosecutor. . . or as they would have appeared to a person of ordinary circumspection and diligence." *Perry v. Sharber* , 803 S.W.2d 223, 225 (Tenn. Ct. App. 1990).

135. "Any improper motive is sufficient to constitute malice when malicious prosecution is charged." *Lawson v. Williamson*, 447 S.W.2d 369, 374 (Tenn. 1969).

136. Under Tennessee law "abandonment or withdrawal of an allegedly malicious prosecution is sufficient to establish a final and favorable termination so long as such abandonment or withdrawal was not accompanied by a compromise

or settlement, or accomplished in order to refile the action in another forum." *Christian v. Lapidus*, 833 S.W.2d 71, 74 (Tenn. 1992).

137. Plaintiff was arrested on April 23, 2019 on a charge of harassment against certain employees of Metro Water Services.

138. Plaintiff called John Drake, then acting only as his friend but currently his attorney, to help Plaintiff get to Plaintiff's own funds so he could bail himself out.

139. Prior to this arrest, the Metro Nashville Police Department investigated this issue and didn't find probable cause for an arrest. (Exhibit [9] : Police Report ).

140. The police report also found the police did not find any evidence of a threat by Plaintiff. Specifically the report stated the following:

> A SECURITY GUARD AT THE LOCATION. MR. JOBE STATED MR. CLAYTON (SUSPECT), A CUSTOMER, HAS BEEN LEAVING EMAILS AND VOICEMAILS OVER THE PAST FEW MONTHS. MR. JOBE PRESENTED OFFICERS WITH THE MULTIPLE EMAILS AND VOICEMAILS MR. CLAYTON HAD BEEN SENDING TO METRO WATER SERVICES. THE VOICEMAILS AND EMAILS MR. JOBE PRESENTED TO OFFICERS WERE IN REFERENCE TO A PROJECT STORMWATER COMPLETED NEAR MR. CLAYTON'S RESIDENCE. MR. CLAYTON WAS DISSATISFIED WITH THE SERVICE HE RECEIVED AND HAS BEEN IN CONSTANT CONTACT WITH METRO WATER SERVICES SINCE THE PROJECT WAS COMPLETED. IN THE VOICEMAILS MR. CLAYTON USED PROFANITY AND RAISED HIS VOICE BUT *NO THREATS WERE MADE*.

(Exhibit [9] : Police Report page 2. Emphasis added.)

141. Nevertheless, the District Attorney's Office, knowing it had no probable cause against Plaintiff, investigated the matter itself and took it to the grand jury for to get an indictment. (Exhibit [7] : Grand jury indictment )

142. The so called "true bill indictment" did not list any facts to support an indictment but merely a conclusory recitation of the statute. For example count 1 regarding Tom Palko stated the following:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that: MARK CLAYTON on the 6th day of September, 2018, in Davidson County, Tennessee and before the finding of this indictment, did communicate with Tom Palko without lawful purpose with the intent that the means of the communication annoy, offend, alarm or frighten Tom Palko, and by the action, did annoy, offend, alarm or frighten Tom Palko, in violation of Tennessee Code Annotated § 39-17-308, and against the peace and dignity of the State of Tennessee.

(Exhibit [7] : Grand jury indictment page 2).

143. Count 2 of the indictment had the same conclusory language with Hal Balthrop being the alleged victim. (Exhibit [7] : Grand jury indictment page 3).

144. Count 3 of the indictment had the same conclusory language with various unnamed "employees of Metro Water Services" named as the alleged victims. (Exhibit [7] : Grand jury indictment page 4).

145. The indictment subpoenaed Mose Jobe as a witness through is address, but it also subpoenaed Tom Palko and Hal Balthrop "C/O District Attorneys Office" showing the DA's office had been in communication with these parties during the investigatory phase. (Exhibit [7] : Grand jury indictment page 1).

146. The word "threat" was nowhere in the indictment. (Exhibit [7] : Grand jury indictment )

147. The indictment was signed by District Attorney Glenn Funk. (Exhibit [7] : Grand jury indictment page 4).

148. During the course his trial, Plaintiff retained attorney Byron Pugh to represent him.

149. Mr. Pugh had been an assistant DA for Metro Nashville/Davidson County prior to this.

150. Mr. Pugh initially did not want to do a formal bill of particulars and tried to rely on an email from Lauren Hogan, but was persuaded to file for a formal bill of particulars. (Exhibit [5] : Emails about Bill Of Particulars ).

151. The email Mr. Pugh received from Lauren Hogan said nothing about any "threat" being made. (Exhibit [5] : Emails about Bill Of Particulars ).

152. Mr. Pugh ultimately filed a formal motion for a Bill Of Particulars and Plaintiff received a bill of particulars signed by DA Lauren Hogan where she falsely claimed Plaintiff stated he was "coming after" Tom Palko and claimed, for the first time, that this was a "threat", when Plaintiff said no such words, and such words are not recorded on the voicemail referenced by Defendant Hogan. (Exhibit [3] : Bill Of Particulars ).

153. Tom Palko, Kimberly Hayes, Hall Balthrop and Cyrus Toosi appear in the Bill Of Particulars as complaining witnesses against Plaintiff.

154. Tom Palko libeled Plaintiff by sending internal emails to third parties claiming Plaintiff was "very aggressive" and insinuating that a police officer needed to be on hand to protect a contractor from Plaintiff.

155. On information and belief, Tom Palko's false and misleading statements about Plaintiff were brought into the DA's office's bogus pre-grand jury investigation of Plaintiff.

156. Plaintiff indicated to Mr. Pugh that he wanted to pretrial motion to dismiss. (Exhibit [6] : Emails about Motion To Dismiss in Criminal Case )

157. Mr. Pugh stated that he did not want to file such a motion and that he was only willing to file a Rule 29 motion to dismiss at trial. (Exhibit [6] : Emails about Motion To Dismiss in Criminal Case )

158. It was discovered that if a Rule 12 motion was not filed *before* trial, any defenses that could be raised, such as "defect in the institution of the prosecution" T.R.Cr.P. 12(A) or "a defect in the indictment, presentment, or information" would be waived. (Exhibit [6] : Emails about Motion To Dismiss in Criminal Case ); *Id.* F.

159. Despite it being brought to his attention that failure to do a Rule 12 motion to dismiss before trial would prejudice his client, Mr. Pugh *continued* to insist that wasn't the right course of action. (Exhibit [6] : Emails about Motion To Dismiss in Criminal Case ).

160. Mr. Pugh ultimately filed a motion to withdraw from representing Plaintiff in his criminal case claiming that some anonymous person at the Tennessee Board Of Professional Responsibility told him to do so.

161. If someone at the T.B.P.R. indeed told Mr. Pugh to withdraw from a criminal case simply because his client wanted him to zealously advocate for his behalf and not waive the defense that there was a defect in the initiation of the prosecution and/or a defect in the indictment, that is potentially a violation of the Plaintiff's constitutional right to an attorney under the Sixth Amendment.

162. Plaintiff subsequently hired attorney John Tennyson to represent him.

163. Attorney John Tennyson on behalf of Plaintiff filed 1) a motion to dismiss 2) a motion for pro tempore to have the Davidson County District Attorneys Office barred from prosecuting the case and 3) a motion to unseal the indictment. (Exhibit [10] : Pretrial motions in criminal case ).

164. In filing these motions, Plaintiff alleged fraud in procuring the indictment, alleged that the DAs office was pursuing the indictment and prosecution of Plaintiff with malice knowing the Plaintiff was not guilty, and did so with the improper purpose of chilling Plaintiff's First Amendment rights of free speech and to petition the government for redress of grievances.

165. In the Motion for Disclosure of Grand Jury Proceedings, Plaintiff argued count 1 was based on fraud by way of a false statement "based upon a particular quote Mr. Clayton made in a recording telephone conversation; however, Mr. Clayton did not utter the words falsely attributed to him by the State." (Exhibit [10] : Pretrial motions in criminal case pages 2-3).

166. In the Motion for Disclosure of Grand Jury Proceedings, Plaintiff argued count 2 of charging him with dissemination of what was a political meme was a violation of the First Amendment of the U.S. Constitution. (Exhibit [10] : Pretrial motions in criminal case page 3).

167. In the Motion for Disclosure of Grand Jury Proceedings, Plaintiff argued that for count 3, "the State cannot prove" and "the State cannot allege" that Plaintiff did had "no legal purpose in contacting the Water Department under such circumstance." (Exhibit [10] : Pretrial motions in criminal case page 3).

168. In the Motion for Disclosure of Grand Jury Proceedings, Plaintiff argued that "Pursuant to *Costello v. U.S.*, 380 U.S. 389 (1956), indictments must be substantially and rationally valid on their face. Here, the indictments against Mr.

Clayton are not substantially and rationally valid for the reasons stated above." (Exhibit [10] : Pretrial motions in criminal case page 3).

169. In the Motion for Appointment of Prosecutor Pro Tempore, Plaintiff alleged that he contacted DA Glenn Funk's office to urge him "to enforce criminal provisions against the Election Commission." (Exhibit [10] : Pretrial motions in criminal case page 7).

170. Plaintiff further alleged in the Pro Tempore motion that this complaint was for the Election Commission refusing to follow a court order to put a black democratic candidate back on the ballot. (Exhibit [10] : Pretrial motions in criminal case page 8).

171. Plaintiff alleged in the Pro Tempore motion that he began publishing letters and speaking out or radio criticizing Glen Funk for failure to enforce voting rights. (Exhibit [10] : Pretrial motions in criminal case pages 7-8).

172. Plaintiff alleged in the Prop Tempore motion that the indictment against him came "Less than a year after Mr. Clayton's first published letter to the elected district attorney general." (Exhibit [10] : Pretrial motions in criminal case page 8).

173. In the Motion To Dismiss the criminal complaint against Plaintiff, Plaintiff argued that the indictment must be dismissed because "communication done with a lawful purpose cannot be used to convict under Tenn. Code Ann. § 39-17-308(a)(2)." (Exhibit [10] : Pretrial motions in criminal case page 15).

174. In the Motion To Dismiss the criminal complaint, Plaintiff argued that "the application of the harassment statute against someone who is petitioning a government agency for redress of a legitimate grievance is a violation of the First

Amendment to the U.S. Constitution." (Exhibit [10] : Pretrial motions in criminal case page 20).

175. The state failed to respond to motion to dismiss, motion to disqualify the district attorney office, and motion to unseal the indictment proceedings for approximately three (3) months. Ultimately, Honorable Judge Monte Watkins dismissed *State v. Clayton*. (Exhibit [10] : Pretrial motions in criminal case page 1)

176. During one of the court hearing days, Lauren Hogan stated in front of John Tennyson that she did not want to even pursue the case against Plaintiff for so called harassment of Metro Water Services but did so because Plaintiff has called the DA's office on multiple occasions pressuring the DA's office take legal actions Plaintiff believed were in the public interest.

177. Defendant Hogan's statement that she didn't want to prosecute Plaintiff but was being pressured by her supervisors shows the DA's office did not truly believe Plaintiff was guilty of the crime they indicted him for.

178. On information and belief, the supervisors of Lauren Hogan at the time were Amy Hunter and Glenn Funk.

179. All Defendants knew or had reason to know that there was no probable cause for a criminal charge of harassment by the police report that declares Plaintiff made not threat against anyone based on the evidence and the fact that the police saw no reason to arrest Plaintiff based on the same evidence.

180. The fact that the "threat" claim was made up later based on attributing a word to Plaintiff that the actual evidence shows he did not say shows fraud in pursuing the indictment and prosecution of Plaintiff.

181. The DA's office cannot claim prosecutorial immunity for actions taken prior to convening the grand jury.

182. Metro Water Services employees cannot claim qualified immunity for pushing for the prosecution of Plaintiff after the police report showed there was not probable cause that Plaintiff committed a crime.

183. Plaintiff's allegations in his pretrial motions, which the DA's office Defendants failed to respond to, shows well pled allegations of improper purpose on the part of the DA's office Defendants in prosecuting Plaintiff.

184. Plaintiff ultimately won his criminal case against the State on the merits.

### II Defamation

185. The tort of defamation covers both libel and slander. *Brown v. Christian Brothers Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013).

186. "A libel action involves written defamation and a slander action involves spoken defamation." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 820 (Tenn. 1994).

187. "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Id.*

188. "To establish a prima facie case of defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Brown*, 428 S.W.3d at 50.

189. Publication means the communication of the defamatory matter to a third person. *Id.* To be actionable, the alleged defamatory statement must constitute a serious threat to the plaintiff's reputation. *Id.*


Case 3:22-cv-00936 Document 90 Filed 03/15/24 Page 29 of 49 PageID #: 907

190. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation. *Id.*

**A. Slander - Paige Burcham Dennis**

191. On May 18, 2022 Plaintiff attended a meeting with the Tennessee Election Registry Of Election Finance over an exorbitant fine filed against Councilman Jonathan Hall.

192. At that meeting, which was open to the public and was recorded by Fox 5 News, Paige Dennis in her individual capacity slandered Plaintiff by falsely insinuating that he had called making "threats."

193. The falsity of the "threats" assertion is shown by the fact that Lauren Topping, general counsel for the Tennessee Election Registry Of Election Finance, not mentioning any concerns when she spoke with Jonathan Hall about the phone call on the day it occurred.

194. Damages is shown by the fact that when one does a Google search on "Mark Clayton Jonathan Hall" the top current result as of January 1, 2023 "Trooper removes man who made threats from state meeting https://www.newschannel5.com." (See Exhibit 3 : Screenshot of Google search)

**B. Conspiracy To Commit Slander - Paige Burcham Dennis, William Young, Tom Lawless**

195. Conspiracy in their individual capacity between Tom Lawless, Paige Burcham Dennis, and William Young and possible others is shown by William Young's statement to News Channel 5 that the "took the unusual step" of making sure a state trooper was at the meeting.

196. William Young's statement shows a "meeting of the minds" between the parties before hand to treat Plaintiff as someone "threatening" based on nothing but

an innocuous and totally non-threatening phone call made by Plaintiff to the Election Registry on the day before.

197. The conspiracy to slander Plaintiff is also shown by the self congratulatory discussions the parties had after the meeting was over regarding actions they took against Plaintiff.

198. William Young's statement to the media was not part of his official duties and are thus not covered under any immunity.

199. The innocuous and non-threatening nature of the phone call is shown by the fact that the attorney for the Election Registry did not bring up any concerns about Plaintiff or the phone call he made when she talked to Jonathan Hall and asked about Plaintiff appearing as a witness on his behalf.

**C. False-Light Invasion of Privacy - William Young**

200. The elements of False-Light Invasion of Privacy are "(1) publicity, (2) that places the plaintiff in a false light, (3) that is "highly offensive to a reasonable person," and (4) that the defendant knew of or acted with reckless disregard to the "falsity of the publicized matter and the false light in which the other would be placed." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643-644 (Tenn.2001)..

201. Defendant William Young knew or had reason to know that there was no basis to the assertion by Defendant Dennis that Plaintiff had called the Election Registry Office the day before and made "threats."

202. Defendant Young knew, or should have known, that Plaintiff would defend himself against the false criminal allegation that Defendant Dennis was prepared to make that Plaintiff had called making "threats."

203. An accusation that someone was removed from a meeting for making threats is highly offensive to a reasonable person.

204. Defendants knew or had reason to know the accusation was false as their own general counsel never made mention of any threats when discussing the phone call with Jonathan Hall.

205. In his after meeting statement to News Channel Five, Defendant Young lent credence to Defendant Dennis' false accusation by saying they had taken the "unusual step" of making sure a state trooper was present. On information and belief that "unusual step" showed tacit agreement to slander Plaintiff and then be prepared for any possible reaction from him.

**D. Conspiracy For False-Light Invasion Of Privacy - Paige Burcham Dennis, William Young, Tom Lawless**

206. William Young's statement shows a "meeting of the minds" between the parties before hand to treat Plaintiff as someone "threatening" based on nothing but an innocuous and totally non-threatening phone call made by Plaintiff to the Election Registry on the day before.

207. The conspiracy to slander Plaintiff is also shown by the self congratulatory discussions the parties had after the meeting was over regarding actions they took against Plaintiff.

208. William Young's statement to the media was not part of his official duties and are thus not covered under any immunity.

**E. Libel and False Light - News Channel Five**

209. After Plaintiff was unlawfully ejected from the Election Registry meeting, he talked to the News Channel Five reporter in attendance and explained the entire background including the fact that he had just won a criminal case for harassment made by the DA's office who was in attendance at the meeting.

210. News Channel Five was also given a press release with Plaintiff's full side of the story.

211. Instead of writing a balanced account based on the facts, News Channel Five released a highly edited video where you their reporters talked over everything Plaintiff said except for when he responded to Defendant Dennis' false criminal allegation that he had called making "threats."

212. News Channel Five falsely stated in its reporting that Plaintiff alleged Paige Dennis made a criminal allegation when the recording itself shows that she actually made a criminal allegation as calling someone and making a threat fits under the criminal harassment statute.

213. News Channel Five published a website article of the story that had embedded tags in it that were intentionally designed under the Google Search Engine to show up on the front page for a search for "Mark Clayton" and "Jonathan Hall" and which would say "Trooper removes man who made threats from state meeting." (Exhibit [11] : Screenshot of Google search showing libel by News Channel Five )

214. Plaintiff's attorney sent News Channel Five a cease and desist letter as required by statute for at least 10 days before filing a defamation claim against a news organization. (Exhibit [4] : Cease and desist communication to News Channel Five )

215. Plaintiff incorporates by reference the paragraphs in his, Defamation and Libel causes of action.

216. News Channel Five, through its attorney, responded that it stood by its story because the title stated "Trooper removes angry man from meeting after *reportedly* making threats against the TN Registry."

217. Plaintiff's attorney explained to News Channel Five's attorney that if you look at the HTML tag codes you can see where News Channel Five published in its website search tags the phrase "Trooper removes man who made threats from state meeting."

218. The "<title>" tag of News Channel Five's story page says "Trooper removes man who made threats from state meeting" and the "<meta keywords>" tag says "jonathan hall ,mark clayton ,metro council ,registry of election finance ,tennessee state trooper" which shows News Channel Five acted intentionally to publish the false and libelous claim that Plaintiff was removed for *actually* making threats as opposed to *allegedly* making threats on the front page of Google when his name was searched in conjunction with Jonathan Hall. (Exhibit [12] : Screenshot showing News Channel Five defamatory HTML tags )

219. As of the filing of this Second Amended Complaint, News Channel Five still has the same libelous title tag and keyword tags in its website story designed to defame Plaintiff and put him in a false light.

### III False Imprisonment - Paige Burcham Dennis, William Young, Tom Lawless

220. The elements of false imprisonment and false arrest are "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Brown*, 428 S.W.3d at 54 quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn.1990).

221. According to the Tennessee statute, removal[1] also constitutes false imprisonment. *Id.* § 39-13-302

[1]"A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a)

222. "In order to constitute an unlawful imprisonment, where no force or violence is actually employed, the submission of the plaintiff must be to a reasonably apprehended force." *Newsom v. Thalhimer Bros., Inc* ., 901 S.W.2d 365, 367 (Tenn. 1994).

223. On May 18, 2022, Plaintiff attended a public election finance hearing where in support of Councilman Jonathan Hall who was also on Plaintiff's witness list in his criminal and civil case.

224. Prior to the meeting, Plaintiff made one phone call the Tennessee Election Registry Of Election Finance and informed her that he was coming to the meeting and explained to her his position that Mr. Hall was being unfairly targeted due to being on Plaintiff's witness list and that the fine being levied against Mr. Hall was out of line with actions taken or not taken against other campaigns with similar infractions.

225. Plaintiff has been made aware of off the record communications among councilmen who were not punished to the same extent that they were concerned that the punishment against Mr. Hall would spill over to them as well. Plaintiff intends to subpoena them for deposition to put those conversations on the record.

226. As Plaintiff began to speak, members of the committee began shouting over him and Paige Burcham Dennis falsely accused Plaintiff of having made threats.

227. As a result of this false accusation, Plaintiff was forcibly ejected from the meeting by a Tennessee State Trooper.

228. The submission of the Plaintiff was to the reasonably apprehended force by the state trooper.

229. The removal of the Plaintiff was involuntary.

230. The Plaintiff had the right to be at the meeting within the sole discretion of his liberty

231. The Plaintiff chose to be at the meeting and not to leave.

### IV Intentional Infliction Of Emotional Distress

232. Under Tennessee law "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 SW 2d 618, 622 (Tenn. 1997).

233. The conduct Plaintiff is complaining about was intentional and it is not tolerated by civilized society as shown by the fact that Tennessee has laws that criminalizes such conduct.

234. Dr. William Kenner, a licensed mental health professional, evaluated Plaintiff and interviewed some of his acquaintances from December 2020 through February 2021 and determined he had suffered "significant mental distress" related the arrest and prosecution resulting from actions Plaintiff took to resolve his water issues. (Exhibit [2] : Affidavit of William Kenner, M.D. )

#### A. Outrageous Conduct Shown By Official Oppression Through Malicious Prosecution

235. Tennessee's "official oppression statute" puts criminal liability on "a public servant under color of law" who "Intentionally subjects another to mistreatment or to arrest, detention, stop, frisk, halt, search, seizure, dispossession, assessment or lien when the public servant knows the conduct is unlawful." T.C.A. § 39-16-403(a)

236. Based on Lauren Hogan's own statement, Glenn Funk and Amy Hunter initiated a prosecution against Plaintiff for supposedly harassing employees of Metro Water

Services when they were in fact upset at Plaintiff for lawful communication with the District Attorney's Office. (See earlier paragraph)

237. The Bill Of Particulars filed by Lauren Hogan identifies Tom Palko, Kimberly Hayes, Hall Balthrop and Cyrus Toosi as being involved in the initiation of the prosecution of Plaintiff.

**B. Outrageous Conduct Shown By Official Oppression Through Denial Of Equal Protection And Due Process**

238. Tennessee's "official oppression statute" puts criminal liability on "a public servant under color of law" who "Intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity, when the public servant knows the conduct is unlawful."

239. Tennessee's "Bill Of Rights For Permit Applicants" requires, among other things, that 1) "the permitting process under this chapter should be a predictable, ordinary process for the benefit of the commissioner and permit applicants alike", 2) " the permitting process under this chapter should be susceptible to easy public review and scrutiny", 3) "permitting process under this chapter should afford applicants basic due process, including notice of application defects, timely review of applications, and prompt and meaningful administrative and judicial review of permitting decisions." *Id.* 69-3-141

240. The Tennessee Constitution guarantees "equal privileges and immunities for all those similarly situated." *Tennessee Small School Sys. v. McWherter*, 851 SW 2d 139, 152 (Tenn: Supreme Court 1993)

241. Due process under the U.S. Constitution also requires equal protection for similarly situated individuals. *Teague v. Lane*, 489 US 288, 300 (1989).

242. Kimberly Hayes showed contempt for Plaintiff's rights as a permit applicant under Tennessee Law when Plaintiff described to her a hypothetical construction of a causeway with culvert across the stream and she told him that "of course" that would need a permit, but when she realized that Plaintiff was talking about his neighbor's downstream causeway that was built without permit she reversed her position, thus violating Plaintiff's equal protection rights under the Tennessee and U.S. constitutions by treating him different from a similarly situated person.

### C. Outrageous Conduct Shown By Perjury

243. Tennessee's perjury statute includes "a false statement, not under oath, but on an official document required or authorized by law to be made under oath and stating on its face that a false statement is subject to the penalties of perjury." T.C.A. § 39-16-702.

244. Under the Tennessee Rules Of Criminal Procedure, "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." T.R.Cr.P. 7

245. Lauren Hogan in a Bill Of Particulars attributed to Plaintiff words he did not in fact say, the false statements were intentional and a Bill Of Particulars is an official statement signed by an attorney which is required to be true.

### V Violation Of 42 U.S.C. § 1983

246. Plaintiff incorporates by reference all paragraphs under the headings "Outrageous Conduct Shown By Official Oppression Through Malicious Prosecution", "Outrageous Conduct Shown By Official Oppression Through Denial Of Equal Protection" and "Outrageous Conduct Shown By Perjury."

247. The elements of 42 U.S.C. § 1983 are 1) a plaintiff has been denied a constitutional right and 2) that deprivation has happened under the color of law. *Adickes v. SH Kress &Co.*, 398 US 144, 188 (1970) By the statute, color of law means any "color of any statute, ordinance, regulation, custom, or usage." *Id.* at 213 The Supreme Court has held that custom only takes the force of law "by virtue of the persistent practices of state officials." *Id.* at 230.

248. Under *Monell*, "a public official may be held liable in damages when his actions are found to violate a constitutional right and there is no qualified immunity". *Monell v. New York City Dept. of Social Servs.*, 436 US 658, 707 (1978).

249. Municipalities generally cannot be held liable for action of employees but "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694

250. That same principal "also applies to a local government when implementation of its official policies or established customs inflicts the constitutional injury." *Id.* at 708.

251. An illegal policy or custom 42 U.S.C. § 1983 can be shown by "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F. 3d 462, 478 (6th Cir. 2013).

252. The following employees of Metro Nashville with final decision making authority ratified the constitutional violations against Plaintiff or failed to train and

supervisor to prevent them:

(a) Mayors Karl Dean, Megan Barry, David Briley, and John Cooper who directly supervised Detective Michael Dixon who investigated Plaintiff under false pretenses and later refused to inform Plaintiff who was falsely accusing him of making threats.

(b) Vice Mayor Brenda Haywood who responded to Plaintiff's plea for help to resolve his water issue and stop the malicious prosecution against him with "prayer emojis."

(c) MWS director Scott Potter who was copied on at least one email from the employees at MWS who had adopted an internal policy of not helping Plaintiff with his legitimate complaints but instead falsely accusing him of making threats.

(d) John Honeysucker, a supervisor at MWS who made a false allegation of Plaintiff threatening him and ultimately told multiple persons in the MWS department not to help Plaintiff but instead refer all Plaintiff's inquiries to Metro Legal.

(e) Kimberly Hayes who was over the single family dwelling section of permitting for MWS, had the power to levy fines and demand construction be removed, and made it clear that there was a different policy for Plaintiff than there was for the similarly situated downstream property owner.

253. "The text of the statute purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997).

254. "The coverage of the statute is thus broader than the preexisting common law of torts. We have nevertheless recognized that Congress intended the statute to

be construed in the light of common-law principles that were well settled at the time of its enactment." *Id.*

255. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law" counts as color of law. *United States v. Classic*, 313 US 299, 326 (1941).

256. On of the aims of 42 U.S.C. § 1983 "was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice" so that plaintiffs would have a remedy "against those who representing a State in some capacity were unable or unwilling to enforce a state law." *Monroe*, 365 US at 172, 174.

257. Malicious prosecution is an actionable claim under 42 U.S.C. § 1983. *Esmail v. Macrane*, 53 F. 3d 176 - Court of Appeals, 180 (7th Cir. 1995).

258. When using malicious prosecution for a 42 U.S.C. § 1983 claim, it's not enough to show lack of probable cause as for the malicious prosecution claim itself, but also to show there was a "spiteful effort" to "get" the plaintiff "for reasons wholly unrelated to any legitimate state action." *Id.*

259. For the purposes of 42 U.S.C. § 1983, there can be a "class of one" because "classifications should be scrutinized more carefully the smaller and more vulnerable the class is." *Id.*

260. Prosecutors have absolute immunity from suit under 42 U.S.C. § 1983 "when performing the traditional functions of an advocate." *Kalina*, 522 U.S. at 118.

261. However, prosecutors do not have absolute immunity when "acting as a complaining witness rather than a lawyer." *Id.* at 119.

262. The malicious prosecution of Plaintiff goes above and beyond mere absence of probable cause to "spiteful effort" to "get" Plaintiff "for reasons wholly unrelated to any legitimate state action" as shown by Lauren Hogan stating she didn't want to pursue the harassment case regarding Metro Water Services but did so from pressure by her superiors who didn't like him calling the DA's office.

263. Lauren Hogan does not have absolute immunity because she acted as a complaining witness when she put words in the mouth of Plaintiff saying he said he was "coming after" Tom Palko when those are not the words on the recording.

264. Actions taken by Kimberly Hayes, Tom Palko and others to thwart Plaintiff's ability to exercise his rights on the the Permit Applicant's Bill Of Rights constitutes a violation of his due process rights under 42 U.S.C. § 1983.

265. Prosecuting Plaintiff for protected political speech from the email "meme" that he sent to voicemails and calls that he made for the purpose of pressuring the Metro Water Services to actually do their job is a violation of Plaintiff's First Amendment rights of free speech and right to petition the government for redress and is therefore actionable under 42 U.S.C. § 1983.

266. Multiple city officials have shown a custom of abuse of the constitutional rights of Plaintiff shown through emails directing others not to talk to Plaintiff, through a prosecutor being directed to prosecute Plaintiff against her better judgment and through Kimberly Hayes reversing court on the requirement of a permit once she realized to whom she was talking.

267. Tom Lawless, William Young and Paige Dennis conspiring to have Plaintiff ejected from a public meeting based on a false accusation that Plaintiff made "threats" on a phone call the previous day is a violation of Plaintiff's First Amendment Right

under the U.S. Constitution to petition the government for grievances, speech and the right to attend meetings open to the public.

**VI Violation Of 42 U.S.C. § 1985 - Conspiracy to interfere with civil rights**

268. There is liability under 42 U.S.C § 1985(2) for the following:

> (2)Obstructing justice; intimidating party, witness, or juror If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

269. Plaintiff was an official witness at a judicial proceeding before the Tennessee Election Registry Of Election Finance on May 18, 2022 on behalf of Jonathan Hall.

270. Plaintiff informed the Tennessee Election Registry Of Election Finance via phone call the day before that he indented to testify that Jonathan Hall's exorbitant fine was retaliation for his being on Plaintiff's witness list for Plaintiff's criminal and civil cases.

271. Plaintiff was in the middle of testifying to this effect when Paige Dennis made the false insinuation that Plaintiff had called and made "threat" and when Tom Lawless caused a Tennessee State Trooper to forcibly remove Plaintiff in conspiracy with William Young who told News Channel 5 they had "taken the unusual step" of having a state trooper there for that purpose.

272. Tom Lawless, Paige Dennis and William Young used a false accusation plus threat and intimidation to prevent Plaintiff from testifying in violation of 42 U.S.C. § 1985.

273. On information and belief, this was a continuation by the same named defendants and/or other affiliated parties to intimidate Jonathan Hall as a witness in favor of Plaintiff which is also a violation of violation of 42 U.S.C. § 1985.

## VII Violation Of 42 U.S.C § 1986 Action for neglect to prevent

There is liability under 42 U.S.C. § 1986 for the following.

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number

> of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

274. The two members of the DAs office who witnessed the conspiracy to slander Plaintiff and to commit false imprisonment against Plaintiff by forcibly ejecting him from the May 18, 2022 meeting in order to keep Plaintiff from testifying are liable under 42 U.S.C. § 1986 and will be added to the complaint once Plaintiff determines their names through discovery.

**Prayers For Relief**

WHEREFORE Plaintiff prays for the following relief:

1. Service of process be executed upon all named defendants.

2. Economic and non-economic damages for intentional infliction of emotional distress, reckless infliction of emotional distress, humiliation, depression, anxiety, low quality of life, mental suffering, anguish of the mind, emotional anguish, trauma and apprehension, property and income loss, expenses for medical and psychological rehabilitation, suffering and physical pain and sickness, damage to property, loss of earning capacity and violations of civil rights which either may or may not be torts and actual damages related thereto.

3. Punitive damages.
4. Structural injunctive relief to all Defendants in their official capacity enjoining from further restricting Plaintiffs participation in civil society pursuant to his duties, rights, privileges, and immunities as described in this complaint.
5. Court courts and attorney's fees.
6. That the Plaintiff be awarded all compensatory, consequential, incidental, and punitive damages to which he is entitled in an amount not less than $75 million;
7. That the Plaintiff be awarded all costs and discretionary costs of trying this action;
8. That the Plaintiff be awarded his reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b);
9. That a jury of 12 be empaneled to try this cause;
10. That pre-judgment and post-judgment interest be awarded to the Plaintiff;
11. That permanent injunctive and declaratory relief issue, including but not limited to a declaration that Plaintiff has never harassed or threatened anyone related to this matter.
12. Enjoin all parties from all from further violations of Plaintiff's 2nd amendment rights.
13. That the Plaintiff be awarded any and all further relief to which it appears he is entitled.

Respectfully Submitted,

s/ John Drake

John Drake (BPR No. 03502)
(615) 810-6645
jmdrakelaw@gmail.com

## Exhibit List

### References


[1] *Affidavit of Jonathan Hall and phone screenshot*.

[2] *Affidavit of William Kenner, M.D.*

[3] *Bill Of Particulars*.

[4] *Cease and desist communication to News Channel Five*.

[5] *Emails about Bill Of Particulars*.

[6] *Emails about Motion To Dismiss in Criminal Case*.

[7] *Grand jury indictment*.

[8] *Kimberly Hayes recording transcripts.*

[9] *Police Report*.

[10] *Pretrial motions in criminal case*.

[11] *Screenshot of Google search showing libel by News Channel Five*.

[12] *Screenshot showing News Channel Five defamatory HTML tags*.

[13] *Texts to and from Brenda Haywood*.