# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARK CLAYTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00936** |
| | ) | **Judge Aleta A. Trauger** |
| **WILLIAM YOUNG, TOM LAWLESS,** | ) | |
| **and PAIGE DENNIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 139) filed by William Young, Tom Lawless, and Paige Burcham-Dennis[1]—the only three defendants remaining in this case—seeking summary judgment on the remaining claims against them. For the reasons set forth herein, the defendants' motion will be granted in part and denied in part.

## I.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In moving for or responding to a motion for summary judgment, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or

---

[1] Paige Burcham-Dennis is identified as Paige Dennis in the pleadings. The parties now refer to her as Paige Burcham-Dennis, so the court does as well.

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S.

at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence" that the nonmoving party is entitled to a verdict. *Id.*

## II.     PROCEDURAL HISTORY

Plaintiff Mark Clayton initiated this lawsuit in November 2022 (Doc. No. 1); he filed his First Amended Complaint ("FAC") (Doc. No. 5) as a matter of course shortly thereafter. The FAC asserted state and federal claims against three distinct sets of defendants: the Metro Defendants, the DA Defendants, and the Registry Defendants. In November 2023, the court issued a Memorandum and Order addressing three separate motions to dismiss by the three distinct sets of defendants and granted two of them in their entirety, dismissing all claims against the Metro Defendants and the DA Defendants. (Doc. Nos. 71 (Memorandum), 72 (Order).) The court granted in part and denied in part the Motion to Dismiss filed by Young, Lawless, and Burcham-Dennis, the Registry Defendants. Specifically, as noted in the Memorandum, the court dismissed the state law false imprisonment claim against defendants Burcham-Dennis and Young, the claims under 42 U.S.C. §§ 1985 and 1986 against all three of the Registry Defendants, and the official-capacity claims against all three defendants. The ruling left intact the plaintiff's First Amendment claims under 42 U.S.C. § 1983 and his state law claims for false imprisonment (against defendant Lawless only),[2] defamation, false light invasion of privacy, and conspiracy to engage in defamation and false light invasion of privacy. (*See generally* Doc. Nos. 71, 72.) The court also ruled on the

---

[2] As the defendants point out in their present motion papers, the Order erroneously stated that the false imprisonment claim against defendants Dennis and *Lawless* was dismissed. It should have stated that the claim was dismissed as to defendants Dennis and *Young*, while the false imprisonment claim against defendant Lawless was permitted to proceed. (*Compare* Doc. No. 71 at 43–45, 51 *with* Doc. No. 72 at 2.) The parties have not been confused by this error, and the court will formally make that clarification in the Order accompanying this Memorandum.

plaintiff's Motion for Leave to File a Second Amended Complaint, finding that the proposed amendment would not revive the claims against the Metro Defendants or the DA Defendants but that it would clarify the non-dismissed claims against the Registry Defendants. The court, therefore, granted the plaintiff's motion, with the caveat that the amended pleading should not be construed as reinstating the claims against the Metro Defendants or the DA Defendants. (Doc. No. 72 at 62–63.) The court subsequently granted the plaintiff's unopposed Motion for Leave to File Corrected Second Amended Complaint (*see* Doc. Nos. 88, 89), making the corrected Second Amended Complaint ("SAC") (Doc. No. 90) the operative pleading.

In May 2025, the court granted in part the plaintiff's Motion for Leave to File Third Amended Complaint. (Doc. Nos. 133, 134.) Specifically, the court rejected as untimely the plaintiff's request to add new defendants but granted him leave to amend his pleading to assert a new claim against the three Registry Defendants under the Tennessee Open Meetings Act, Tenn. Code Ann. §§ 8-44-101 *et seq.* The court's Order explicitly directed the plaintiff to "file a revised Third Amended Complaint by May 12, 2025, omitting reference to the new defendants," while also noting that "[o]mission of the proposed new defendants from the Third Amended Complaint will not be deemed a waiver of the plaintiff's ability to appeal the court's denial of his motion for leave to add the new defendants." (Doc. No. 134 at 1.) The plaintiff, however, never filed a Revised Third Amended Complaint, as a result of which the SAC (Doc. No. 90) remains the operative pleading.[3]

---

[3] In their Motion for Summary Judgment, the Registry Defendants note their understanding that the SAC is the operative pleading based on the plaintiff's failure to file the Third Amended Complaint. (*See* Doc. No. 139 at 1 n.1.) The plaintiff's response briefing does not dispute this understanding. However, in his recently filed—and untimely—Motion for Summary Judgment and supporting Memorandum, which the court has stricken, the plaintiff expressly seeks summary judgment on the Open Meetings Act claim. (Doc. Nos. 166, 167.)

In June 2025, the Registry Defendants filed their Motion for Summary Judgment, seeking judgment in their favor on all remaining claims asserted in the SAC. The motion is accompanied by a Memorandum of Law (Doc. No. 141), Statement of Undisputed Material Facts ("SUMF") (Doc. No. 140), and the evidentiary material cited in support of the defendants' factual statements. The plaintiff filed his Response in Opposition to the Motion for Summary Judgment (Doc. No. 147), Response to the SUMF (Doc. No. 147-1), and the unsigned, unsworn Affidavit of Mark Clayton (Doc. No. 147-2). Under a Notice of Filing that did not remotely identify the subject of the Notice or indicate that it had attachments, the plaintiff also filed an Amended Response to the defendants' SUMF (Doc. No. 148 at 4–14), along with several new exhibits apparently intended to call into question the veracity of the defendants' statements of fact or to bolster the plaintiff's position in the parties' ongoing discovery dispute. (*See* Doc. No. 148 at 15–21.) The defendants filed a Reply. (Doc. No. 149.) The court denied the plaintiff's Motion to Strike the Reply and alternative Motion for Leave to File Sur-Reply. (Doc. Nos. 156, 162.) The plaintiff later filed a Supplemental Affidavit, which he apparently had intended to file with his Amended Response to the SUMF. (Doc. No. 165; *see also* Doc. No. 148 at 1.)

## III.    FACTS

As set forth in the SAC, Tom Lawless and Paige Burcham-Dennis are members of the Tennessee Registry of Election Finance ("Registry"). (SAC ¶¶ 12–13.) In 2022, Burcham-Dennis was chair of the Registry. (Doc. No. 139-2, Young Aff. ¶ 7.) William ("Bill") Young is the Executive Director of the Bureau of Ethics and Campaign Finance Ethics Commission ("Bureau") and has held that position since 2019. (*Id.* ¶ 3.) The Bureau is "composed of both the Registry . . . and the Tennessee Ethics Commission." (Doc. No. 139-2, Topping Aff. ¶ 3.) The Registry is responsible for enforcing the Campaign Financial Disclosure Act, Tenn. Code Ann. § 2-10-101 *et*

*seq.*, the Campaign Contribution Limits Act, Tenn. Code Ann. § 2-10-301 *et seq.*, and the Gubernatorial Inauguration Finance Disclosure Act, Tenn. Code Ann. § 2-10-401.

At some point prior to May 18, 2022, the Registry had entered an order assessing civil penalties against former Nashville Metro Councilman Jonathan Hall. (*See* SAC ¶ 95; Young Aff. ¶ 5.) Hall's request for reconsideration of that Order was on the Agenda for the Registry meeting that took place on May 18, 2022. (Young Aff. ¶ 5.) Mark Clayton learned about Hall's matter before the Registry by "s[eeing] it in the news." (Doc. No. 139-1, Clayton Dep. 96.) Upon seeing this news, it was immediately "obvious" to Clayton that the Registry's case against Hall was in retaliation against Hall for his agreeing to help Clayton and to be a witness for Clayton in a criminal case against him by the Davidson County District Attorney's Office.[4] Hall never appeared as a witness for Clayton. (*Id.* at 96–97, 100, 102–03.)

Clayton called the Registry on May 17, 2022. (Topping Aff. ¶ 4; Clayton Dep. 122.) During the call, the plaintiff advised the person with whom he spoke that he intended to appear at the meeting the next day as a witness for Hall. (Clayton Dep. 123.) The primary purpose of his call was to find out about the procedures for testifying at a Registry meeting. (*Id.* at 124.) The plaintiff acknowledges that, during the call, he referred to Paige Burcham-Dennis as "Miss Piggy." (*See id.* at 126 ("I said: We don't know what her name is, but we call her Miss Piggy because she . . . says she's going to impose the maximum fine on Jonathan Hall, and she obviously knows about supersizing things.").) Clayton maintains that this was an appropriate comment because he has "a

---

[4] As set forth in the SAC, Clayton was charged with harassment in April 2019 in connection with communications between Clayton and employees of Metro Water Services. (SAC ¶ 19.) Clayton alleges that the charges were politically motivated by disagreements between Clayton and the Davidson County District Attorney's Office. (*Id.* ¶¶ 18–19, 32–34.)

First Amendment right to criticize government officials." (*Id.*) He also accused the Registry members of racism during the telephone call. (*Id.* at 133.)

According to the plaintiff, he was calm and composed throughout the call. (*Id.* at 132–33.) *see also* Doc. No. 147-2, Clayton unsigned Aff. ¶ 4.) Lauren Topping, General Counsel for the Bureau of Ethics and Campaign Finance, is the person who answered Clayton's call to the Registry. (Topping Aff. ¶ 4.) Topping did not know Mark Clayton and had never met him prior to the call. (*Id.*) According to Topping, after she informed Clayton that Hall would need to confirm to the Registry that he intended to present Clayton as a witness and that it would ultimately be up to the Registry members to determine whether Clayton's testimony would be allowed, Clayton "raised his voice and became increasingly agitated during the call, insisting that Mr. Hall be permitted to present witnesses and Mr. Clayton be permitted to speak." (*Id.* ¶¶ 5–6.) Topping attests that, in addition to referring to Paige Burcham-Dennis as "Miss Piggy," Clayton

> made other derogatory and sexist remarks about her. He also accused Registry members of being racist[5] and argued that the assessment of civil penalties against Mr. Hall was racially motivated. Mr. Clayton continued a tirade about Mr. Hall's matter and asserted [the] right to speak at the Registry meeting. He threatened to sue the Registry if he were not permitted to speak.

(*Id.* ¶ 6.) Clayton denies this statement, maintaining that he did not at any point during the call "threaten violence, threaten to sue, or make any other type of threat" and that he "remained calm and composed throughout the conversation." (Clayton unsigned Aff. ¶ 4.)

Regardless, Topper's assessment of the conversation was that it was "abrupt" and that "there was enough hot language directed at specific members of the Registry to raise concerns

---

[5] The basis for the plaintiff's racism charge is unclear. He testified that he called the members of the Registry racist "[i]n the context of voting rights . . . because they are part of removing people off the ballot." (Clayton Dep. 133.) From the court's view of the Video, the three defendants and the plaintiff all appear to be White, but nothing in the record affirmatively indicates the race of anyone involved in this case.

about safety at the meeting." (Topper Aff. ¶ 7.) She therefore reported the call to the Bureau's Executive Director, Bill Young. (*Id.*)

According to Young, Topping reported to him that the caller became "extremely agitated" during the call and "could not fully explain why he wished to appear on Mr. Hall's behalf." (Young Aff. ¶ 6.) Nothing in the record indicates that Topping repeated to Young Clayton's accusations of racism or his calling Burcham-Dennis "Miss Piggy." Regardless, Topping's comments about the caller's agitation caused Young to be concerned that he might disrupt the Registry meeting and "could perhaps threaten the safety of those attending the meeting," so, "out of an abundance of caution," he arranged for additional security from the Tennessee Highway Patrol for the meeting, and he informed Burcham-Dennis of the situation. (*Id.* ¶ 7.) Young did not know Clayton, had never spoken with him before he appeared at the meeting on May 18, 2022, and he did not recall talking to any other Registry members about Clayton or the situation prior to the meeting, aside from Burcham-Dennis. (*Id.* ¶ 8.)[6] The plaintiff testified that he did not know any of the defendants before the meeting, and they did not know him. (Clayton Dep. 186–87.)

The Registry met for its regularly scheduled meeting on the morning of May 18, 2022. (*See* Doc. No. 139-3 at 7, May 18, 2022 Meeting Minutes.) The meeting was open to the public and recorded via video and audio. (*See* Doc. No. 139-3 at 5, Public Notice of Meeting; *see also Meeting Video Part 1*, available at https://www.tn.gov/tref/calendar/2022/5/18/registry-of-election-finance-board-meeting.html (referred to hereinafter as "Video").). A reporter from Newschannel

---

[6] Young denied speaking with anyone other than Burcham-Dennis about Clayton's call and later clarified that he *did not recall* speaking with anyone else. (Young Aff. ¶ 8; Doc. No. 169-1, Young Dep. 16.) Lawless likewise does not remember speaking with Young about Clayton prior to the meeting. (Doc. No. 139-4, Lawless Answer to Pl.'s Interrog. No. 10.) However, Lawless made a comment during the May 18, 2022 meeting suggesting that Young had spoken with him about Clayton's telephone call at an Inn of Court meeting the evening before the meeting. (*See* Video 15:04–07.)

5 attended the meeting. (Young Aff. ¶ 12.) As set forth above, the meeting Agenda included reconsideration of the order assessing civil penalties against Councilman Jonathan Hall. (Doc. No. 139-3 at 5.) When Hall's case was called, Director Young asked if anyone wanted to speak on behalf of Hall, and, when Clayton apparently indicated from the audience that he wanted to speak, Young invited him to come forward. (Video 7:24–7:30.) Clayton approached the podium and began speaking, identifying himself only after being directed to do so. (*Id.* at 7:43.)

Immediately after Clayton introduced himself, the microphone began malfunctioning, and the Video does not capture anything he said from 7:43 through approximately 7:58, and then only somewhat sporadically from 7:58 until approximately 8:48, when a staff member or audience member moved a different microphone closer to Clayton, so that he could be heard somewhat better.[7] During the audible part of his speech, Clayton talked about his case in the Davidson County Criminal Court, his successful efforts to have the entire Davidson County District Attorney's Office disqualified from presenting the case against him, and the dismissal of the case. (*Id.* at 8:00–9:00; *see also* Clayton Dep. 149–50.)

After Clayton had been speaking for over a minute, defendant Lawless stated, "I'm sort of having a difficult time figuring out how . . . ," and Burcham-Dennis finished his sentence, "this matters to us, how this affects this case." (Video 9:03–09.) Lawless continued, "I really, with all due respect—," at which point Clayton interrupted him and started speaking over him. Lawless, obviously irritated at Clayton's cutting him off, stated loudly, "Mr. Clayton, be quiet please!" (*Id.* at 9:12.)

---

[7] The Registry members apparently could hear Clayton, and nothing in the record supports his allegation that the members intentionally silenced the microphone while he spoke. (*See* Clayton Dep. 138.)

At this juncture, the matter escalated quickly. Clayton questioned why he needed to be quiet, interrupting Lawless again. Burcham-Dennis then asked Clayton if he was the gentleman who called their office the day before. Clayton was evasive and did not immediately state that he had called the office. He then accused Burcham-Dennis of "interrupting a witness," adding (incorrectly) that "[a] judge can't even do that." (*Id.* at 9:26–29.) When Burcham-Dennis asked if he was the one "threatening our office yesterday," Clayton asked her what the "nature of the threat" was and then interrupted her again, stating, "Okay, so you don't know. You just made a criminal accusation against me—" (*Id.* at 9:30–37.)

At that point, fed up with Clayton's disrespectful and disruptive behavior, Lawless and Burcham-Dennis declared Clayton out of order and dismissed him from the meeting. They called the State Trooper providing security at the meeting to come forward. As the Trooper approached him, Clayton picked up his briefcase and walked out of the meeting room, stating, "I'll see you in court."[8] (*Id.* at 10:00.) The Trooper followed him from the room. According to Clayton, after they left and were beyond the meeting room camera, the Trooper "forcibly escorted [him] entirely out of the building" and told him that he was not to re-enter the building that day. (Doc. No. 165, Clayton Supp. Aff. ¶¶ 7–9.)

Following Clayton's removal, the Registry continued to discuss the matter for approximately ten minutes. During this discussion, Burcham-Dennis explained why they had decided to have a State Trooper present, noting that Director Young had told her that the Registry had received a phone call the day before, conveying "what [she] would consider threatening accusations and threatening context" from this unknown "gentleman," and they "felt that

---

[8] Although it cannot be heard on the Video, Clayton apparently called Lawless a name as he exited the meeting room that could not be repeated in a public meeting. (*See* Video 14:17–45.)

something might go wrong." (Video 10:33–11:03.) Topping explained that she was the person who had received Clayton's phone call, and she clarified that, although he did not make any direct threats of violence, he had made a lot of "inappropriate statements" of a "personal nature" and had used enough "hot language" to make her "concerned." (*Id.* at 13:51–14:05.) As discussed below, in the context of the plaintiff's defamation claim, Burcham-Dennis nonetheless repeated several times her contention that Clayton had "threatened" the Registry. (*See, e.g.*, Video 10:46–50, 13:40, 16:53.) The Registry ultimately voted to take no action on Hall's request for reconsideration on the grounds that his request was untimely. (See Doc. No. 139-3 at 9.)

Following the meeting, a Newschannel 5 reporter spoke with Young. (Young Aff. ¶ 12.) It is undisputed that the subsequent news report stated:

> Clayton also reportedly made "inappropriate statements" and used "hot language" that made the staffer who answered the call "concerned."
>
> Registry Executive Director Bill Young said that was why they had taken the unusual step of requesting a trooper attend the meeting.

*See* https://www.newschannel5.com/news/newschannel-5-investigates/trooper-removes-angry-man-from-meeting-after-reportedly-making-threats-against-the-tn-registry [https://perma.cc/GC88-DD99].

## IV.    DISCUSSION

The SAC asserts state law claims for defamation (in the form of slander) against Burcham-Dennis and conspiracy to commit defamation against each Registry Defendant; false light invasion of privacy against Young and conspiracy to commit false light invasion of privacy against each Registry Defendant; false imprisonment against Lawless; and a claim under 42 U.S.C. § 1983 against all three defendants for "conspiring to have Plaintiff ejected from a public meeting based on a false accusation that Plaintiff made 'threats' on a phone call the previous day," in violation of

his First Amendment rights. (SAC ¶¶ 191–99, 200–08, 220–31, 267.)[9] The Registry Defendants move for summary judgment on each of these claims. The defendants argue both that they are entitled to summary judgment on the merits of each claim and that they are entitled to either absolute or qualified immunity. The plaintiff disputes these arguments, but he also asserts that the defendants are not entitled to summary judgment because they have not fully cooperated with discovery.

As an initial matter, the court rejects the plaintiff's contention that summary judgment should be denied because the defendants have not cooperated with discovery. The plaintiff moved for, and was granted, an extension of the deadline to file a response to the defendants' summary judgment motion, specifically for the purpose of giving the parties time to resolve a discovery dispute and for the plaintiff to take the defendants' depositions. (*See* Doc. Nos. 145, 146.) The plaintiff filed his Response on the extended due date, August 8, 2025, without seeking a further extension and without asking the court to assist in the scheduling of the defendants' depositions prior to that date. Following a telephone conference with the undersigned on September 8, 2025, the court entered an Order that, among other things, directed the plaintiff to give the defendants three possible dates for taking the depositions of the three defendants and directed the parties to notify the court when the depositions had been scheduled. (Doc. No. 162.) The same Order directed any party who felt the need for additional briefing on the pending Motion for Summary Judgment to "file a motion for leave that details why additional briefing is necessary." (*Id.* at 1.)

The parties filed a timely Notice of Agreed Deposition Date, indicating that all three defendants' depositions had been scheduled for October 3, 2025. The plaintiff in fact filed all three

---

[9] The proposed Third Amended Complaint differs substantially from the SAC insofar as it adds a claim for conspiracy to engage in false imprisonment and a claim for violation of the Tennessee Open Meetings Act, Tenn. Code Ann. § 8-44-101. (Doc. No. 125-2 ¶ 239, 303–12.)

deposition transcripts in connection with his (untimely) Motion for Summary Judgment, indicating that the three defendants were, in fact, deposed on October 3, 2025. (*See* Doc. Nos. 169-1, 169-2, 169-3.) The plaintiff never, however, filed a declaration or affidavit establishing that he is unable "to present facts essential to justify [his] opposition," Fed. R. Civ. P. 56(d), nor has he filed a motion requesting additional briefing on the defendants' Motion for Summary Judgment. In sum, the plaintiff has not established that the defendants' purported failure to comply with discovery in any way prevented him from responding to the Motion for Summary Judgment.

The court, therefore, will proceed to address the defendants' substantive arguments.

## A.      First Amendment

The SAC asserts a claim under 42 U.S.C. § 1983, premised on allegations that the Registry Defendants conspired "to have Plaintiff ejected from a public meeting based on a false accusation that Plaintiff made 'threats' on a phone call the previous day," in violation of the plaintiff's "First Amendment Right . . . to petition the government for grievances, speech and the right to attend meetings open to the public." (SAC ¶ 267.) The defendants—and the court—construe the SAC as asserting a claim that the defendants violated the plaintiff's rights under the First Amendment and that they conspired to violate his First Amendment rights. The defendants argue that (1) they are entitled to absolute quasi-judicial immunity from the First Amendment claims; (2) alternatively, they are entitled to qualified immunity; and (3) in any event, the undisputed facts establish that they did not violate the plaintiff's rights under the First Amendment or conspire to violate those rights.

### *1.      Absolute Immunity*

The Registry Defendants claim that they are entitled to absolute immunity because they acted in a "quasi-judicial capacity during the relevant portions of the May 2022 meeting." (Doc. No. 141 at 13.) Judicial immunity from a § 1983 claim is governed by federal law. *Morgan v. Bd.*

*of Pro. Resp.*, 63 F.4th 510, 520 (6th Cir. 2023). "The burden of justifying absolute immunity rests on the official asserting the claim." *Cooperrider v. Woods*, 127 F.4th 1019, 1027 (6th Cir. 2025) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982)).

"Judicial immunity is a long-recognized common-law doctrine shielding judges from collateral attacks challenging a judge's actions taken in her official judicial capacity." *Morgan*, 63 F.4th at 518 (citing *Forrester v. White*, 484 U.S. 219, 225 (1988)). When it applies, judicial immunity is "absolute: all of a judge's actions taken in an official judicial capacity are immune from suit." *Id.* Moreover, in addition to covering judges acting in their judicial capacity, "[a]bsolute quasi-judicial immunity extends the doctrine to 'those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune.'" *Id.* (quoting *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994)); *see also Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 F. App'x 342, 347 (6th Cir. 2015) ("Quasi-judicial immunity 'attaches to public officials whose roles are functionally comparable to that of a judge.'" (quoting *Keystone Redev. Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011))).

The Sixth Circuit has directed courts considering whether state officials are entitled to quasi-judicial immunity to consider a number of factors, including "whether the officials' 'positions are akin to that of judges'"; "whether 'the potential for vexatious lawsuits is great'"; and "whether 'enough safeguards exist to protect [the complainant's] constitutional rights.'" *Cooperrider*, 127 F.4th at 1031–32 (quoting *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1422 (6th Cir. 1996)). Regardless, as with judicial immunity, quasi-judicial immunity does not extend to "all official acts"; rather, "quasi-judicial immunity only extends the same immunity a judge would enjoy to nonjudicial officials performing tasks intertwined with the judicial process." *Morgan*, 63

F.4th at 520. That is, "[b]ecause judges can commit official acts that are still considered nonjudicial in nature, so too can their agents commit acts that are nonjudicial." *Id.* Generally, courts must "look to the nature of the challenged act itself and whether the party bringing the § 1983 claim dealt with the state actor in her judicial capacity." *Id.*

Here, the Registry Defendants argue that, in assessing civil penalties against a political candidate or political campaign committee, they act in a quasi-judicial capacity, insofar as they hear testimony, receive evidence, and issue an order rendering a decision; these decisions are controversial, giving rise to a strong potential for vexatious lawsuits; and procedural safeguards protect complainants' rights, insofar as state law provides that any aggrieved party can seek judicial review of a final decision or a denied reconsideration in a contested case. (Doc. No. 141 at 14.)

Irrespective of whether the defendants may have acted in a quasi-judicial capacity in the course of assessing a civil penalty against Jonathan Hall, they have not shown that they acted in a quasi-judicial capacity vis-à-vis Mark Clayton at the Registry meeting on May 18, 2022. Clayton simply appeared as a concerned citizen at a public Registry meeting, for the purpose of voicing his support for Hall on Hall's request for reconsideration. The decisions to terminate Clayton's speaking time and then to eject him from the meeting are precisely the type of actions the Registry would or could be called upon to perform in the course of any Registry meeting. That is, the Registry Defendants took these actions in their capacity as members of the Registry performing the administrative task of conducting a regularly scheduled Registry meeting. Applying the Sixth Circuit's functional approach, which requires the court to look at "the nature of the function being performed rather than the identity of the actor performing it," *Cooperrider*, 127 F.4th at 1031, the court finds that, although the Registry Defendants' actions in ejecting Clayton were clearly *official*,

they were not clearly *judicial*. The defendants, moreover, have not pointed to any case in which quasi-judicial immunity was afforded in a context similar to that here, where the complainant is not the target of a quasi-judicial proceeding but simply an individual voicing support for that target during a public meeting. Clayton himself did not have the ability to appeal any Registry decision— either the decision regarding the civil penalty assessed against Hall or the decision to eject Clayton from the meeting. The court therefore finds that the Registry Defendants were not acting in a judicial capacity during the incident in question and are not entitled to absolute quasi-judicial immunity from suit arising from the actions at issue in this case.

### 2. Qualified Immunity

"Qualified immunity protects governmental officials from suit as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023) (quoting *Harlow*, 457 U.S. at 818). A qualified immunity analysis requires a two-pronged inquiry. "The first prong addresses whether the facts, 'when taken in the light most favorable to the party asserting the injury, show the [defendant's] conduct violated a constitutional right.'" *Id.* (quoting *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)). "The second prong asks whether the right was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id.* (quotation marks and citations omitted). The court may consider these prongs in either order. *Colson v. City of Alcoa*, 37 F.4th 1182, 1189 (6th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

### a) Plaintiff's § 1983 Conspiracy to Retaliate Claim

The defendants move for summary judgment on the plaintiff's claim that they *conspired* to violate the plaintiff's rights, in retaliation for his phone call. To prove a § 1983 conspiracy, a plaintiff must establish that (1) at least two people "agreed to a 'single plan' to deprive the plaintiff

of rights protected by § 1983"; (2) "each alleged coconspirator must have subjectively 'shared' the plan's illegal objective; and (3) "one of the coconspirators must have taken an 'overt act' to carry out the plan." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 887 (6th Cir. 2024) (citations omitted).

In this case, the plaintiff has no evidence, direct or circumstantial, to support his allegation that the defendants conspired ahead of time to deprive him of his constitutional rights. Even assuming that Young told Lawless as well as Burcham-Dennis about the plaintiff's telephone call, only rank speculation supports the plaintiff's belief that the defendants reached a plan ahead of the meeting to prevent him from speaking and to eject him from the meeting based on that call. On this basis alone, the defendants are entitled to summary judgment on the plaintiff's § 1983 conspiracy claim.

Moreover, the intracorporate conspiracy doctrine states that, if "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019) (quoting *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839–40 (6th Cir. 1994)). In *Jackson*, the Sixth Circuit expressly held that the "intracorporate conspiracy doctrine applies in § 1983 suits to bar conspiracy claims where two or more employees of the same entity are alleged to have been acting within the scope of their employment when they allegedly conspired together to deprive the plaintiff of his rights." *Id.* at 818. Here, the alleged members of the conspiracy were all members of the same state entity acting within the scope of their agency.[10] On this basis too, the conspiracy claim fails.

---

[10] The Sixth Circuit recognizes an exception to the intracorporate conspiracy doctrine when employees act outside the scope of their employment, but the plaintiff here does not allege facts supporting an inference that the defendants acted outside the scope of their agency as members of the Registry.

The defendants are entitled to summary judgment on the plaintiff's "conspiracy to retaliate" claim.

> b) *Whether the Defendants' Conduct Violated the Plaintiff's First Amendment Rights*

The defendants also argue that they did not violate the plaintiff's First Amendment rights. They characterize the Registry meeting as a limited public forum and assert that the defendant's dismissal from the meeting was because his statements were unrelated to the matter before the Registry, because he repeatedly interrupted the Registry members, and because, when asked about his phone call the previous day, he became agitated and "denounced the Chairwoman for making an allegedly criminal accusation against him." (Doc. No. 141 at 11.)

It is well established that the standards applied "to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). "The Supreme Court has recognized four types: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum." *McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024) (en banc) (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015)); *see also Brindley v. City of Memphis*, 934 F.3d 461, 467 (6th Cir. 2019). Content restrictions in the first two categories are subject to strict scrutiny review; content restrictions in the limited public forum and nonpublic forum survive so long as they are "reasonable in light of the purpose served by the forum and . . . viewpoint neutral." *Brindley*, 934 F.3d at 467 (citation omitted).[11]

---

[11] In *McDonough*, the Eleventh Circuit performed a deep dive into the development of the Supreme Court's jurisprudence regarding the characterization of the differing types of fora and the standard of review that applies to each. The court acknowledged its own inconsistent approach and endeavored to update the law of that circuit to conform to the Supreme Court's recognition of four distinct fora, as explained in *Good News Club*, *Walker v. Texas Division*, and other recent (and

A limited public forum is one that is limited to "certain groups or for the discussion of certain topics." *Walker*, 576 U.S. at 215 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The Registry meeting at issue here constitutes a limited public forum, meaning that the members of the Registry could, without violating the First Amendment, impose reasonable restrictions based on the content of the speech—limiting it to the topics up for discussion before the Registry—but not based upon viewpoint.

In addition, however, courts have "consistently rejected First Amendment claims against government officials who prevent individuals from further disturbing public meetings." *Davis v. Hennepin Cnty.*, No. CIV08-5320 JNE/AJB, 2010 WL 1507618, at *18 (D. Minn. Mar. 10, 2010) (citations omitted), *report and recommendation adopted as modified*, No. CIV08-5320JNE/AJB, 2010 WL 1507616 (D. Minn. Apr. 14, 2010), *aff'd*, 402 F. App'x 147 (8th Cir. 2010); *see also Dyer v. Atlanta Indep. Sch. Sys.*, 852 F. App'x 397, 402 (11th Cir. 2021) (finding that school board

---

not-so-recent) cases. The Supreme Court's rulings are, to say the least, confusing and often contradictory. *Compare, e.g.*, *Good News Club*, 533 U.S. at 106 (discussing the standard applied to a "limited public forum"), *with Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) ("Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums."). As a result, not surprisingly, the appellate courts' treatment of the issue has not been entirely consistent. The Sixth Circuit, for example, acknowledged that there are four types of fora in *Brindley* (citing *Miller v. City of Cincinnati*, 622 F.3d 524, 534–35 (6th Cir. 2010), which cites *Good News Club* and *Pleasant Grove v. Summum*, 555 U.S. 460 (2009)), and then walked it back to three in *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation*, 978 F.3d 481, 490, 491 (6th Cir. 2020), citing *Minnesota Voters Alliance* and characterizing the limited public form as simply another type of nonpublic form. In other cases, however, the Sixth Circuit has appeared to characterize the limited public forum as a particular subset of the designated public forum, while also recognizing that the level of scrutiny in the limited public forum is different from that typically applied in the designated public forum. *See, e.g.*, *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019) (referring to a school board meetings as a "'designated' and 'limited' public forum" (citing *Lowery v. Jefferson Cty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009)) but also recognizing that, in the "limited public forum, the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination" (citing *Rosenberger*, 515 U.S. at 829–30)).

policies "outlining how someone may speak at a community meeting, prohibiting disruption, and requiring decorum" were "content-neutral policies" that did not offend the First Amendment); *Eichenlaub v. Township of Ind.*, 385 F.3d 274, 281 (3d Cir. 2004) (holding that the removal of a citizen from a public meeting did not violate his First Amendment rights when the citizen became "repetitive and truculent" and "repeatedly interrupted the chairman"); *see also Collinson v. Gott*, 895 F.2d 994, 1000 (4th Cir. 1990) (Phillips, J., concurring in judgment) (observing that government officials conducting public meetings that qualify as limited public fora have the right to "set subject matter agendas, and to cut off speech which they reasonably perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner").

In this case, the defendants maintain that Clayton's dismissal from the meeting was based on his disruptive conduct and the fact that he was raising matters that were not related to the subject matter at hand. They contend that, because Clayton's expulsion was not related to his viewpoint and was a reasonable means of maintaining the order of the meeting, it did not violate the plaintiff's rights under the First Amendment.

The plaintiff responds that his intended remarks were "directly relevant to the issue before the Registry and fell squarely within the scope of public concern regarding racial equity in candidate treatment and prosecutorial abuse." (Doc. No. 147 at 9–10 (citing Clayton unsigned Aff. ¶ 5).) He claims that he was attempting to explain the nexus between the criminal case against him and the civil penalty assessed against Hall—"how Hall was being targeted in retaliation for his association with Plaintiff"—but the Registry members interrupted him and charged him baselessly with calling the Registry the previous day and "threatening" the office. (*Id.*)

It is clear that a Registry policy, even an *ad hoc* policy, of curtailing speech that is irrelevant to the subject matter at issue is viewpoint neutral. The Registry Defendants, up until the point that Lawless interrupted Clayton, had good reason to believe that Clayton's speech—which centered on the Davidson County District Attorney's prosecution of criminal charges against him—was irrelevant to the civil penalty assessed against Hall. Clayton may have believed that his testimony was relevant, but he did not explain the connection during the minute or more that he was permitted to speak.[12] Nor does it appear that he mentioned retaliation or racism. Lawless's interruption of Clayton to point out that he could not see the relevance between the criminal charges against him and the matter then before the Registry was viewpoint neutral, and the Registry had a reasonable basis for concluding that Clayton's irrelevant speech was disruptive in and of itself.

Moreover, given the Registry's heightened concerns for security in light of the "abrupt" telephone call, the members had reason to expect that Clayton, if he was in fact the person who had called the day before, might be disruptive. Notably, although Clayton maintains that he was calm and composed during the telephone call, Young and the Registry members had reason only to know what Topping told Young, which was that the caller was "agitated," used "hot language," and "could not fully explain why he wished to appear on Mr. Hall's behalf." (Topping Aff. ¶ 7; Young Aff. ¶ 6.)

In sum, Lawless and Burcham-Dennis's decision to expel the plaintiff from the May 18, 2022 meeting when he interrupted them repeatedly and responded disingenuously to the question of whether he had called the office the day before was "reasonable in light of the purpose served

---

[12] Clayton's insistence that the civil assessment against Hall was in retaliation for Hall's (admittedly extremely limited role) in the plaintiff's defense to the criminal charges against him appears to be based on nothing but rank speculation. The plaintiff has not presented a shred of competent evidence that links these events.

by the forum" and "viewpoint neutral." *Brindley*, 934 F.3d at 467. It did not, therefore, violate the plaintiff's constitutional rights.

In addition, it is undisputed that defendant Young is not a member of the Registry. Rather, he is Executive Director of the Bureau of Ethics and Campaign Finance Ethics Commission, and he attended the Registry meeting in that capacity. The Video of the meeting establishes that Young did not participate in the verbal exchange between Clayton and the other two defendants and did not personally play any part in the decision to eject Clayton from the meeting. "[I]t is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." *Hopper v. Phil Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (quoting *Stoudemire v. Mich. Dep't. of Corrs.*, 705 F.3d 560, 570 (6th Cir. 2013)). Because the undisputed evidence establishes that Young was not a member of the Registry and did not play any part in the Registry's actions in ejecting the plaintiff from the meeting, he is entitled to summary judgment on this claim for the separate reason that he did not participate in challenged decision to remove him from the Registry meeting.

Because the court finds that the defendants did not violate the plaintiff's rights, it does not reach the question of whether those rights were clearly established at the time. The defendants are entitled to summary judgment on the first prong of the qualified immunity analysis.

### B.     State Law Claims

#### 1.     State Law Immunity

The defendants assert that they are absolutely immune from suit under the Tennessee Claims Commission Act ("TCCA"), Tenn. Code Ann. § 9-8-307, and/or the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-201(b)(2). The court notes, as an initial matter, that the TGTLA "governs only claims against counties, municipalities, and other local governmental entities and does not apply to claims against the State." *Moreno v.*

*City of Clarksville*, 479 S.W.3d 795, 809 (Tenn. 2015) (quoting *Sneed v. City of Red Bank*, 459 S.W.3d 17, 24 (Tenn. 2014)); *see also Tenn. Dep't of Mental Health & Mental Retardation v. Hughes*, 531 S.W.2d 299, 300 (Tenn. 1975) (holding that the trial court erred in holding that "instrumentalities of the state government, as contrasted with local governmental entities, are subject to the terms and provisions of the [TGTLA]"). Because the defendants are agents of the state, rather than a municipality, the TGTLA does not apply.

The TCCA, on the other hand, does govern monetary claims against the state and state officials. It provides in relevant part that the Tennessee Claims Commission "has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of 'state employees'" for, among other categories of claims, "libel and/or slander where a state employee is determined to be acting within the scope of employment." Tenn. Code Ann. § 9-8-307(a)(1)(R). The Claims Commission does not have jurisdiction over "over any intentional torts." *Shell v. State*, 893 S.W.2d 416, 421 (Tenn. 1995).

While the Claims Commission has exclusive jurisdiction to hear claims against the *state* for which the state has waived sovereign immunity, it does not have exclusive jurisdiction over claims against state *officials* in their personal capacity. *See Prewitt v. Semmes-Murphey Clinic, P.C.*, No. W2006-00556-COA-R3-CV, 2007 WL 879565, at *6 (Tenn. Ct. App. Mar. 23, 2007) ("Tenn. Code Ann. § 9-8-307(h) does not extinguish a claimant's right of action but merely immunizes state employees from individual monetary liability." (citing *Shelburne v. Frontier Health*, 126 S.W.3d 838, 844-45 (Tenn. 2003))). Accordingly, individual state officials may be sued in state or federal court, but, under the TCCA, "[s]tate officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions

done for personal gain." *Id.* § 9-8-307(h). The Sixth Circuit recognizes that immunity under § 9-8-307(h) applies to state law claims filed in federal court as well as state court. *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1421 (6th Cir. 1996) (citing *Walker v. Norris*, 917 F.2d 1449, 1458 (6th Cir. 1990)). However, if the tort in question has willfulness or malice as an element, the state official is not immune. *Accord Haywood v. Moore*, No. 1:05-cv-276, 2006 WL 8442740, at *8 (E.D. Tenn. Sept. 8, 2006) (finding that the defendant was entitled to absolute immunity under § 9-8-307(h) from claims for negligence and negligence *per se*, but not from claims for malicious prosecution, abuse of process, intentional infliction of emotional distress, and defamation, as "each contain[s] an element of wilfulness or maliciousness," at least as alleged in the complaint).

### 2. Slander

Clayton's slander claim against Burcham-Dennis is premised upon her "falsely insinuating" that Clayton made "threats" to the office during his May 17, 2022 telephone call with Lauren Topping. (SAC ¶ 192.) Burcham-Dennis was not actually party to the telephone call, and her understanding of it came third-hand, through Young, who heard about it from Topping, who confirmed that the plaintiff did not make any direct threats. Clayton also asserts a conspiracy to commit slander among all three defendants.

### a) Claim Against Burcham-Dennis

Under Tennessee law, the tort of defamation encompasses both libel and slander, with libel being written defamation and slander involving spoken defamation. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994); *see also Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) ("Slander is 'the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood.'" (quoting *Little Stores v. Isenberg*, 172 S.W.2d 13, 16 (Tenn. Ct. App. 1943))).

To establish a *prima facie* case of defamation, whether slander or libel, the plaintiff must prove that "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571–72 (Tenn. 1999) (citing Restatement (Second) of Torts § 580 B (1977)). Under this standard, "[p]rivate individuals . . . need only show that allegedly false statements were made negligently to recover in a defamation action." *Charles v. McQueen*, 693 S.W.3d 262, 269 (Tenn. 2024). However, Tennessee courts have long held that the "Tennessee Constitution's protections for free speech and press," like their federal counterparts, "require an actual malice standard for defamation actions involving speech critical of public officials or public figures." *Id.* at 268–69.

For purposes of summary judgment, the defendants apparently concede both that Burcham-Dennis's statements that the plaintiff "threatened" the Registry office were false and defamatory, in the sense that the repeated assertions to that effect were injurious to the plaintiff's reputation,[13] and that it was published. They argue that they are nonetheless entitled to summary judgment because the plaintiff is either a public figure or a limited public figure (having "injected himself in a matter of public concern (Councilman Hall's election finance matter)"), as a result of which the plaintiff must establish that Burcham-Dennis's statement was made with actual malice. (Doc. No. 141 at 20 (citing *Hibdon v. Grabowski*, 194 S.W.3d 48, 58-59 (Tenn. Ct. App. 2005)).) The

---

[13] The heading of the section of the defendants' Memorandum addressing the defamation claim states that Burcham-Dennis's "question was not defamatory," but the body of the argument does not contain any argument regarding whether her question was injurious to the plaintiff's reputation and instead focuses on the question of malice. Regardless, the Video establishes that Burcham-Dennis repeatedly stated during the meeting, even after his departure, that the plaintiff had "threatened" the Registry.

Registry Defendants maintain that Clayton cannot establish actual malice on the part of Burcham-Dennis or show that she "entertained serious doubts as to the truth of her question." (*Id.* at 21.)

In response, the plaintiff denies that he qualifies as a public figure but nonetheless argues that "the record establishes actual malice by clear and convincing evidence." (Doc. No. 147 at 16.) He points to the following as proof of malice: (1) Lauren Topping confirmed during the May 18, 2022 meeting that Clayton had not made any "direct threats" during the May 17, 2022 telephone call, but, even after that, Burcham-Dennis repeated on the record that the plaintiff had "threatened" the Registry members and that his conduct during the meeting justified the decision to have security at the meeting; (2) Burcham-Dennis was not a party to the telephone call and heard about it from Young, who heard about it from Topping, but still publicly accused the plaintiff of threatening the Registry members without personal knowledge of the contents of the telephone call; (3) Burcham-Dennis "escalated the [f]alse [n]arrative" even after Clayton was ejected from the meeting, directing Young to create a file documenting the entire encounter while the incident was fresh on everyone's mind and claiming she felt uncomfortable from the moment Clayton—whom she did not know—walked into the room with his "bag pointed right at [her]"; (4) after Clayton's departure, the Registry members joked about Clayton's "get[ting] a bullet" if he showed up at Burcham-Dennis's house; and (5) Burcham-Dennis's post-hoc arguments that she "had no prior knowledge" and "could not be expected to know the truth" is belied by evidence that she was "told the truth and chose to ignore it." (Doc. No. 147 at 17–18.)

The plaintiff is somewhat stuck between a rock and a hard place with respect to this claim. On the one hand, if he is not a public figure, he only needs to prove negligence, but if he proves only that Burcham-Dennis was negligent, then she would be entitled to absolute immunity under Tenn. Code Ann. § 9-8-307(h), as discussed above. Proving malice, or intent, is much more

difficult, but doing so would permit the plaintiff to circumvent absolute immunity. Because the plaintiff argues only that he can prove actual malice, the court has no need to consider the question of whether he qualifies as a public figure or limited public figure as a matter of law (he likely does not) and will instead consider whether there is sufficient evidence of malice to allow this claim to proceed to a jury.[14]

Malice, for purposes of a defamation claim, means that the statements at issue were made with "knowledge" that they were "false and defaming" or "with reckless disregard for the truth of the statement." *Charles v. McQueen*, 693 S.W.3d 262, 280 (Tenn. 2024) (quoting *Sullivan*, 995 S.W.2d at 571). It does not require, in the defamation context, an actual desire to inflict harm. *Hill v. State*, No. M2022-01749-COA-R3-CV, 2025 SWL 1078617, at *6 (Tenn. Ct. App. Apr. 10, 2025). "Establishing actual malice is, nevertheless, 'a steep hill to climb.'" *Id.* (quoting *Charles*, 693 S.W.3d at 266). As the Tennessee Supreme Court has explained:

> The evidence must indicate that the defendant entertained serious doubts about the truth of her publication. A speaker's failure to thoroughly investigate a claim, without more, does not establish actual malice. But evidence the speaker purposefully avoided learning whether her allegations were true is evidence of actual malice. Actual malice can also be established by showing that the statement was so inherently improbable that only a reckless [individual] would have put [it] in circulation.
>
> Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. This is a demanding burden. The evidence must produce a firm belief or conviction in the fact finder's mind about the truth of the facts to be established.

*Charles*, 693 S.W.3d at 281–82 (internal quotation marks and citations omitted) (alterations in original).

---

[14] The plaintiff stated at the Registry meeting on May 18, 2022 that he is a public figure, apparently based on his having run for public office in 2012. (*See* SAC ¶ 117.) His briefing does not take that position.

In this case, there is no evidence before the court that Young told Burcham-Dennis that Clayton had threatened the Registry members when he called the office on May 17, 2022. The only evidence in the record is that Topping reported that he used "hot language" and was agitated and that Young related this information to Burcham-Dennis. In other words, this is not a situation in which Young is alleged to have exaggerated or incorrectly conveyed to Burcham-Dennis what Topping told him and that Burcham-Dennis was merely negligent in failing to verify with Topping prior to the meeting what exactly Clayton had said. She, instead, appears to have baselessly thrown out the suggestion that Clayton had threatened Registry members when he called. She doubled down on that suggestion when she characterized his speech before the Registry on May 18, 2022 as threatening, when the Video makes it clear that the only "threat" Clayton uttered was the threat to file a lawsuit. The Video establishes, in fact, that she repeated several times that Clayton had "threatened" the Registry, even after Topping clarified that he had not made a direct threat. (*See, e.g.*, Video 10:46–50, 13:40, 16:53.) The court finds that this evidence is sufficient to permit a jury to find by clear and convincing evidence that Burcham-Dennis was, at a minimum, reckless in repeatedly stating that Clayton had threatened the Registry office. She is not entitled to summary judgment on this claim.

b)      *Conspiracy to Commit Slander*

"An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (citing *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002).

As with his First Amendment claim, the plaintiff simply has no evidence to support the existence of a preexisting agreement to slander the plaintiff. Burcham-Dennis alone is the

individual who used the term "threaten," and there is no evidence that she had a preconceived intention ahead of the meeting to accuse the plaintiff of making threats, much less that she shared such an intent with anyone else. The plaintiff himself does not make any effort to defend his "conspiracy to defame" claim. The defendants are entitled to summary judgment as to this claim.

### 3. *False Light and False Light Conspiracy*

Tennessee recognizes false light invasion of privacy as a "distinct, actionable tort," though it "overlap[s] in some ways" with the tort of defamation. *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001). To prevail on his false light claim, Clayton must prove that

> (1) a party gave publicity to a matter in a way that placed him in a false light; (2) the false light in which [he] was placed would be highly offensive to a reasonable person; and (3) the party had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [he] would be placed.

*Charles*, 693 S.W.3d at 280 (internal quotation marks, citations, and brackets omitted).[15]

The facts alleged in the SAC in support of the false light claim against Young and the false light conspiracy claim against all three Registry Defendants are as follows:

> 201. Defendant William Young knew or had reason to know that there was no basis to the assertion by Defendant Dennis that Plaintiff had called the Election Registry Office the day before and made "threats."

> 202. Defendant Young knew, or should have known, that Plaintiff would defend himself against the false criminal allegation that Defendant Dennis was prepared to make that Plaintiff had called making "threats."

> 203. An accusation that someone was removed from a meeting for making threats is highly offensive to a reasonable person.

> 204. Defendants knew or had reason to know the accusation was false as their own general counsel never made mention of any threats when discussing the phone call with Jonathan Hall.

---

[15] A negligence standard applies unless the plaintiff is a public official or public figure or asserts a claim "about a matter of public concern." *West*, 53 S.W.3d at 647–48. Again, however, in this case, if the claim were premised only on negligence, the defendants would benefit from absolute immunity. The plaintiff maintains that he has proof of malice.

205. In his after meeting statement to News Channel Five, Defendant Young lent credence to Defendant Dennis' false accusation by saying they had taken the "unusual step" of making sure a state trooper was present. On information and belief that "unusual step" showed tacit agreement to slander Plaintiff and then be prepared for any possible reaction from him.

. . . .

206. William Young's statement shows a "meeting of the minds" between the parties before hand to treat Plaintiff as someone "threatening" based on nothing but an innocuous and totally non-threatening phone call made by Plaintiff to the Election Registry on the day before.

207. The conspiracy to slander Plaintiff is also shown by the self congratulatory discussions the parties had after the meeting was over regarding actions they took against Plaintiff.

(SAC ¶¶ 201–07.)

The Registry Defendants construe the false light claim against Young as based upon Young's statements to the reporter who attended the May 18, 2022 meeting. They argue that nothing in the news report attributed to Young places the plaintiff in a false light because Young's statement was not highly offensive, and they contend that the plaintiff cannot show that Young acted with malice. (Doc. No. 141 at 20–21.) The plaintiff responds that his false light theory is not limited to the language in the news report cited by the defendants—that Clayton "reportedly made 'inappropriate statements' and used 'hot language'"—and instead is based on the "totality of the public portrayal" of the plaintiff as a "dangerous, threatening individual who posed a risk to Registry staff, necessitating armed security and forcible removal." (Doc. No. 147 at 19.) He argues that "[t]his narrative was orchestrated and disseminated by William Young in coordination with Paige Dennis and Tom Lawless, despite internal confirmation that no threats of violence were made" and that Young's additional statement "that the Registry took the 'unusual step' of having a trooper present because of Plaintiff's call" was a "deliberate amplification of a false and inflammatory narrative." (*Id.* at 19–20.)

The initial problem with the plaintiff's argument is that it falls somewhat outside the scope of the allegations in the SAC. In addition, however, it is not supported by the record. As set forth above, the court finds that Burcham-Dennis is not entitled to summary judgment on the defamation claim against her, based on her repeated assertions during the meeting that the plaintiff had "threatened" the Registry. The only statements Young made during that part of the meeting that concerned Clayton, however, were to confirm that his office would "document this at the Registry's request," that he took "very seriously the safety of the staff," and, in response to a question by Lawless, that the Registry members' personal addresses were not online. ((Video 18:26–38, 18:46–51.) Otherwise, Young did not make any statements about Clayton during the meeting. And the only actions he took before the meeting were (1) to ask another staff member to secure security for the meeting, based on Topping's report regarding the tenor of her telephone call with Clayton; and (2) inform Burcham-Dennis (and perhaps Lawless) that he had done so and why.

Thus, the only possible basis for a false light claim against Young is the statements he made to the reporter following the meeting, since nothing he said during the meeting itself could be deemed to be objectively offensive or to have placed Clayton in a false light. The vast majority of the news article appears to be based on the reporter's own observations of the meeting; the only statement in the article attributed to Young is the one quoted in the SAC and referenced in the defendants' Memorandum: "Registry Executive Director Bill Young said . . . they had taken the unusual step of requesting a trooper attend the meeting" (SAC ¶ 206), because Clayton had "reportedly made 'inappropriate statements' and used 'hot language' that made the staffer who answered the call 'concerned.'" (Doc. No. 141 at 21–22 (quoting https://www.newschannel5.com/news/newschannel-5-investigates/trooper-removes-angry-man-

from-meeting-after-reportedly-making-threats-against-the-tn-registry [https://perma.cc/GC88-DD99]).)

This statement is simply not actionable. Ensuring the presence of security at a public meeting of a government body based on a disgruntled telephone call by a member of the public cannot, in this day and age, be deemed an unreasonable step. Moreover, Young's statement was not untrue, and nothing in the record remotely suggests that Young "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [Clayton] would be placed."

Young is entitled to summary judgment on the false light claim. Because a conspiracy claim under Tennessee law "requires an underlying predicate tort allegedly committed pursuant to the conspiracy" and "is not actionable where the underlying tort is not actionable," *Lane*, 334 S.W.3d at 763 (citation omitted), the other defendants are also entitled to summary judgment on the conspiracy claim. The court further notes that the plaintiff has not presented any evidence to support the existence of a conspiracy.

### 4. False Imprisonment

False imprisonment is "the intentional restraint or detention of another without just cause." *Brown v. SCOA Indus., Inc.*, 741 S.W.2d 916, 919 (Tenn. Ct. App. 1987) (citing *Little Stores v. Isenberg*, 172 S.W.2d 13, 16 (Tenn. Ct. App. 1943)). "The elements of the tort of false imprisonment are (1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Newsom v. Thalhimer Bros.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1994) (citing *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)). To establish "unlawfulness," the plaintiff must show that the defendant "acted without probable cause." *Brown*, 741 S.W.2d at 920. Moreover, although the court suggested otherwise in ruling on the Registry Defendants' Motion to Dismiss, a false imprisonment claim may be based upon either

"forc[ing] another to leave a place where they have a right to be" or "forcefully prevent[ing] another person from leaving a place the person has a right to leave." 35 C.J.S. False Imprisonment § 1 (Dec. 2025 update); *see also Little Stores*, 172 S.W.2d at 16 ("A person has the right of free locomotion, to go and come as they choose, so long as they do not trespass on the rights of others."). Actual force is not required, but in the absence of force or threats, "[t]he evidence must establish a restraint against the plaintiff's will, as where she yields to force, to the threat of force or to the assertion of authority." *Newsom*, 901 S.W.2d at 368 (citation omitted).

The court previously granted dismissal of the false imprisonment claim against defendants Burcham-Dennis and Young, as well as the conspiracy claim against them, because the plaintiff did not allege their involvement in the false imprisonment. Instead, the false imprisonment claim was supported only by the allegation that "Tom Lawless ultimately directed the state trooper to have Plaintiff removed from the meeting." (SAC ¶ 111.) Thus, the only false imprisonment claim technically remaining intact is the claim against Lawless. The defendants seek summary judgment on this claim on the basis that "Lawless' action calling for Plaintiff's removal was not unlawful. Rather, it was justified in the circumstances." (Doc. No. 141 at 23.) The defendants maintain that the removal was "justified" because the plaintiff's comments at the meeting were unrelated to Hall's request for reconsideration of the penalty assessed against him and, "[w]hen [Clayton] would not provide clarification, he interrupted Registry members [and] became increasingly agitated." (*Id.*) The plaintiff responds in relevant part that the defendants' assertion that the plaintiff "would not provide clarification" and "became increasingly agitated" is "a complete inversion of the truth" and "directly contradicted by the video." (Doc. No. 147 at 24.)

As set forth above, Lawless and Burcham-Dennis had a reasonable basis for believing that Clayton was substantially disrupting the meeting based on his irrelevant comments and his conduct

in response to the Registry's questioning the relevance of his comments and his telephone call the day before. Because the removal of the plaintiff from the meeting was justified, the false imprisonment claim against Lawless fails as a matter of law.

## V.      CONCLUSION

For the reasons set forth herein, the Registry Defendants' Motion for Summary Judgment (Doc. No. 139) will be granted in part and denied in part. The motion will be denied with respect to the slander claim against Burcham-Dennis but granted as to all other claims. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge